**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
Suite 1558
Los Angeles, CA 90024
Telephone:  (310) 405-7190
jpafiti@pomlaw.com

(*additional counsel on signature page*)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STEVEN DOHERTY, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| PIVOTAL SOFTWARE, INC., ROBERT MEE, and CYNTHIA GAYLOR, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Steven Doherty ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pivotal Software, Inc. ("Pivotal" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the

1

Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired (1) Pivotal common stock pursuant or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with Pivotal's April 2018 initial public offering (the "Offering" or "IPO"); and/or (2)  Pivotal securities between April 24, 2018 and June 4, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Pivotal was founded in 2013 and is headquartered in San Francisco, California. Pivotal, together with its subsidiaries, provides a cloud-native application platform and services in the United States.

3.     Pivotal's cloud-native platform, Pivotal Cloud Foundry ("PCF"), purportedly accelerates and streamlines software development by reducing the complexity of building, deploying, and operating cloud-native and modern applications.  The Company also purportedly enables its customers to accelerate their adoption of a modern software development process and their business success using its platform through its strategic services, Pivotal Labs ("Labs"). Pivotal markets and sells PCF and Labs through its sales force and ecosystem partners.

4.      In April 2018, Pivotal commenced the IPO, issuing over 42 million shares of Pivotal common stock to the investing public at $15.00 per share, all pursuant to the Registration Statement, raising more than $638 million in gross proceeds.

5.      On March 14, 2019, Pivotal issued a press release in which disclosed its financial outlook for fiscal year 2020 and told investors that the Company was in the "early stages of [a] high-growth market."  In particular, Pivotal touted a financial outlook for the full fiscal year 2020, of subscription revenue of $542 to $547 million and total revenue of $798 to $806 million

6.      In the Registration Statement and throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Pivotal was facing major problems with its sales execution and a complex technology landscape; (ii) the foregoing headwinds resulted in deferred sales, lengthening sales cycles, and diminished growth as its customers and the industry's sentiment shifted away from Pivotal's principal products because the Company's products were outdated, inadequate, and incompatible with the industry-standard platform; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.      On June 4, 2019, post-market, Pivotal reported its financial and operating results for the first quarter of fiscal year 2020, advising investors that "sales execution and a complex technology landscape impacted the quarter."  Wedbush Securities ("Wedbush") analyst Daniel Ives ("Ives") called the quarter a "train wreck" and characterized the Company's operating results as "disastrous," asserting that Pivotal's "management team does not have a handle on the underlying issues negatively impacting its sales cycles and the activity in the field which gives us concern that this quarter will be the start of some 'dark days ahead' for Pivotal (and its investors)."

8.      On this news, Pivotal's stock price fell $7.65 per share, or over 40%, to close at $10.89 per share on June 5, 2019, far below the IPO price of $15 per share.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

10.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pivotal is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Pivotal securities at artificially inflated prices pursuant or traceable to the Registration Statement and during the Class Period, and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Pivotal is a Delaware corporation with its principal executive offices located at 875 Howard Street, Fifth Floor, San Francisco, California.  Pivotal securities trade in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "PVTL".

16.     Defendant Robert Mee ("Mee") has served as Pivotal's Chief Executive Officer at all relevant times.

17.     Defendant Cynthia Gaylor ("Gaylor") has served as Pivotal's Chief Financial Officer at all relevant times.

18.     The Defendants Mee and Gaylor are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Pivotal's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Pivotal's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Pivotal, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

20.     Pivotal was founded in 2013 and is headquartered in San Francisco, California. Pivotal, together with its subsidiaries, provides a cloud-native application platform and services in the United States.

21.     Pivotal's cloud-native platform, PCF, purportedly accelerates and streamlines software development by reducing the complexity of building, deploying, and operating cloud-native and modern applications.   The Company also purportedly enables its customers to accelerate their adoption of a modern software development process and their business success using its platform through its strategic services, Labs.   Pivotal markets and sells PCF and Labs through its sales force and ecosystem partners.

22.     In April 2018, Pivotal commenced the IPO, issuing over 42 million shares of Pivotal common stock to the investing public at $15.00 per share, all pursuant to the Registration Statement, raising more than $638 million in gross proceeds.

23.     On March 14, 2019, Pivotal issued a press release in which it disclosed its financial outlook for fiscal year 2020 and told investors that the Company was in the "early stages of [a] high-growth market."   In particular, Pivotal touted a financial outlook for the full fiscal year 2020, of subscription revenue of $542 to $547 million and total revenue of $798 to $806 million

### **Defendants' Materially False and Misleading Statements**

24.     On December 15, 2017, Defendants filed with the SEC a confidential draft Registration Statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments, including comments from the SEC emphasizing the

6

importance of adequately disclosing material trends and risk factors, as required by Items 303 and 503 (defined below).

25.     On or about April 18, 2018, Defendants filed a final amendment to the Registration Statement, which registered over 37 million shares of Pivotal common stock for public sale.  The SEC declared the Registration Statement effective on April 19, 2018.  On or about April 20, 2018, Defendants filed the final prospectus for the IPO, which forms part of the Registration Statement. On April 24, 2018, the Company completed the IPO, which, upon the underwriters exercising their full overallotment option to purchase additional shares, issued a total of 42,550,000 shares priced to the public at $15.00 per share, generating over $638 million for Defendants.

26.     Defendants claimed in the Registration Statement that "[l]egacy IT [c]hallenges" at "many enterprises" was its  "[o]pportunity":

*Legacy IT Challenges: Our Opportunity*

Despite the availability of these cloud technology and agile process advancements, many enterprises remain deeply invested in legacy technology and process that differ significantly from cloud-native approaches to software development and operations. These enterprises are seeking to leverage private and public cloud technologies and to use cloud-native software to transform their businesses. They continue to deploy monolithic software built on custom silos of supporting infrastructure. When changes to software become necessary, many manual steps and serial reviews and approvals by different functional teams are required, which can often lead to instability and downtime. For a large enterprise with hundreds or thousands of applications and large numbers of disparate hardware components in multiple data centers, the operational challenges can be daunting as hundreds or thousands of people in operations may be required just to support a small number of developers and to keep existing applications running. This complexity can create ingrained processes and cultures that are resistant to change, given the level of investment in legacy infrastructure and inefficient IT operations, which constrain innovation and new software development initiatives.

In addition to these technology challenges, many enterprises implement legacy software development approaches such as the 'waterfall' process, in which software development proceeds in a strict sequence from conception to analysis, design, construction, testing, implementation and maintenance. By the time such software is ready to be released, requirements and business priorities often have changed. The waterfall process is ill-suited for software development and IT operations, where the code and user requirements are constantly changing.

27. The Registration Statement highlighted the Company's purported "leading cloud-native platform" as "[its] solution" to these legacy IT challenges, stating in relevant part:

> We provide a leading cloud-native platform that makes software development and IT operations a strategic advantage for our customers. PCF customers can accelerate their adoption of modern software development practices through Labs, our complementary strategic services. Our customers realize measurable improvement in developer productivity, software quality, security, time-to-market and IT operational efficiency. Our offering helps make developing and operating software a strategic advantage for our customers, empowering them to revolutionize their customer experiences, helping create new revenue streams and improving the speed and cost of business operations through software.

28. Defendants also touted the "[m]arket opportunities" purportedly available for Pivotal, stating that its "cloud-native software addresses IT spending across **the rapidly growing market** for public cloud workloads, sometimes referred to as Platform-as-a-service ('PaaS'), and the market for application infrastructure, middleware and development software." Indeed, the Registration Statement touted an estimated market of "over $50 billion" for its cloud-native platform.

29. On March 14, 2019, Pivotal issued a press release announcing its financial and operating results for the fourth quarter and full fiscal year 2019.

30. After touting its financial results, including subscription revenue growth of over 50% in 4Q19 and FY19, and total revenue growth of 27% year over year in 4Q19 and 29% year over year for FY19, Defendant Mee stated that the Company was in the "early stages of [a] high-growth market."

31. The March 14, 2019 press release also contained the Company's financial outlook for the first quarter of fiscal 2020 and the full fiscal year of 2020, stating:

> For the first quarter of fiscal 2020, Pivotal currently expects:
> - Subscription revenue of $124.5 to $125.5 million

- Total revenue of $183 to $185 million
- Non-GAAP loss from operations of $13.5 to $12.5 million
- Non-GAAP net loss per share of 6¢ to 5¢, assuming weighted average shares outstanding of approximately 267 million

For the full fiscal year 2020, Pivotal currently expects:

- Subscription revenue of $542 to $547 million
- Total revenue of $798 to $806 million
- Non-GAAP loss from operations of $38 to $36 million
- Non-GAAP net loss per share of 15¢ to 13¢, assuming weighted average shares outstanding of approximately 272 million.

32.    Later on March 14, 2019, the Company held a conference call with analysts to discuss its financial results for fiscal year 2019 and its guidance for fiscal year 2020. On that call Defendant Gaylor told analysts and investors that Pivotal "continue[s] to attract new customers and as many of [its] existing customers grow their investments with [Pivotal]."

33.    Discussing the Company's net expansion rate for Fiscal 2019, Defendant Gaylor stated that the Company "continued to see healthy expansion from existing customers." Notably, after touting the Company's "industry-leading" net expansion rate, Defendant Gaylor stated that Pivotal "expect[s] the percentage to come down ***gradually over time.***" (Emphasis added.)

34.    Moreover, Defendant Gaylor concluded her prepared remarks for the call by providing greater detail on the Company's 2020 guidance, stating in relevant part:

I would also like to share some assumptions that we have built into our guidance. I'm pleased to confirm that we will continue to be on track to reach breakeven profitability 8 to 10 quarters from the time we went public, which would be during the first half of our fiscal '21.

With regards to revenue, we expect mix to continue shifting towards subscription. We expect services revenue for the year to be relatively flat to last year as we enable existing customers to be self-sufficient, leverage our SI partners and as maintenance revenue associated with legacy products continues to decline and as we expect -- and we expect services gross margin to be in the low 20% range for the year.

***

> *In closing, we will continue to drive top line growth and operating leverage across the company. We are still in the early stages of executing against our long-term vision in this high-growth market, and I look forward to updating you on our progress throughout the year*.

(Emphasis added.)

35.     Following Defendant Gaylor's description of the Company's guidance, an analyst at Credit Suisse pressed her on the Company's projected growth and potential risks to achieving the projected figures, to which Defendant Gaylor responded that Pivotal's guidance was "reasonable":

> Kevin Ma, Credit Suisse:
>
> … [Y]ou mentioned guidance implies flat growth next year and deceleration from this year. How should we think about the upside/ downside risks from what you baked into your 2020 outlook? And what are the major variables that might cause it to be higher or lower?
>
> Defendant Gaylor:
>
> It's a great question. Thanks for the question. I would say, in general, our guidance is pretty consistent and each quarter reflects our expectations for this point in time in the year. *So we think it's reasonable*. Clearly, there is some upside and downside in the guidance, *but what we're putting out is what we think is reasonable for the year.*

(Emphases added.)

36.     Finally, Defendant Mee reiterated his statement in the March 14 press release, also parroted by Defendant Gaylor on the conference call, that Pivotal was "still in the early stages of this high-growth market." Defendant Mee further touted Pivotal's "***industry-leading net expansion rate*** of 149%" and added that "we expect to see continued growth in these very large accounts as they seek to modernize the applications that run their businesses." (Emphasis added.)

37.     Market analysts received the Company's Fiscal 2020 guidance and the Individual Defendants' statements favorably.   For example, on March 15, 2019, Morgan Stanley raised its price target for Pivotal shares from $24 to $26, citing the Company's much touted expansion

rates, billings, and revenue outlook pointing to "a large opportunity ahead."  Likewise, RBC Capital raised its price target from $25 to $27 and remained constructive on Pivotal's opportunity and valuation, noting billings and revenue growth plus the subscription outlook.  Also, on March 22, 2019, Wedbush analyst Ives was quoted as stating that Pivotal has "massive tailwinds" as businesses continue the shift towards cloud-based software systems, and concluded that Pivotal is on "a clear path to profitability over the next few years, which many investors are overlooking." Wedbush then placed a price target of $26 per share on Pivotal stock and rated it as an outperformer.

38.     On March 29, 2019, after the market closed, Pivotal issued its annual report on Form 10-K with the SEC for the fiscal year ended February 1, 2019 (the "2019 10-K").  The 2019 10-K touted the Company's strategic services, Labs, stating in relevant part:

> Labs software development experts deliver strategic services that transfer the expertise for enterprises to accelerate their cloud native transformation by implementing modern agile development practices. With Labs, we help customers co develop new applications and transform existing ones while accelerating software development, streamlining IT operations and ultimately driving self sustaining business transformation.

39.     Defendants further touted its services business in the 2019 10-K,  stating: "We expect that over time subscription revenue will continue to become a larger percentage of our total revenue as customers continue to adopt PCF and as our SI partner ecosystem ramps to deliver strategic services directly to our customers." In fact, one of the six "competitive strengths" the Company claims to have is its "***Leading cloud-native platform with strategic services***. Our cloud-native platform combines technology and agile development through our renowned Labs processes, enabling cloud-native transformation within enterprises." (Emphasis in original.)

40.     The 2019 10-K was signed by Defendant Mee and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants attesting to the accuracy

of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

41.    The statements referenced in ¶¶__-__ were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Pivotal was facing major problems with its sales execution and a complex technology landscape; (ii) the foregoing headwinds resulted in deferred sales, lengthening sales cycles, and diminished growth as its customers and the industry's sentiment shifted away from Pivotal's principal products because the Company's products were outdated, inadequate, and incompatible with the industry-standard platform; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

42.    In addition, the Registration Statement contained untrue statements of material facts and omitted to state material facts both required by governing regulations and necessary to make the statements made therein not misleading.  Foremost, the Registration Statement contained merely a boilerplate warning to the effect that its sales cycles "*can* be long, [and] unpredictable" (emphasis added), but failed to disclose that the Company was *already* experiencing deferred sales, lengthening sales cycles, and consequently diminished growth as customers and industry sentiment shifted away from Pivotal's principal, yet outdated, PAS offering because it was incompatible with the industry-standard Kubemetes platform.

43.    At the same time, Pivotal's alternate Kubemetes-compatible PKS offering was severely limited and could not be applied to the full scope of large enterprise customers' needs. This disjointed product mix—on the one hand, an outdated primary PAS offering, incompatible

with the industry standard; on the other, a limited secondary PKS add-on that, although compatible with the industry standard, could only handle a narrow subset of enterprise customer's needs—hamstrung the Pivotal sales force's ability to respond to customers who were demanding a versatile, Kubemetes-compatible platform.  It also rendered Pivotal's primary PAS offering increasingly obsolete, for Pivotal would be forced to reengineer its flagship PAS product from the ground up to be compatible with Kubemetes and thus competitive against large public cloud providers like Amazon, Microsoft, and Google.  These undisclosed negative events, trends, and uncertainties rendered false and misleading Pivotal's reported financial and operational statements incorporated in the Registration Statement.

44.    Defendants were required to disclose this material information in the Registration Statement for at least three independent reasons.  First, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires disclosure of any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to materially impact Pivotal's future operating results and prospects.  The undisclosed increasing competition, increasingly apparent obsolescence of its primary offerings, competitive disadvantages hampering its sales force, and consequently deferred sales, lengthening sales cycles, diminished growth, and other financial metrics, were likely to (and in fact did) materially and adversely affect Pivotal 's future results and prospects.

45.    Second, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk. The Registration Statement's discussion of risk factors did not even mention, much less adequately describe, the risk posed by the increasing competition, increasingly

apparent obsolescence of its primary offerings, competitive disadvantages hampering its sales force, and consequently deferred sales, lengthening sales cycles, diminished growth, and other financial metrics, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

46.     Third, Defendants' failure to disclose the then-increasing competition, increasingly apparent obsolescence of its primary offerings, competitive disadvantages hampering its sales force, and consequently deferred sales, lengthening sales cycles, diminished growth, and other financial metrics, much less the likely material effects these omissions would have on Pivotal 's share price, rendered false and misleading the Registration Statement's many references to known "risks" which "*if*" occurring "*may*" or "*could'* materially affect the Company. (Emphasis added.) These "risks" had already materialized at the time of the IPO.

**The Truth Begins to Emerge**

47.     On June 4, 2019, post-market, Pivotal issued a press release, reporting its financial and operating results for the first quarter of 2020.  Therein, Defendant Mee disclosed that "sales execution and a complex technology landscape impacted the quarter," which resulted in the Company revising its 2020 guidance, less than three months after it was first touted to the market. Specifically, the Company provided the following revised guidance:

For the second quarter of fiscal 2020, Pivotal currently expects:
- Subscription revenue of $131 to $133 million
- Total revenue of $185 to $189 million
- Non-GAAP loss from operations of $11 to $9 million
- Non-GAAP net loss per share of 4¢ to 3¢, assuming weighted average shares outstanding of approximately 274 million

For the full fiscal year 2020, Pivotal currently expects:
- Subscription revenue of $530 to $538 million
- Total revenue of $756 to $767 million
- Non-GAAP loss from operations of $49 to $44 million

14

- Non-GAAP net loss per share of 15¢ to 13¢, assuming weighted average shares outstanding of approximately 275 million

48. The Company held a conference call with analyst the following day on June 5, 2019. On that call, multiple analysts questioned Defendant Gaylor regarding the Company's lowered guidance:

Credit Suisse:

And just a follow-up for Cynthia. Hi, *Cynthia, just trying to reconcile the comments that you've made about slipped deals landing in 2Q. With your guidance for significant deceleration in deferred revenue and RPO, it would seem you're expecting the business gets worse.* How much of that is demand environment? How much is execution? And what's embedded in terms of close rates and duration in that guidance that you've given us on deferred's and RPO?

Defendant Gaylor:

I guess, in terms of the quarter itself we did have some deals that slipped in Q1 and as Rob said, the good news there is that we don't lose the deal. So they're very much still in play and a few of them have already closed in Q1 and we're expecting others to close in the coming quarters. Our sales cycle in places is elongating, I think partly due to a lot of the things that Rob talked about in terms of the complex tech landscape. And then from a sales execution perspective, I think you hit the nail on the head, these things tend to take time and we think we have kind of the right team and the right process in place to make it happen, but it takes time. And I think that's what you're seeing reflected in the balance sheet metrics, if you will.

\* \* \*

Citi:

*I want to observe that you took down your full year guidance for services by order of magnitude of $30 million to $35 million or so and that's been the primary portion of the drag on the guidance.* And so a mark-up question from that perspective, you sell expensive pieces of software that take a while to implement. What are you seeing as far as propensity of your customers to go on and procuring, obviously expensive pieces of software that may take a little bit -- a bit of time to implement? Are you seeing a positive spend or maybe people taking a bit of a pause in doing these kinds of expensive and long term duration implementations?

Defendant Gaylor:

Yes. So I think it's a good question, and I think you're spot on. You probably as you noted, we guide to subscription revenue and we guide to total revenue and the strategy around services is to sell the amount of services that customers need to

really enable them on the platform and it's really about enabling them. I think in Q1, specifically, ***the slipped deals that we saw did play into kind of the services revenue line and we would expect that to kind of continue as you look through the year. We just had a lower level of attach to software***. I think the other thing is, we are partnering with ATICE to kind of scale services outside of our four walls. I would say that probably less played into the quarter, but it is a careful balance as we operationalize it and scale. So I think that's a piece of the puzzle there as well.

Citi:

And just one follow-up; it seems like you've had a little bit of challenges as far as adding new customers in the previous quarters. And just from the perspective of timing, by you lowering this guidance, are you implying that you observed some lightness on expansion deals and not only on new customer acquisitions? What should we be reading with regards to your expectations for those two separate drivers of top line growth for 2020?

Defendant Gaylor:

So I think from a customer perspective, I mean, we're focused on continuing to grow our customer base. Rob talked a little bit about PKS and we have over 140 PKS customers. We're expecting that over time, there'll be more volume there both in dollars, but also in counts, as the go-to-market strategy -- as the go-to-market strategy there ramps. I think in terms of -- it's important for us to acquire new customers, and we're very focused on that motion. I think part of that plays into kind of some of the sales execution pieces and making sure we're building pipeline through both top of the funnel activity and enablement. And those are two key priorities for us in terms of continuing to build on the number of customers that we have.

(Emphases added.)

49.    Following the call, Wedbush analyst Ives called the quarter a "train wreck" and characterized the Company's operating results as "disastrous," asserting that Pivotal's "management team does not have a handle on the underlying issues negatively impacting its sales cycles and the activity in the field which gives us concern that this quarter will be the start of some 'dark days ahead' for Pivotal (and its investors)."

50.    On this news, Pivotal's stock price fell $7.65 per share, or over 40%, to close at $10.89 per share on June 5, 2019.

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Pivotal securities (1) pursuant or traceable to the Registration Statement issued in connection with the IPO; and/or (2)  during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pivotal securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pivotal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pivotal;

- whether the Individual Defendants caused Pivotal to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Pivotal securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

58.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Pivotal  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Pivotal securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

59.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

60.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Pivotal securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Pivotal securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

64.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Pivotal securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Pivotal's finances and business prospects.

65.     By virtue of their positions at Pivotal, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

66.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Pivotal, the Individual Defendants had knowledge of the details of Pivotal's internal affairs.

67.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Pivotal.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Pivotal's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Pivotal securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Pivotal's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise

acquired Pivotal securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

68.     During the Class Period, Pivotal securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Pivotal securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Pivotal securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Pivotal securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

69.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

**(VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)**

71.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, the Individual Defendants participated in the operation and management of Pivotal, and conducted and participated, directly and indirectly, in the conduct of Pivotal's business affairs.  Because of their senior positions, they knew the adverse non-public information about Pivotal's misstatement of income and expenses and false financial statements.

73.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Pivotal's financial condition and results of operations, and to correct promptly any public statements issued by Pivotal which had become materially false or misleading.

74.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Pivotal disseminated in the marketplace during the Class Period concerning Pivotal's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Pivotal to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Pivotal within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Pivotal securities.

75.     Each of the Individual Defendants, therefore, acted as a controlling person of Pivotal.  By reason of their senior management positions and/or being directors of Pivotal, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Pivotal to engage in the unlawful acts and conduct complained of herein.  Each of the

23

Individual Defendants exercised control over the general operations of Pivotal and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Pivotal.

## COUNT III

### (Violations of Section 11 of the Securities Act Against All Defendants)

77.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

78.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

79.     This Cause of Action does not sound in fraud.  Plaintiff does not allege that Defendants had scienter or fraudulent intent, which are not elements of the Section 11 claim.

80.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

81.     Defendant Pivotal Energy is the registrant and issuer of the stock sold in the Offering.  As issuer of the stock, the Company is strictly liable to plaintiff and the Class for the misstatements and omissions in the Registration Statement.

82.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

83.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

84.     By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

85.     Plaintiff acquired Pivotal shares pursuant to the Registration Statement.

86.     Plaintiff and the Class have sustained damages.  The value of Pivotal common stock has declined substantially subsequent and due to Defendants' violations.

87.     At the time of their purchases of Pivotal stock, plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint.  Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff filed this Complaint.

88.     By virtue of the foregoing, plaintiff and the other members of the Class are entitled to damages under Section 11 of the Securities Act from all of the Defendants, and each of them, jointly and severally.

## COUNT IV

### (Violations of Section 15 of the Securities Act Against The Individual Defendants)

89.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

90.     This Count is brought pursuant to Section 15 of the Securities Act against Defendant Pivotal and the Individual Defendants.

91.     The Individual Defendants were controlling persons of Pivotal by virtue of their positions as directors or senior officers of Pivotal.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major stockholders of Pivotal.  The Individual Defendants controlled the Company and all of Pivotal's employees.

92.     Defendant Pivotal and the Individual Defendants were each a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed, or authorized the signing of, the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

93.     By reason of such wrongful conduct, Defendant Pivotal and the Individual Defendants are liable pursuant to Section 15 of the Securities Act.  As a direct and proximate result of said wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Pivotal stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 20, 2019                    Respectfully submitted,

                                          **POMERANTZ LLP**

                                          */s/ Jennifer Pafiti*
                                          Jennifer Pafiti (SBN 282790)
                                          1100 Glendon Avenue
                                          Suite 1558
                                          Los Angeles, CA 90024
                                          Telephone: (310) 405-7190
                                          E-mail: jpafiti@pomlaw.com

                                          **POMERANTZ LLP**
                                          Jeremy A. Lieberman
                                          J. Alexander Hood II
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Telephone:  (212) 661-1100
                                          Facsimile:  (212) 661-8665
                                          Email:  jalieberman@pomlaw.com
                                                     ahood@pomlaw.com

                                          **POMERANTZ LLP**
                                          Patrick V. Dahlstrom
                                          10 South La Salle Street, Suite 3505
                                          Chicago, Illinois 60603
                                          Telephone:  (312) 377-1181
                                          Facsimile:  (312) 377-1184
                                          Email:  pdahlstrom@pomlaw.com

                                          *Counsel for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28