**Pages 1 - 21**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | |
|---|---|
| STEVEN DOHERTY, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> VS. <br><br> PIVOTAL SOFTWARE, INC., ROBERT MEE, and CYNTHIA GAYLOR, <br><br> Defendants. | **NO. C 19-03589 CRB** |

San Francisco, California
Friday, October 11, 2019

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

For Steven Doherty and Tech Trader Fund LP:

> POMERANTZ, LLP
> 600 Third Avenue, 20th Floor
> New York, New York  10016
> **BY:  J. ALEXANDER HOOD, ESQ.**

For Oklahoma City Employee Retirement System and Police
Retirement System of St. Louis:

> LABATON SUCHAROW LLP
> 140 Broadway
> New York, New York  10005
> **BY:  FRANCIS P. McCONVILLE, ESQ.**
> **ALEC T. COQUIN, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
         Official Reporter, CSR No. 7445

**APPEARANCES**:   (CONTINUED)


For Defendants:

DAVIS, POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California  94025
BY:  **NEAL A. POTISCHMAN, ESQ.**
**ANDREW D. YAPHE, ESQ.**

**Friday - October 11, 2019**                          **10:01 a.m.**

## P R O C E E D I N G S

### ---o0o---

(Call to Order of the Court.)

**THE CLERK:**  Calling Civil Action C 19-3589, Doherty versus Pivotal Software, Inc.

Counsel, please step forward and state your appearances for the record.

**MR. McCONVILLE:**  Good morning, Your Honor.  Francis P. McConville from Labaton Sucharow.  I'm here on behalf of the Oklahoma City Employee Retirement System and Police Retirement System of St. Louis.  And with me is my colleague Alec Coquin, who I believe just submitted a pro hac vice.

**THE COURT:**  Good morning.

**MR. COQUIN:**  Good morning, Your Honor.

**MR. HOOD:**  Good morning, Your Honor.  Alexander Hood of Pomerantz LLP, here on behalf of lead plaintiff movant Steven Doherty and Tech Trader Fund LP.

**THE COURT:**  Good morning.

**MR. POTISCHMAN:**  Good morning, Your Honor.  Neal Potischman from Davis Polk on behalf of the defendants.  With me is my colleague Andrew Yaphe.

**THE COURT:**  Good morning.

So you have nothing to say, right, in this?

**MR. POTISCHMAN:**  We take no position on the

appointment of lead plaintiff or lead counsel.  We do have one comment with respect to one of the proposed orders that was submitted, but that's it, Your Honor.

THE COURT:  Okay.  All right.  So let's get to the -- there are motions to consolidate.  There's no reason why I shouldn't grant that, is there?  Is there?

MR. McCONVILLE:  No, Your Honor.

Again, Francis P. McConville from Labaton Sucharow.

I don't believe anyone in the courtroom has an objection to --

THE COURT:  Yeah, I don't think anybody has an objection.  Okay.  So that's granted.  All right.  So now they're consolidated.

Now let's go to the motion to appoint lead plaintiffs.  As I understand it -- let's see.  We're going to refer to -- we have the group, and then we have the -- what are they?  What do we call them?  Sorry.

MR. McCONVILLE:  The two institutional investors, Your Honor?

THE COURT:  Yeah.  We have -- yeah.  I'm just trying to figure out.  The Pivotal investor group, that's the group; and the other is, collectively, Oklahoma.

MR. McCONVILLE:  Oklahoma City and St. Louis.  I just call them --

THE COURT:  Okay.  So we have the group and we have

Oklahoma.

MR. McCONVILLE:  Fair enough.

THE COURT:  Right?

Okay.  And reviewing the submissions, the group maintains that they have about twice the level of losses -- if that's the appropriate measure -- than Oklahoma.

MR. HOOD:  That's correct, Your Honor.  And the parties have not disputed that monetary loss is the appropriate metric.

THE COURT:  And even if you take Oklahoma's view that the group should not be a group in terms of the statement of loss, they still would have the lead loser.

MR. HOOD:  That's correct, Your Honor.  Not only would the group have the lead loser, so to speak; but that loser would have, I believe, greater losses than Oklahoma City group in the aggregate.

THE COURT:  And so their response to that is:  Well, the plaintiff is not really -- while that may or may not be the case --

MR. McCONVILLE:  We don't dispute the losses, Your Honor.

THE COURT:  Yeah.

-- the plaintiff wouldn't meet the other requirements of Rule 23.

MR. McCONVILLE:  That is correct, Your Honor.

THE COURT:  Okay.  So I think that's what we need to focus on for the purpose of this discussion, because I think everything else sort of falls into place.

And the argument, as I understand it, that you make is that, well, in the initial filing, there -- what? -- wasn't enough of a description of the plaintiff that would make that plaintiff typical.  I'm not quite sure I follow the argument.

So let me turn to you, sir.

MR. McCONVILLE:  Sure.  If I may, Your Honor.

THE COURT:  Yeah.  Go right ahead.

MR. McCONVILLE:  There's a number of things at issue with the Pivotal investor group's initial filing.  I think the first thing that I would point to, which really gets at the heart of the adequacy of this group to serve as lead plaintiff -- because, again, in determining the presumptive lead plaintiff, not only do you have to identify the largest loss, but then that movant also has to make a prima facia showing of adequacy and typicality.  It's our position that they have failed to do that.  Therefore, they don't enjoy the presumption as the lead plaintiff.

THE COURT:  Let me stop you there.

Are you saying that they didn't do it at all or they didn't do it in a timely fashion?

MR. McCONVILLE:  Well, I would say they didn't do it at all, and here's why.

**THE COURT:**  So I don't have to be concerned about the timeliness because even if I accept their argument -- which I do, by the way -- that they can supplement and describe, provided they do so within a particular period of time, the other aspects of their characteristics for qualification to be the lead plaintiff, your view, Oklahoma's view is it still is inadequate?

**MR. McCONVILLE:**  It's still inadequate, and let me explain why.

So with the initial motion, Doherty, who is one of the members of this group, submitted a certification that was signed before the complaint was even filed; and it contained 200 times more transactions than the certification that he initially filed with his complaint.  So on its face, it's a false certification signed under the penalty of perjury.

Now, to remedy that, in the opposition brief, they submitted a new certification, again, signed under the penalty of perjury, which had the same exact date as the first certification, again, containing all these new transactions.

So one of two things happened here.  Either they filed a false certification with the initial complaint, or they filed a false certification with the initial lead plaintiff.

And courts, when looking --

**THE COURT:**  Give it to me.  What is false about it?

**MR. McCONVILLE:**  Well, the transactions in the initial

certification filed with the complaint start in April of 2019, and there's a list of 25 transactions.

In their initial lead plaintiff motion, which was the same exact certification signed on the same date, there were over 200 -- I'm sorry -- over 400 transactions starting in April of 2018.

And when looking at the discrepancies in certifications filed with lead plaintiff motions, courts say this cuts at the heart of the plaintiffs' ability to serve in a fiduciary capacity.  And I'll point to two cases.

**THE COURT:**  Well, wait.  Before you get there, let's just assume, for the sake of this discussion, that I would find that those certifications, whether accurate or inaccurate, are not material to this determination; that is, that while there may be discrepancies and you cite cases which would, in my view, disqualify the person from serving, I have to believe that the court somehow found that they were material discrepancies.  What if I were not to find that?  Then what I need to know is your argument that accepting these certifications, why would they not be qualified to be the representative?

**MR. McCONVILLE:**  Sure.  So I'll address that directly, Your Honor.

This is a group that was brought together by counsel.  It was not clear at the date they filed the lead plaintiff motion

whether they had ever spoken to each other, whether they even knew if the other investor actually existed.  There was no joint declaration that was filed with the initial motion.

And, again, to your point about the supplemental filing, they filed a supplemental joint declaration, but it's still not clear from the face of that document whether these two investors have ever spoken to each other.

So we would say that this is the precise type of group that has been rejected time and again as an attorney attempt to aggregate the largest financial interest in order to seize the lead counsel position.  And that, in and of itself, is a basis for denying the lead plaintiff status.

And, again, I can point to cases.  We've cited them in our papers.  But one case that I'll point to is the *Takata v. Riot Blockchain* case -- it's 2018 Westlaw 58013979 -- where the Court looks at the initial filing and the way the group has been comprised and says:  The way that this thing looks is a basis for denying the lead plaintiff motion.  This is a clear attempt by counsel to put together the group that gets appointed as lead plaintiff.

Now, why is that important?  It's important because the investors haven't shown any sort of ability to oversee counsel and demonstrate the ability to serve in a fiduciary capacity as a lead plaintiff in a PSLRA case, and it's very important.

By contrast, I understand that we have filed as two

institutions.  Those two funds, of their independent volition, requested filing with a partner; and the reason why they did that is because there's a very critical aspect of this case that the Pivotal investor group lacks.  It's standing on the Section 11 claim.

And I can get into that, if Your Honor would allow me to, but it's a sightly technical argument whereby the investors of the Pivotal investor group did not purchase any shares of Pivotal until after the entry into the market of unregistered shares.  And the case law on this is very clear.  The case law on this demonstrates that when there's a mixed market of registered and unregistered shares, you need to show beyond a mere possibility; you need to show a plausibility that the purchase you made can be traced -- chain of title can be traced to those shares.  And they've simply failed to do that.

And on this point, Your Honor, I would point the Court to a Ninth Circuit decision where this analysis is clearly laid out as to how you demonstrate standing on Section 11.  And the case is *Century Aluminum*, and the cite is 729 F.3d 1164.  And the Court there says:  Look, in a situation where you have a mixed market, you need a greater level of factual specificity in order to demonstrate that the Court can reasonably infer that the shares were purchased pursuant to the registration statement.

And the Court says, quote:  Experience and common sense

says that when there's more than one type of share on the market, you will not be able to trace it.

In this situation, unregistered shares indisputably entered the market on November 16 -- I'm sorry -- on November 6th, 2018; and by December of 2018, unregistered shares made up more than 40 percent of the float of Pivotal shares.

Now, Mr. Doherty buys and sells a whole bunch during the class period, which we allege in our papers, we argue in our papers is another reason why he's atypical, because he's an in-and-out day trader.  Perhaps even he won't be able to rely on the fraud-on-the-market presumption.  But the clear fact, based on his trading, is that he sells in and out and does not buy and hold shares which are held over the corrective disclosure until May of 2019.

Now, May of 2019, at that point, there's indisputably more than 45 percent of unregistered shares.  It is simply impossible for him to trace chain of title of a registered share at the time of buying of May of 2019.

THE COURT:  Okay.  Let me hear from your opponent.
Go ahead.

MR. HOOD:  Certainly, Your Honor.  We covered a number of points there.  I'd like to respond to them each in turn.

As an initial matter, I think there's been a continued focus on what's been submitted in the initial motion papers,

which, as Your Honor has indicated, the supplemental submissions, for the purposes of our argument here, should be accepted as not disqualifying.

In addition, the -- first of all, the argument as to the propriety of the composition of the Pivotal group versus the propriety of the composition of what I'll call the Oklahoma group, it's an odd argument to make, Your Honor.  First of all, it is at odds with the case law.  The majority of courts do consider groups that lack a preexisting -- a pre-litigation relationship, looking to exactly the kinds of joint declaration that we've submitted.  The group members have attested to their cohesiveness, to their understanding of the lead plaintiffs' responsibilities, to their willingness to undertake those responsibilities together on behalf of the class, and to the fact that they have communicated.

In addition, it's doubly odd because there's been no substantive distinction articulated as between the propriety of the Pivotal group and propriety of the Oklahoma group.  There's nothing in the record to indicate that the Oklahoma group's members have a pre-litigation relationship either or that they were not introduced by counsel.

THE COURT:  Well, I'm not particularly moved by that argument of Oklahoma.

But what about the adequacy of this particular plaintiff to represent?  What I understand counsel saying is that he's

going to have a very difficult time establishing enough to give him standing in the sense that he's a good representative of the group because of his in-and-out transactions and so forth.

MR. HOOD:  Certainly glad to address that, Your Honor.

THE COURT:  Yeah.

MR. HOOD:  With regard to the Section 11 argument --

THE COURT:  Sorry?

MR. HOOD:  Pardon me.  With regard to the argument as to Section 11 standing --

THE COURT:  Yes.

MR. HOOD:  -- what counsel's referring to here is prior to the IPO, there was an issuance of -- pardon me; not "an issuance" -- certain unregistered shares of Pivotal Class A common stock were acquired by an entity called GE International Holdings.  Then the IPO happened.  November 6th, after the expiration of a 180-day lockup provision, that entity sold almost 10 million of its shares of unregistered Pivotal stock into the market.

So at that point, November 6th, 2018, that's the point at which you had unregistered shares entering the market. However, at that point, they only comprised less than 25 percent of the entire market.

I believe the *Century Aluminum* case that's from the early 1980s, more recently, considering the same issue, the Central District of California, and the case *Sudunagunta v. Nantkwest,*

*Inc.* -- that's 2018 U.S. District Lexis 137084 -- held that the standard is whether or not shares, unregistered shares dominated or didn't dominate the market.

And here, with fewer than 25 percent of the shares in the market being unregistered, I don't think you can say --

**THE COURT:**  You have to slow down.

**MR. HOOD:**  Certainly.  Apologies.

-- I don't think you can say that the unregistered shares dominated.

**MR. McCONVILLE:**  Your Honor, if I may on that point.

**THE COURT:**  Of course.

**MR. McCONVILLE:**  So the operative date, I think, is not November 6th; it's December 12th, which is when GE sold the remainder of its 15 million shares.  So it initially sold 9 million in November and then an additional 5 million in December.  And at that point, you're at nearly 40 percent of the outstanding float of unregistered shares.

But I think we're missing the point here, because it's not about percentage or semantics or determining what's dominated or not dominated.

I'll point to the *Nantkwest* case because I think it's interesting.  In that case, 99.5 percent of the shares were registered shares.  There was 0.5 percent unregistered shares. So in that instance, the Court said:  Yes, on this basis, there's a factual determination that it's more likely than not

that the shares he purchased are registered.

It is simply impossible to do that here because you can't trace the chain of title between registered and unregistered shares.

And the *Century Aluminum* case of the Ninth Circuit is from 2013, just to correct my colleague.

So I think what's important here is that there needs to be something more than a mere possibility that they purchased the shares.  It needs to be plausible.  It needs to be more likely than not.  It needs to satisfy the *Iqbal* and *Twombly* standard of Rule 8 in order for them to have standing for a Section 11 claim.  Otherwise, it's on its face a 12(b)(6) motion to dismiss.

And one thing I'll point to, Your Honor, is that when you look at the plan of allocation for Section 11 cases, it is standard across the board for the time period in which investors acquired shares to be six months.  And the reason why it's six months is, that's the period of time before locked-up shares can enter the market; and once they enter the market, it's no longer possible for an investor making a claim in a securities case to say, "Yes, I have been damaged by Section 11 violations."

And I'll point to the *Lending Club* case, which was in front of Judge Alsup.  The plan of allocation in that case cuts off at six months, and there's good reason why.

And I'll quote from *Lending Club*, 282 F.Supp.3d, 1171 at 1179 through 81.

". . . if there is a mixture of pre-registration stock and stock sold under the misleading registration statement, a plaintiff must either show that he purchased his stock in the initial offering" -- which they have not -- "or trace his later-purchased stock back to the IPO [sic]," which they cannot.

As a result, it's our respectful position that they lack standing for the Section 11 claim.

And one other point, Your Honor, I'll make.  I do a lot of cases with Mr. Hood's firm.  We're very familiar with each other for many years.  We have one case together where he very well knows the importance of an investor having Section 11 standing.  It's the *Gross v. AT&T* case, 19 CV 2892, in the Southern District of New York before Judge Caproni.  At the lead plaintiff stage, my client had the third largest loss, but they had standing on Section 11.  So she sua sponte plucked them out and put them in part of the leadership group represented by Mr. Hood's firm.  That's the importance of having an investor with Section 11 standing.

And I will bet you dollars for doughnuts --

**THE COURT:**  What are you betting me?

**MR. McCONVILLE:**  Dollars for doughnuts.

**THE COURT:**  Dollars for doughnuts.

**MR. McCONVILLE:**  -- if, at the amended complaint stage, either of the Pivotal group investors are lead plaintiff, they will add an investor that has indisputable standing, and then you have a class representative who has not been vetted through the lead plaintiff process serving in that capacity.  I can tell you that that's what would happen.

So --

**THE COURT:**  So you say they'll remedy the situation?

**MR. McCONVILLE:**  That's correct.  But now they'll add another unrelated investor who hasn't been vetted through the adequacy and typicality analysis.

**THE COURT:**  This vetting process is more theoretical than actual.  That's my experience.

But putting that aside, putting that aside, you say any defect, they're going to cure; because, after all, they're your opponent, sitting there taking elaborate notes on what you're saying is the weakness of your adversaries.

**MR. McCONVILLE:**  And, Your Honor, this isn't me trying to throw a portion of the class under the bus.

**THE COURT:**  No, no, no.

**MR. McCONVILLE:**  I'm taking a realistic approach to this litigation.

**THE COURT:**  It's good to have a realistic approach every now and then.

Do you want to respond to that?

**MR. HOOD:**  Certainly, Your Honor.

As for amended pleadings, I wouldn't want to get ahead of our skis here.  I think we're still well off from that.

In terms of the plausibility that the group acquired the shares -- that the shares are traceable to the IPO more likely than not, we're talking a market that more than 80 percent of the shares were traceable to the IPO; that that would seem to me to be more likely than not.

In addition, my understanding is that one of the Oklahoma group's members, the St. Louis Police Retirement System, itself, would lack standing if we accept this argument for Section 11 claims, given the timing of its own purchases.

**THE COURT:**  So you're saying whatever defects you may have, they're worse?

**MR. HOOD:**  Precisely, or at least equivalent, Your Honor.

**THE COURT:**  Or they're equal.

**MR. McCONVILLE:**  Well, I would say, Your Honor, that's precisely why the group was formed in the first instance, because Oklahoma City has indisputable standing for the Section 11 claim.  And while St. Louis Fire may not -- and, again, this is an issue that would be briefed up at the motion to dismiss -- we made a determination, our clients made a determination that we wanted standing for this claim because it could be the most important claim in the case.  And their group

just simply does not have standing for that claim.

THE COURT:  Anything anybody wants to add?

MR. HOOD:  Well, Your Honor, I think we've covered the standing point fairly well.

Again, I need to add, I would cite to *Nantkwest*, once again, that this is recent authority.  More than 80 percent of the shares --

THE COURT:  What was Judge Alsup's case again?  What is the cite for that?

MR. McCONVILLE:  Sure.  That is the *Lending Club* case.

THE COURT:  Pardon?

MR. McCONVILLE:  *Lending Club*.  And I can give you the CV number.

THE COURT:  Yeah.

MR. McCONVILLE:  It's C 16-0- --

THE COURT:  C 16- --

MR. McCONVILLE:  C 16-02627.

And the plan of allocation, for purposes of Section 11 standing, was ECF Number 3441 at 18 and 19.

THE COURT:  Okay.  Anything else anybody wants to add?

MR. McCONVILLE:  Your Honor, I would just finally add that Oklahoma City and St. Louis are two sophisticated institutions.  They're fiduciaries for their living.

THE COURT:  Oklahoma is very sophisticated.

MR. McCONVILLE:  They have a desire to serve as lead

plaintiff in this case and ensure that there's adequate representation, oversee counsel so that the class's interest and recovery is maximized.

THE COURT: Great. Thank you very much. I've taken that under submission.

And now I will hear from the defense --

MR. POTISCHMAN: Thank you, Your Honor.

THE COURT: -- who's taking no position.

MR. POTISCHMAN: I will be exceedingly brief.

Yes, Your Honor, we take no positions on those applications.

THE COURT: Exactly.

MR. POTISCHMAN: I simply wish to note that the Pivotal investigator group submitted a proposed order that, in paragraph 14, purports to direct preservation obligations on the parties. That's not something that I think is typically included in consolidation and lead plaintiff orders; it's not something they briefed; and I don't think it's appropriate to have a preservation order embedded in a consolidation and lead plaintiff order.

Obviously, defendants are aware of their preservation obligations, Your Honor, and are taking reasonable steps to preserve.

That same provision is not in the other order; so I'm just raising it.

THE COURT:  Okay.

MR. POTISCHMAN:  Thank you, Your Honor.

THE COURT:  Yes.  I appreciate your position, and I'll address that.

MR. POTISCHMAN:  Thank you, Your Honor.

THE COURT:  Thank you, everybody.

Submitted.

(Proceedings adjourned at 10:24 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Saturday, October 19, 2019

_Ana M. Dub_

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court