IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEVEN DOHERTY, et al.,

        Plaintiffs,

    v.

PIVOTAL SOFTWARE, INC., et al.,

        Defendants.

Case No. 3:19-cv-03589-CRB

**ORDER GRANTING CONSOLIDATION AND APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL**

This case stems from three class actions alleging violations of the Securities Exchange Act and the Securities Act. Purchasers of Pivotal Software, Inc.'s ("Pivotal's") securities assert that they are entitled to damages caused by Pivotal's alleged false and/or misleading statements about its financial and business condition. Three sets of motions are now pending—for consolidation, appointment as lead plaintiff, and approval of lead counsel pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Most substantial are the motions for appointment of lead plaintiff. Originally, five different plaintiffs sought to be named lead plaintiff. Three of those subsequently withdrew or chose not to oppose, leaving two competing motions: one by Steven Doherty and the Tech Trader Fund LP (collectively, the "Pivotal Investor Group" or "the Group") and one by the Oklahoma City Employee Retirement System and Police Retirement System of St. Louis (collectively, "Oklahoma").

As discussed below, the Court (1) consolidates the three related securities class actions; (2) appoints Oklahoma as lead plaintiff in the consolidated action; and (3) appoints Labaton Sucharow LLP as lead counsel and appoints Wagstaffe, Von

Loewenfeldt, Busch & Radwick LLP as liaison counsel for plaintiffs in the consolidated action.

## I.  BACKGROUND

### A.  Factual Background

Defendant Pivotal is a Delaware corporation with its principal executive offices in San Francisco, California.  Doherty Compl. (dkt. 1) ¶ 15.  Pivotal and its subsidiaries provide a cloud-native application platform and services in the United States.  Id. ¶ 2. Pivotal's platform allegedly accelerates and streamlines software development by reducing the complexity of building, deploying, and operating cloud-native and modern applications.  Id. ¶ 21.  Pivotal also allegedly provides strategic services, enabling customers to accelerate their adoption of a modern software development process.  Id.

Defendant Robert Mee served as Pivotal's Chief Executive Officer, and defendant Cynthia Gaylor served as Pivotal's Chief Financial Officer at all relevant times.  Id. ¶¶ 16, 17.  Defendants Mee and Gaylor (the "Individual Defendants") possessed the power and authority to control the contents of Pivotal's Securities and Exchange Commission ("SEC") filings, press releases, and other market communications at all relevant times.  Id. ¶ 19.

The Plaintiff class consists of all persons and entities, other than the defendants, who purchased or otherwise acquired (1) Pivotal's common stock traceable to the registration statement issued in connection with Pivotal's April 2018 initial public offering ("IPO"), and/or (2) Pivotal securities between April 24, 2018 and June 4, 2019 (the "class period").  Id. ¶ 1.

On December 15, 2017, the defendants filed a confidential draft registration statement on Form S-1.  Id. ¶ 24.  The draft went through a series of amendments in response to SEC comments.  Id.  On or about April 18, 2018, defendants filed a final amendment to the registration statement, which registered over 37 million shares of Pivotal common stock for public sale.  Id. ¶ 25.  The SEC declared the registration statement effective on April 19, 2018.  Id. ¶¶ 25–28.  On or about April 20, 2018, defendants filed

the final prospectus for the IPO.  Id. ¶ 25.

On April 24, 2018, Pivotal completed the IPO, which, upon the underwriters exercising their full overallotment option to purchase additional shares, issued a total of 42,550,000 shares priced to the public at $15.00 per share.  Id.  This generated over $638 million in gross proceeds for the defendants.  Id.

On March 14, 2019, Pivotal issued a press release in which Pivotal disclosed its financial and operating results for the fourth quarter and full fiscal year 2019.  Id. ¶¶ 29–31.  In that press release, Mee stated that Pivotal was in the "early stages of [a] high-growth market."  Id. ¶ 30.  The press release also contained Pivotal's financial outlook for the first quarter and full fiscal year 2020.  Id. ¶ 31.

Later on the same day, Pivotal held a conference call with analysts to discuss its financial results for fiscal year 2019 and its guidance for fiscal year 2020.  Id. ¶ 32; see also id. ¶¶ 35–39.  On that call, Gaylor told analysts and investors that Pivotal "continue[s] to attract new customers and as many [sic] of [its] existing customers grow their investments with [Pivotal]."  Id. ¶ 32.  Gaylor discussed Pivotal's "industry-leading" net expansion rate, but also stated that Pivotal "continued to see healthy expansion from existing customers," and that Pivotal "expect[s] the percentage to come down gradually over time."  Id. ¶ 33.

On June 4, 2019, after the market closed, Pivotal issued a press release reporting its financial and operating results for the first quarter of fiscal year 2020.  Id. ¶ 47.  In that press release, Mee advised investors that "sales execution and a complex technology landscape impacted the quarter."  Id.  The June 4 press release also contained a revised guidance for 2020.  Id.

The following day, on June 5, 2019, Pivotal held a conference call, and multiple analysts questioned Gaylor about the revised guidance.  Id. ¶ 48.  Following the call, an analyst called the quarter a "train wreck" and characterized Pivotal's operating results as "disastrous."  Id. ¶ 49.  Pivotal's stock price fell $7.65 per share, or over 40%, to close at $10.89 per share on June 5, 2019, far below the IPO price of $15 per share.  Id. ¶ 50.

### B.     Procedural Background

On June 20, 2019, Steven Doherty filed a complaint asserting claims under Section 11 and Section 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. Id. ¶ 1 (the "Doherty Action").  On the same day, Mikebeb M. Abera filed a complaint asserting claims under Section 11 and Section 15 of the Securities Act.  See Abera Compl. (dkt. 1) ¶ 9 in Abera v. Pivotal Software, Inc., No. 19-cv-3601-HSG (the "Abera Action"). The Abera Action named the same defendants as the Doherty Action, and included additional defendants such as Pivotal directors and underwriters of its IPO.  Id. ¶¶ 14–40. Doherty published notice of the action on June 20, 2019, which advised investors in Pivotal securities that they had until August 19, 2019 to seek appointment as lead plaintiff. See Wagstaffe Decl., Ex. C (dkt. 22-3).  The next day, on June 21, 2019, Peter Kleinman filed a complaint asserting claims under Section 11, Section 12(a)(2), and Section 15 of the Securities Act against the same defendants as the Abera Action.  See Kleinman Compl. (dkt. 1) ¶¶ 2, 7–34 in Kleinman v. Pivotal Software, Inc., No. 19-cv-3605-RS ("the Kleinman Action"); Abera Compl. ¶¶ 14–40.

All three actions advance substantially the same allegations.  The complaints allege that the defendants made false and/or misleading statements regarding Pivotal's business, operational, and compliance policies.  See Doherty Compl. ¶ 1; Abera Compl. ¶ 1; Kleinman Compl. ¶ 1.  Specifically, they allege that the defendants failed to disclose that: (1) "Pivotal was facing major problems with its sales execution and a complex technology landscape"; (2) those issues "resulted in deferred sales, lengthening sales cycles, and diminished growth as its customers and the industry's sentiment shifted away from Pivotal's principal products because [they] were outdated, inadequate, and incompatible with the industry-standard platform"; and (3) Pivotal's "public statements were materially false and misleading at all relevant times."  Doherty Compl. ¶ 6.

On August 19, 2019, class members Dana Penza, Vasant Punjabi, Mary Anderson, Oklahoma, and the Pivotal Investor Group filed five competing motions to consolidate the related actions, appoint lead plaintiff, and appoint lead counsel.  See Penza Mot. (dkt. 7);

Punjabi Mot. (dkt. 11); Anderson Mot. (dkt. 16); Okl. Mot. (dkt. 21); Group Mot. (dkt. 29).

On August 28, 2019, Penza withdrew his motion, conceding that he does not have the largest financial interest in the relief sought by the class, as required by the PSLRA. Penza Not. (dkt. 35) at 3. On the same day, Punjabi withdrew his motion for the same reason. See Punjabi Not. (dkt. 36) at 1. On September 3, 2019, Anderson filed a notice of non-opposition to competing motions. See Anderson Not. (dkt. 37). Movants Oklahoma and the Group continue to seek appointment as lead plaintiff.

## II.    CONSOLIDATION

Federal Rule of Civil Procedure 42(a) permits consolidation where "actions before the court involve a common question of law or fact." Fed. R. Civ. P. 42(a). "Consolidation is within the broad discretion of the district court." In re Adams Apple, Inc., 829 F.2d 1484, 1487 (9th Cir. 1987). In determining whether consolidation is appropriate, a court "should 'weigh the interest of judicial convenience against the potential for delay, confusion and prejudice.'" See Hessefort v. Super Micro Computer, Inc., 317 F. Supp. 3d 1056, 1060 (N.D. Cal. 2018) (quoting Zhu v. UCBH Holdings, Inc., 682 F. Supp. 2d 1049, 1052 (N.D. Cal. 2010)); see also Huene v. United States, 743 F.2d 703, 704 (9th Cir. 1984). Courts in the Ninth Circuit "have recognized that class action shareholder suits are particularly well suited to consolidation . . . because unification expedites pretrial proceedings, reduces case duplication, avoids the need to contact parties and witnesses for multiple proceedings, and minimizes the expenditure of time and money for all parties involved." See Hessefort, 317 F. Supp. 3d at 1060 (quoting Miami Police Relief & Pension Fund v. Fusion-io, Inc., No. 13-CV-05368-LHK, 2014 WL 2604991, at *3 (N.D. Cal. June 10, 2014)).

The Court agrees with the parties that consolidation of the Doherty Action, the Abera Action, and the Kleinman Action is proper. No party has opposed such consolidation. That the complaints differ slightly does not impede consolidation. See 15 U.S.C. § 78u-4(a)(3)(A)(ii) (contemplating consolidation when "more than one action on behalf of a class asserting substantially the same claim or claims" has been filed). All

three actions involve common questions of law and fact related to the Pivotal IPO, and contain similar allegations regarding Pivotal's public dissemination of false and misleading information to investors during the same time periods. <u>See</u> Doherty Compl. ¶ 1; Abera Compl. ¶ 1; Kleinman Compl. ¶ 1. Consolidation is proper because it serves the judicial interest in convenience, there is no reason to think it would increase delay, including each claim in one action will reduce confusion, and no party has articulated a concern regarding prejudice.

Accordingly, the Court orders that:

1. The following actions are consolidated pursuant to Federal Rule of Civil Procedure 42(a) for all purposes including, but not limited to, discovery, pretrial proceedings and trial proceedings:

| Abbreviated Case Name | Case Number |
| --- | --- |
| <u>Doherty v. Pivotal Software, Inc.</u> | No. 19-cv-03589-CRB |
| <u>Abera v. Pivotal Software, Inc.</u> | No. 19-cv-3601-HSG |
| <u>Kleinman v. Pivotal Software, Inc.</u> | No. 19-cv-3605-RS |

2. The consolidated cases shall be identified as: <u>In re Pivotal Securities Litigation</u> and the files of this action shall be maintained in one file. Any other actions now pending or hereafter filed in this District which arise out of the same or similar facts and circumstances as alleged in these related actions shall be consolidated for all purposes as the Court is notified of them. The parties shall notify the Court of any other action which is pending or filed outside of this District which may be related to the subject matter of these consolidated actions when they become aware of such actions.

3. Every pleading filed in the consolidated action shall bear the following caption:

IN RE PIVOTAL SECURITIES LITIGATION,

_____/   Master File No.

_____/   <u>CLASS ACTION</u>

### III. APPOINTMENT OF LEAD PLAINTIFF

Two competing movants seek appointment as lead plaintiff: (1) the Pivotal Investor Group and (2) Oklahoma. For the following reasons, the Court appoints Oklahoma as lead plaintiff of the consolidated action.

#### A. Legal Standard

A court is to appoint the "most adequate plaintiff" to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). The plaintiff most capable of adequately representing the interest of class members "is the person or group of persons that" (1) either filed the complaint or filed a timely lead plaintiff motion; (2) has the largest financial interest in the relief sought by the class, as determined by the court; and (3) satisfies the requirements of Federal Rule of Civil Procedure 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Rule 23 provides that a party may serve as a class representative if (1) its claims or defenses are typical of those of the class, and (2) it will fairly and adequately protect the interests of the class. Fed. R. Civ. Proc. 23(a).

The Ninth Circuit has established a three-step process for the appointment of a lead plaintiff under the PSLRA. See In re Cavanaugh, 306 F.3d 726, 729–31 (9th Cir. 2002); In re Stitch Fix, Inc. Sec. Litig., No. 18-cv-06208-JD, 2019 WL 3940954, at *1 (N.D. Cal. Aug. 9, 2019); Bruce v. Suntech Power Holdings Co., Ltd., No. CV 12-04061 RS, 2012 WL 5927985, at *1 (N.D. Cal. Nov. 13, 2012). First, the court must determine whether the plaintiff in the first-filed action issued a notice publicizing the pendency of the action.[1] See Cavanaugh, 306 F.3d at 729. Second, the court must compare the financial stakes of the various plaintiffs, determine which has the most to gain from the lawsuit, and determine whether that plaintiff satisfies Rule 23, particularly its typicality and adequacy requirements. Id. at 730. If so, it is entitled to lead plaintiff status. Id. at 732. If not, the court must then consider the plaintiff with the next-largest financial stake and repeat the

---

[1] The PSLRA provides that the plaintiff must publish notice alerting members of the purported class of the pendency of the action, the claims asserted, and the purported class period within 20 days after filing the complaint. 15 U.S.C. § 78u-4(a)(3)(A)(i). Any member of the purported class may file a motion to serve as lead plaintiff within 60 days of the notice's publication. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

inquiry. Id. at 730. Third, the court must consider competing plaintiffs' attempts to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23. Id. This can be done using proof that the presumptive lead plaintiff (1) will not fairly and adequately protect the interests of the class, or (2) is subject to unique defenses that render the plaintiff incapable of adequately representing the class. Fed. R. Civ. Proc. 23(a); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); see In re Network Assocs., Inc., Sec. Litig., 76 F. Supp. 2d 1017, 1021 (N.D. Cal. 1999).

## B. Discussion

Both movants have timely moved for appointment as lead counsel in response to the PSLRA notice.[2] Thus, both have satisfied the first PSLRA requirement. The Court first discusses the Group's qualifications, followed by Oklahoma's.

### 1. The Pivotal Investor Group

Although the Group has the largest financial interest in the litigation, it cannot plausibly allege that its shares are traceable to the Pivotal IPO, and therefore it lacks Section 11 standing.

#### a. Financial Loss Requirement

Because the PSLRA does not specify how to calculate "largest financial interest," courts determine which movant has the most to gain from the lawsuit through "accounting methods that are both rational and consistently applied." Cavanaugh, 306 F.3d at 730 n.4. Courts consider the "Olsten-Lax" factors to "determine who has the largest financial interest: '(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered.'" Richardson v. TVIA, Inc., No. C 06 06304 RMW, 2007 WL 1129344, at *3 (N.D. Cal. Apr. 16, 2007) (quoting In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)). Of the four Olsten-Lax

---

[2] It is undisputed that Doherty, the plaintiff in the first-filed action, published adequate notice on June 20, 2019. Both movants timely filed their motions to serve as lead plaintiff within the required 60-day time period. See Okl. Mot. at 8; Group Mot. at 8.

factors, courts in the Ninth Circuit consider the fourth factor, approximate losses suffered, the most determinative. See Richardson, 2007 WL 1129344, at *4; Bruce, 2012 WL 5927985, at *2; Hessefort, 317 F. Supp. 3d at 1059.

The Group asserts that it suffered an aggregate loss of approximately $592,641 in connection with its purchases of Pivotal securities.[3] Group Mot. at 2, 4; Pafiti Decl., Ex. A. This amount is much greater than the loss claimed by Oklahoma, which asserts that it suffered a loss of $253,547.84. Okl. Mot. at 9; Wagstaffe Decl., Ex. B (dkt. 22-2). Oklahoma nonetheless challenges the appropriateness of treating the Group as a group. See Okl. Opp'n (dkt. 39) at 2–5.

Despite Oklahoma's argument to the contrary, see id., aggregation of the Group's two members is appropriate under the PSLRA. Certainly, some courts in the Ninth Circuit have "rejected groups of plaintiffs who lack a pre-existing relationship as being in violation of the spirit of the PSLRA." Bruce, 2012 WL 5927985, at *2. See, e.g., In re Netflix, Inc., Sec. Litig., No. 12-0225 SC, 2012 WL 1496171, at *4 (N.D. Cal. Apr. 27, 2012) ("courts in [the Ninth Circuit] uniformly refuse to aggregate losses of individual investors with no apparent connection with each other aside from their counsel"); Stitch Fix, 2019 WL 3940954, at *2 (". . . group of investors who had no pre-existing relationship with one another, and whose relationship and group status were forged only by a lawyer, is not appropriate to be lead plaintiff . . ."). These courts contend that only groups with a pre-existing relationship can ensure client control over plaintiff's counsel and meet the PSLRA's goal of eliminating lawyer-driven litigation. In re Versata, No. C 01–1439 SI, C 01–1559 SI, C 01–1703 SI, C 01–1731 SI, C 01–1786 SI, 2001 WL 34012374, at *4 (N.D. Cal. Aug. 20, 2001).

However, other courts in the Ninth Circuit have allowed small groups that lack a pre-litigation relationship to serve as lead plaintiff, so long as the Court determines that the

---

[3] The Group (1) purchased 414,741 shares of Pivotal common stock, (2) expended $8,575,628 in net funds on its purchases of Pivotal securities, (3) retained all 64,089 of its Pivotal shares, and (4) incurred losses of approximately $592,641 in connection with its purchases of Pivotal securities. See Group Mot. at 4; Pafiti Decl., Ex. A (dkt. 30-1).

proposed group is capable of actively overseeing the litigation and monitoring its counsel. See id. at *5 ("Requiring a pre-litigation relationship, though appealing in its simplicity, is too rigid"); Bruce, 2012 WL 5927985, at *2 ("[w]hile a pre-litigation relationship amongst lead plaintiffs is preferred, it is not required"); Network Assocs., 76 F. Supp. 2d at 1025–26 (discussing information that a proposed group should provide to a court).

Although the Group's initial motion did not provide information related to communication and coordination between its members, the Group later submitted a Joint Declaration in support of its opposition brief. See Pafiti Opp'n Decl., Ex. A (dkt. 38-2) ("Group Joint Decl."). That the Group did not file the Joint Declaration until after its lead plaintiff motion does not exclude the Court from accepting it. See Robb v. Fitbit Inc., No. 16-cv-00151-SI, 2016 U.S. Dist. LEXIS 62457, at *14 (N.D. Cal. May 10, 2016) (joint declaration filed in support of an opposition brief was not excluded). The Group's Joint Declaration provides the Court with sufficient information about its members, structure, and intended functioning. See Group Joint Decl. ¶¶ 1, 4, 5. Indeed, this information is comparable to the information Oklahoma provided about its own intended functioning. See Wagstaffe Decl., Ex. D (dkt. 22-4) ("Okl. Joint Decl."). Though the Group's members do not appear to have had an extensive pre-existing relationship, the Group only consists of two members and the information provided in its Joint Declaration demonstrates that it would be capable of overseeing the litigation and counsel. See Hodges v. Akeena Solar, Inc., 263 F.R.D. 528, 533 (N.D. Cal. Oct. 21, 2009) (joint declaration re agreed upon protocol adequate to allow aggregation).

Furthermore, one of the Group's members—Tech Trader—meets the largest financial stake requirement on its own. Courts in the Ninth Circuit have held that it is not necessary for members of a group to aggregate themselves in order to overcome the largest financial interest requirement if one of the group's members could meet that requirement by itself. See, e.g., id. at 533; Bruce, 2012 WL 5927985, at *2 (where one of the members of the group met the largest financial interest requirement on its own, court held that the group met the requirement regardless of whether the group's losses were aggregated);

Robb, 2016 U.S. Dist. LEXIS 62457, at *5 (courts are more willing to permit a group of unrelated investors if the group contains an individual investor that would otherwise be entitled to the status as presumptive lead plaintiff). This is not a case in which lawyers aggregated plaintiffs in order to overcome the largest stake requirement because, by itself, Tech Trader suffered a loss of approximately $405,738, which is greater than Oklahoma's aggregate loss of $253,547.84. See Group Opp'n (dkt. 38) at 9; Pafiti Decl., Ex. C (dkt. 30-3).

Because the Group has the largest financial interest, both as a whole and as to Tech Trader individually, it is the presumptive lead plaintiff.

### b.    Rule 23(a) Requirements

However, the Group fails to satisfy Rule 23(a). Rule 23(a) provides that a class action may proceed if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The typicality and adequacy requirements of Rule 23 are the Court's main focus in this context. See Richardson, 2007 WL 1129344, at *4; Cavanaugh, 306 F.3d at 730.[4] The presumptive lead plaintiff "need only make a prima facie showing of its typicality and adequacy." Hessefort, 317 F. Supp. 3d at 1060–61. The PSLRA requires "proof" to overcome the presumption entitling the plaintiff with the largest financial interest in the litigation to appointment as lead plaintiff; speculative assertions are insufficient. See 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II); Armour v. Network Assocs., Inc., 171 F. Supp. 2d 1044, 1054 (N.D. Cal. 2001).

### i.    Adequacy Requirement

The test for adequacy is whether the presumptive lead plaintiff and its counsel have any conflicts of interest with other class members, and whether they will prosecute the

---

[4] Moreover, there is no dispute here about numerosity and commonality.

1    action vigorously on behalf of the class.  See Staton v. Boeing Co., 327 F.3d 938, 957 (9th

2    Cir. 2003).

3           Oklahoma argues that Doherty, individually, is inadequate due to inconsistencies[5] in

4    his PSLRA certifications.  See Okl. Opp'n at 7–9.  Oklahoma accuses Doherty of either

5    intentionally filing false certifications or of failing to adequately supervise his counsel.

6    Okl. Reply (dkt. 55) at 3–4.  The Court rejects Oklahoma's argument.  That Doherty filed

7    inconsistent shareholder certifications does not prevent him from serving as lead plaintiff.

8    See Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1155 (N.D. Cal. 1999)

9    (movant was not barred for "mere failure to file a certification").  Doherty corrected his

10   mistake as to the certificates when it was brought to his attention.  See Group Opp'n at 9–

11   11.  No party has provided the necessary "proof" of inadequacy to overcome the

12   presumption in favor of the Group.  Accordingly, the Court finds that the Group has met

13   the adequacy requirement.

14                  **ii.      Typicality Requirement**

15          The test of typicality is whether other class members have the same or similar

16   injury, whether the action is based on conduct that is not unique to the presumptive lead

17   plaintiff, and whether other class members have been injured by the same course of

18   conduct.  See Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

19   Additionally, the presumptive lead plaintiff may be atypical if it is subject to "unique

20   defenses which threaten to become the focus of the litigation."  See id. (citing Gary Plastic

21   Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d

22   Cir. 1990), abrogated by Microsoft Corp. v. Baker, 137 S. Ct. 1702 (2017)).

23          Oklahoma argues that the Group is atypical because it is subject to unique

24   defenses—specifically, that: (1) Doherty is atypical because he was a "day trader" and was

25   previously employed at Dell EMC; (2) Tech Trader is atypical due to its hedge fund

26

27   ───────────────────────
     [5] Doherty has twice filed the same June 12, 2019 PSLRA certification, see dkts. 1-1, 1-2, 30-3, but
28   the trading data was different each time: first it reflected 25 transactions beginning April 1, 2019,
     and next, it reflected nearly 400 transactions beginning in April 20, 2018.  See Okl. Opp'n at 7–9.

structure and trading method; and (3) neither member of the Group has standing to pursue the Securities Act claims.  See Okl. Opp'n at 5, 9–12.  Oklahoma's first two typicality arguments lack the sufficient "proof" required to overcome the Group's presumptive lead plaintiff status.[6]  However, as discussed below, the Court finds that the Group did <u>not</u> meet its burden of adequately pleading that its shares are traceable to the Pivotal IPO, and therefore lacks standing under Section 11 of the Securities Act.  Accordingly, the Group does not meet the Rule 23 typicality requirement.

### (i) Legal Framework for Traceability

Section 11 of the Securities Act "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement."  <u>In re Century Aluminum Co. Sec. Litig.</u>, 729 F.3d 1104, 1106 (9th Cir. 2013).  To prove a violation of Section 11, a plaintiff must show that the securities it purchased were issued under the statement—i.e., that its securities can be traced to that statement.  <u>See In re Lendingclub Sec. Litig.</u>, 282 F. Supp. 3d 1171, 1179 (N.D. Cal. 2017) (plaintiff bears the burden of tracing shares).

The level of factual specificity needed for a plaintiff to adequately allege that shares are traceable to an offering varies depending on the context.  <u>See Century Aluminum</u>, 729 F.3d at 1107.  When all of a company's shares were issued in a single offering under a single registration statement, it is sufficient merely to allege that the plaintiff's shares are "directly traceable" to the offering in question.  <u>See id</u>.  "No further factual enhancement is needed because by definition <u>all</u> of the company's shares will be directly traceable to the

---

[6] Doherty's trading record does not align with that of a "day trader," but even if it did, courts in the Ninth Circuit have held that being a day trader is not necessarily disqualifying.  <u>See, e.g.</u>, <u>In re Zynga, Inc. Sec. Litig.</u>, No. 12-04007 JSW, 2013 U.S. Dist. LEXIS 9314, at *6 (N.D. Cal. Jan. 22, 2013) ("the Court finds that whether [movant] is a day trader is inconsequential to his request to be appointed lead plaintiff"); <u>Serafimov v. Neptopia, Inc.</u>, No. 04-3364 RMW, 2004 U.S. Dist. LEXIS 25184, at *17–*18 (N.D. Cal. Dec. 3, 2004) ("the Ninth Circuit has held that day traders suffer as do other traders under fraud on the market theory").  Additionally, Oklahoma did not provide proof that Doherty, during his employment at Dell EMC, had contact with any Pivotal employees or come into possession of any non-public information retaining to Pivotal.  <u>See</u> Group Reply (dkt. 54) at 3, 9.  Furthermore, Tech Trader's use of "an algorithm that emulates conventional investment decisionmaking," <u>see id</u>. at 3, does not render Tech Trader atypical.

United States District Court
Northern District of California

offering in question." <u>Id</u>. (emphasis in original).  However, when a company has issued shares in multiple offerings under more than one registration statement (a "mixed-market"), "a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." <u>Id</u>.  This is a "context-specific task that requires the . . . court to draw on its judicial experience and common sense." <u>Id</u>. (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009)).  "[W]hen a company has offered shares under more than one registration statement, aftermarket purchasers usually will <u>not</u> be able to trace their shares back to a particular offering." <u>Id</u>. at 1107–08 (emphasis in original).  Plaintiffs must allege facts from which the court "can reasonably infer that their situation is different." <u>Id</u>. at 1108.

### (ii) Factual Background on Traceability

The parties do not dispute the following facts.  On April 17, 2018, Pivotal issued 19,415,075 unregistered shares of its Class A common stock to GE International Holdings ("GE") prior to its IPO.  <u>See</u> Okl. Opp'n at 6.  Pivotal's IPO took place on April 24, 2018, which issued a total of 42,550,000 shares to the public.  <u>See</u> Doherty Compl. ¶ 25.  During Pivotal's IPO, GE registered and sold 3,883,000 of its pre-IPO Class A shares.  <u>See</u> Okl. Opp'n at 6.  The balance of GE's unregistered 15,532,075 shares were restricted and subject to a 180-day lock up period.  <u>See id</u>.  On November 6, 2018, after the expiration of the 180-day lock up period, GE sold 9,836,521 unregistered shares of Pivotal Class A common stock; this meant that non-IPO shares amounting to approximately 23 percent of Class A common stock entered the market and comingled with IPO shares.  <u>See id</u>.; Group Reply at 6.  Therefore, on November 6, 2018, approximately 77 percent of Pivotal shares on the market were IPO shares.  On December 12, 2018, GE sold its remaining 5,695,554 unregistered shares—and thereby added to the market non-IPO shares amounting to approximately 13 percent of Class A common stock.  <u>See</u> Okl. Opp'n at 6.  Thus, by December 12, 2018, approximately 36 percent of total Pivotal Class A common stock in

the market were non-IPO shares and 64 percent were issued in connection with the IPO.[7]

The parties also do not dispute the amounts and dates that Doherty and Tech Trader purchased Pivotal shares. Doherty first purchased 3,000 shares on April 20, 2018, and subsequently bought and sold shares throughout the class period. See Pafiti Decl., Ex. A. Oklahoma states, and the Group does not contest, that Doherty sold all of his shares on November 2, 2018. See Okl. Opp'n at 6; Pafiti Decl., Ex. A. Doherty then purchased 20,221 shares on November 6, 2018—the date the GE stock comingled with the IPO stock. See Pafiti Decl., Ex. A.; see also Okl. Reply at 8 ("in a series of transactions starting on May 8, 2019, almost four weeks before the end of the Class Period, Doherty purchased 12,975 shares of Pivotal stock in total, and continued to hold all 12,975 shares on June 4, 2019, the date of the corrective disclosure marking the end of the Class Period."). Tech Trader made a single purchase of 51,114 Pivotal shares on June 4, 2019. See Pafiti Decl., Ex. A.

### (iii) Discussion of Traceability

Given the above facts, there is no dispute that both Doherty and Tech Trader purchased Pivotal shares after the GE and IPO shares comingled in the market on November 6, 2018. See Okl. Opp'n at 6–7; Group Reply at 6 ("the only shares that Doherty and Tech Trader held at the end of the Class Period were purchased after the entry into the market of the unregistered shares previously owned by GE"). This is therefore a mixed-market scenario in which the Group must allege with a "greater level of factual specificity" that its shares are traceable to the IPO. See Century Aluminum, 729 F.3d at 1107. Oklahoma argues that the Group has not and cannot do so.

The Group responds that courts assessing traceability look to whether the market was dominated by shares from the offering in question or by pre-existing shares. Group Reply at 6 (citing to Sudunagunta v. NantKwest, Inc., No. CV161947MWFJEMX, 2018

---

[7] At the motion hearing, counsel for Oklahoma argued that the relevant date is December 12, 2018, rather than November 6, 2018. The Court's conclusion regarding traceability is the same regardless of which date it uses.

WL 3917865, at *15–16 (C.D. Cal. Aug. 13, 2018), appeal dismissed, No. 18-80101, 2019 WL 4130797 (9th Cir. July 19, 2019)). The Group argues that since more than seventy-five percent of shares in circulation on November 6, 2018, and more than sixty percent of shares in circulation on December 12, 2018, were issued in connection with the IPO, those IPO shares dominated the market for Pivotal common stock, "making it highly likely, or at least more than plausible, that the [Group's] shares were issued in the IPO." Group Reply at 6. This argument is not persuasive.

While it is true that, in mixed-market situations, courts in the Ninth Circuit have discussed whether the market was dominated by IPO shares, they largely did so in explaining why plaintiffs had not adequately alleged standing. See, e.g., Century Aluminum, 729 F.3d at 1108 (plaintiffs lacked standing where 49 million shares were already in the market when 24.5 shares issued in a secondary offering); In re Exodus Commc'ns, Inc. Sec. Litig., No. C-01-2661 MMC, 2006 WL 1530081, at *3 (N.D. Cal. June 2, 2006) (plaintiffs lacked standing where there were more than 550 million shares outstanding when plaintiffs purchased shares, only 13 million of which were issued in the offering in question).

This is certainly true in two of the three cases upon which the Group relies. The Group cites to Welgus v. TriNet Grp., Inc., No. 15-CV-03625-BLF, 2017 WL 167708 (N.D. Cal. Jan. 17, 2017). Group Reply at 6–7. But in Welgus, the court found that plaintiffs lacked standing where 45 percent of the shares in the market at the time they purchased were secondary offering shares. 2017 WL 167708, at *15. The Group also cites to Abbey v. Computer Memories, Inc., 634 F. Supp. 870 (N.D. Cal. 1986). Group Reply at 7. But in Abbey, the court found that plaintiffs lacked standing where 18 percent of the shares in the market were issued in the offering in question. 634 F. Supp. at 874. The court there added that "a showing that a plaintiff's stock 'might' have come from the relevant offering" is inadequate. Id. It explained: "Relaxing the tracing requirement such that a plaintiff may fulfill it by showing even a high probability that some of his shares were from the relevant offering would be inconsistent with the narrow scope of potential

liability envisioned by section 11." Id. at 875.

The Group does not cite to any case in which a court has found that only having a favorable percentage is enough to plausibly allege traceability. Indeed, courts in the Ninth Circuit and elsewhere[8] have expressly stated the opposite. In In re Quarterdeck Office Sys., Inc. Sec. Litig., No. CV 92-3970-DWW(GHKX), 1993 WL 623310, at *2–3 (C.D. Cal. Sept. 30, 1993), 97 percent of shares in the market were issued pursuant to the offering in question. Despite this high percentage, the court held that plaintiffs lacked standing. See id. at *3. The court explained that plaintiffs' attempt to use statistical analyses to show that their shares "might" have been issued in the offering in question is a "speculative basis for standing" that, "without more, is insufficient." Id. Likewise, in In re Lendingclub Securities Litigation, 282 F. Supp. 3d at 1179, the court explained that "only shares that were purchased in the IPO or in the open market [before commingling] are traceable to the allegedly misleading disclosure statement (absent an individualized showing that post-lock-up purchases were individually traceable to the IPO)." The court cited approvingly to Quarterdeck's holding that "[t]raceability . . . is not a matter of probability, but rather is construed literally and requires a showing that the shares purchased were actually the offending shares." Id. at 1180. And it noted that in the facts before it, the plaintiff had "purchased shares issued under the allegedly misleading registration statement before they were commingled with any other shares," and so "probability does not enter into the analysis." Id.

The only other case that the Group cites in support of its dominance argument, and the only one of the three it cites in which a court found standing, is NantKwest. See Group

---

[8] The Fifth Circuit has also held that a high probability that the shares are traceable to the registered offering is not enough to establish standing to assert a Section 11 claim. See Krim v. pcOrder.com, Inc., 402 F.3d 489, 496–97 (5th Cir. 2005). The court held that, despite there being a 90 percent chance that plaintiff's shares were from the offering in question, "accepting such 'statistical tracing' would impermissibly expand the [Section 11] standing requirement." Id. at 496. The court supported its conclusion with the following analogy: "Taking a United States resident at random, there is a 99.83% chance that she will be from somewhere other than Wyoming. Does this high statistical likelihood alone . . . mean that she can avail herself of diversity jurisdiction in a suit against a Wyoming resident? Surely not." Id. at 497.

Reply at 6–7. But <u>NantKwest</u> is distinguishable. In that case, 99.5 percent of shares in the market came from the offering in question, and so it was "<u>highly</u> unlikely that the shares [the plaintiffs] purchased were Non-IPO Shares." <u>NantKwest</u>, 2018 WL 3917865, at *5 (emphasis in original). Moreover, the plaintiffs had also indisputably purchased 800 shares before the non-IPO shares even entered the market. <u>Id</u>. at *5–*6. These 800 shares were directly traceable to the IPO itself; therefore, plaintiffs had Section 11 standing. <u>See</u> <u>id</u>. at *6. Here, neither Doherty nor Tech Trader held stocks prior to November 6, 2018, the date when the pre-IPO and IPO shares "comingled" in the market. <u>See</u> Pafiti Decl., Ex. A.[9] None of the Group's shares appear directly traceable to the IPO.

Accordingly, the only argument that the Group asserts regarding Section 11 standing is a "speculative" statistical argument, akin to the argument rejected by the <u>Quarterdeck</u> court. <u>See</u> Group Reply at 6. It is also a conclusory allegation, similar to the one the Ninth Circuit rejected in <u>Century Aluminum</u>. Simply alleging that stock is traceable because of a favorable percentage does "not give rise to a reasonable inference that plaintiffs' shares are traceable." <u>See</u> <u>Century Aluminum</u>, 729 F.3d at 1108. Plaintiff's shares could have come from the offering, or alternatively, could not have. <u>See</u> <u>id</u>. "Plaintiffs' allegations are consistent with their shares having come from either source . . . plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." <u>Id</u>. (citing <u>Iqbal</u>, 556 U.S. at 678). "Something more is needed. . . ." <u>Id</u>. Here, the Group failed to allege any additional facts that tend to exclude the possibility that its shares came from GE's pool of non-IPO shares.

The Group has not plausibly alleged that its shares are traceable to the Pivotal IPO and therefore has not plausibly alleged that it has Section 11 standing. Accordingly, the

---

[9] Doherty purchased Pivotal shares prior to November 6, 2018, but it is undisputed that Doherty sold all Pivotal shares on November 2, 2018. <u>See</u> Pafiti Decl., Ex. A. He then purchased Pivotal shares again on November 6, 2018, but this is after the GE non-IPO shares entered the market. <u>See</u> <u>id</u>. Since Doherty did not retain Pivotal shares prior to the GE non-IPO shares entering the market on November 6, 2018, his shares are not directly traceable to the IPO.

United States District Court
Northern District of California

Court finds that the Group is atypical and declines to appoint it as lead plaintiff of the consolidated action.

### 2. Oklahoma

If the presumptive lead plaintiff is inadequate or atypical under Rule 23, the court must then consider the plaintiff with the next-largest financial stake and repeat the inquiry. See Cavanaugh, 306 F.3d at 730. In repeating the inquiry, the Court finds that Oklahoma meets the requirements under the PSLRA. Accordingly, the Court appoints Oklahoma as lead plaintiff of the consolidated action.

#### a. Financial Loss Requirement

The Oklahoma movant is made up of two institutional investors, the Oklahoma City Employee Retirement System and the Police Retirement System of St. Louis. Okl. Mot. at 1. Oklahoma claims that it suffered a combined loss of $253,547.84 as a result of transactions in Pivotal securities. Id. at 9. No party challenges this number or disputes the propriety of aggregating the losses of Oklahoma's group members under the PSLRA. Indeed, aggregation is appropriate, for the same reasons the Court found it appropriate as to the Group. Therefore, Oklahoma is the movant with the next-largest financial interest in the litigation.

#### b. Rule 23(a) Requirements

##### i. Adequacy Requirement

Oklahoma asserts that it will fairly and adequately protect the interests of the class for three reasons. See Okl. Mot. at 10. It contends that no antagonism exists between Oklahoma's interests and the interests of other class members. Id. It contends that it will vigorously represent the Class's interests because of Oklahoma's substantial financial stake in the litigation and standing to pursue all claims alleged. Id. Prior to seeking a role as lead plaintiff, the members of the Oklahoma group held a joint conference call to discuss the merits of the claims alleged, their standing to pursue those claims, the significant losses incurred, and their common goals in maximizing recovery for all Pivotal investors. Okl. Opp'n at 15. Oklahoma contends that it has further demonstrated its

1  adequacy by selecting Labaton Sucharow as lead counsel and Wagstaffe, Von

2  Loewenfeldt, Busch & Radwick LLP as liaison counsel.  Okl. Mot. at 2, 10–11; Okl.

3  Opp'n at 15.  These arguments all support Oklahoma's claim that it is a cohesive group

4  that will adequately represent all class members.

5      However, the Group argues that Oklahoma is inadequate to serve as lead plaintiff

6  because it has taken positions at the expense of one of its own group members.  See Group

7  Reply at 4, 7, 14–15.  Oklahoma's initial motion alleged substantial losses incurred by St.

8  Louis Police—one of Oklahoma's two group members—on purchases that occurred

9  exclusively after November 6, 2018.  See id. at 4; Okl. Mot. at 8–9.  As discussed above,

10 Oklahoma's opposition brief argues that investors who acquired Pivotal securities after

11 GE's unregistered stocks entered the market lacked standing to pursue Securities Act

12 claims.  See Group Reply at 4; Okl. Opp'n at 5–7.  If any investor who purchased Pivotal

13 stock on or after November 6, 2019 lacked standing, then St. Louis Police would be

14 disqualified from appointment as lead plaintiff, which reduces Oklahoma's recoverable

15 damages by roughly $65,561.  See Group Reply at 7, 14.  The Group argues that

16 Oklahoma's change in position was purely for tactical advantage, so that Oklahoma could

17 argue that the Group lacked standing to pursue Securities Act claims.  See id. at 4.  The

18 Group contends that this apparent willingness to exclude a significant number of class

19 members, including one of its own group members, calls into question Oklahoma's fitness

20 to fulfill the fiduciary obligations of lead plaintiff.  See id. at 4, 7, 14.

21     This is not a disqualifying point.  Oklahoma raised an appropriate concern

22 regarding a lead plaintiff movant's Section 11 standing—a concern the Court shares.

23 Moreover, it is undisputed that the other member of the Oklahoma group, Oklahoma City

24 Employee Retirement System, does have Section 11 standing because it purchased and

25 retained Pivotal shares prior to November 6, 2019.  See Wagstaffe Decl., Ex. A (dkt. 22-1).

26 These shares are directly traceable to the IPO.  Therefore, Oklahoma as a group has

27 standing to pursue Securities Act claims against Pivotal.

28          **ii.      Typicality Requirement**

Oklahoma argues that its claims are typical of the claims of other purchasers of Pivotal securities because they arise from the same course of events and their arguments on liability are identical. Okl. Mot. at 9. Oklahoma adds that both of its members are institutional investors, which are the archetypal lead plaintiffs as envisioned by the PSLRA. See Okl. Opp'n at 15.

When enacting the PSLRA, "Congress expected that the lead plaintiff would normally be an institutional investor with a large stake in the outcome." Network Assocs., 76 F. Supp. 2d at 1020. However, as the Group notes, the PSLRA does not require that institutional investors take precedence over individual plaintiffs. See Group Opp'n at 11. The Group argues that Oklahoma, as an institutional investor, should not be appointed over a group of individuals that allege significantly larger losses. See id. at 12. That is correct: a court cannot overcome the statutory presumption in favor of the plaintiff with the greatest financial loss "even if it thinks a different plaintiff would do a better job." See Bruce, 2012 WL 5927985, at *2. "Nor may the district court consider the relative merits of the plaintiffs seeking lead status." Id. That Oklahoma consists of institutional investors is therefore not controlling. Nonetheless, no party has provided proof that Oklahoma does not satisfy the typicality requirement. Therefore, Oklahoma is the movant with the second-largest financial stake in the litigation and otherwise satisfies the Rule 23(a) requirements.

Accordingly, the Court appoints Oklahoma as the lead plaintiff of the consolidated action.

## IV.    APPOINTMENT OF LEAD COUNSEL AND LIAISON COUNSEL

Under the PSLRA, the Court must also appoint lead counsel. 15 U.S.C. § 78u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."). While the appointment of counsel is made subject to the approval of the court, the lead plaintiff gets to select lead counsel for the class. See Cavanaugh, 306 F.3d at 732 ("this is not a beauty contest; the district court has no authority to select for the class what it considers to be the best possible lawyer or

the lawyer offering the best possible fee schedule"). Oklahoma has selected the firm of Labaton Sucharow LLP, a law firm with experience in prosecuting complex securities class actions. There is no reason to disagree with its selection.

Accordingly, the Court appoints Labaton Sucharow LLP as lead counsel and Wagstaffe, Von Loewenfeldt, Busch & Radwick LLP as liaison counsel for plaintiffs in the consolidated action.

## V. CONCLUSION

For the foregoing reasons,

1. The Court CONSOLIDATES the above-captioned securities class actions as ordered above.

2. The Court APPOINTS Oklahoma City Employee Retirement System and Police Retirement System of St. Louis as lead plaintiff in the consolidated action.

3. The Court APPOINTS Labaton Sucharow LLP as lead counsel and appoints Wagstaffe, Von Loewenfeldt, Busch & Radwick LLP as liaison counsel for plaintiffs in the consolidated action.

**IT IS SO ORDERED.**

Dated: November 8, 2019

CHARLES R. BREYER
United States District Judge