**LABATON SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)
Christine M. Fox (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com

*Counsel for Lead Plaintiffs the*
*Oklahoma City Employee Retirement*
*System and Police Retirement System of*
*St. Louis and Lead Counsel for the*
*Class*

**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**
James M. Wagstaffe (#95535)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
wagstaffe@wvbrlaw.com

*Liaison Counsel for the Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PIVOTAL SECURITIES LITIGATION | **Master File No. 3:19-cv-03589-CRB**<br><br>CLASS ACTION<br>JURY TRIAL DEMANDED<br><br>**CONSOLIDATED AMENDED CLASS**<br>**ACTION COMPLAINT** |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................. 1

II. NATURE OF THE ACTION ............................................................................ 2

    A. The Securities Act Claims ................................................................... 3

    B. The Exchange Act Claims ................................................................... 5

    C. Common Allegations Regarding the June 4, 2019 Disclosure and Announcement of the Deal with VMware .......................................... 9

III. COMMON ALLEGATIONS ......................................................................... 11

    A. Jurisdiction and Venue ...................................................................... 11

    B. Parties ................................................................................................ 11

        1. Lead Plaintiffs ........................................................................ 11

        2. Defendants .............................................................................. 12

            (a) Pivotal ........................................................................ 12

            (b) Executive Defendants ................................................ 13

            (c) Director Defendants ................................................... 14

            (d) Underwriter Defendants ............................................. 15

    C. Substantive Allegations ..................................................................... 18

        1. Pivotal's IPO ........................................................................ 24

            (a) Pre-IPO - December 2017 to mid-April 2018............. 24

            (b) Filing of Registration Statement and Prospectus......... 25

            (c) Post-IPO .................................................................... 26

        2. Pivotal's Largest Shareholders ............................................. 26

            (a) Dell Technologies ...................................................... 26

            (b) General Electric ......................................................... 27

            (c) Ford ........................................................................... 28

        3. Confidential Witnesses .......................................................... 28

(a) Background of CWs..................................................28

(b) Competition and an Antiquated Product Offering
Contributed to An Elongated Sales Cycle at Pivotal ...................29

(c) Pivotal's PKS Offering Was Late to the Kubernetes-
Compatible Market and Was Difficult to Sell Because of its
Limited Capabilities..................................................33

(d) Failure to Replace Lost Employees Also Negatively
Affects Pivotal's Sales Efforts .......................................34

4. VMWare Acquires Pivotal in Late 2019 ...............................35

5. Class Action Allegations...........................................37

6. Applicability of Presumption of Reliance: Fraud on the Market
Doctrine...............................................................39

IV. SECURITIES ACT ALLEGATIONS ...........................................41

A. Defendants' False and Misleading Statements and Omissions in Pivotal's
Registration Statement ................................................41

B. Expiration of IPO share lock-up - October 2018 ......................47

C. Decline in Price of Pivotal Shares On June 4, 2019 Disclosure .......47

D. Securities Act Counts...............................................52

1. Count I: Violations of Section 11 of the Securities Act Against
Pivotal, the Director Defendants, the Executive Defendants and the
Underwriter Defendants.................................................52

2. Count II: Violations of Section 12(a)(2) of the Securities Act
Against Defendant Pivotal, the Director Defendants, and the
Executive Defendants ..................................................54

3. Count III: Violations of Section 15 of the Securities Act Against
Michael S. Dell, and the Executive Defendants .........................56

V. EXCHANGE ACT ALLEGATIONS..............................................57

A. Additional Allegations from Confidential Witnesses in Support of
Exchange Act Claims ...................................................57

1. Pivotal and the Executive Defendants Had Access to Information
Which Contradicted Their Statements and Omissions During the
Class Period ..........................................................57

(a) As Sales of Pivotal's Antiquated PAS Stall, Contract Start Dates Are Modified..................................................... 57

(b) Pivotal's Belated Focus on Kubernetes ........................... 57

(c) Meetings and Reports ..................................................... 58

B. Defendants' Materially False and Misleading Statements and Omissions During the Class Period ........................................................ 59

1. First Quarter Fiscal 2019 Results – June 12, 2018 ..................... 60

2. Second Quarter Fiscal 2019 Results – September 12, 2018 .................... 65

3. Third Quarter Fiscal 2019 Results – December 11, 2018......................... 73

4. Citi Global TMT West Conference - January 8, 2019............................ 76

5. Fourth Quarter and Full Year Fiscal 2019 Results - March 14, 2019....... 79

6. Investor Meetings – March 2019 ........................................ 86

C. Materialization of the Previously Concealed Risks – June 4, 2019.................... 87

D. Post-Class Period ...................................................... 94

E. Additional Scienter Allegations Against Pivotal and the Executive Defendants ................................................................. 95

F. Loss Causation/Economic Loss ............................................... 97

G. No Safe Harbor ........................................................... 98

H. Exchange Act Counts............................................................. 99

1. Count IV: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Pivotal and the Executive Defendants ....................................................... 99

2. Count V: Violations of Section 20(a) of the Exchange Act against the Executive Defendants ................................................ 101

PRAYER FOR RELIEF ........................................................... 102

DEMAND FOR TRIAL BY JURY ................................................... 103

# I. INTRODUCTION

1. Lead Plaintiffs Oklahoma City Employee Retirement System ("Oklahoma City ERS") and Police Retirement System of St. Louis ("St. Louis Police," together with Oklahoma City ERS, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned counsel, hereby bring this Consolidated Amended Class Action Complaint (the "Complaint") against Pivotal Software, Inc. ("Pivotal" or the "Company"), Robert Mee, Cynthia Gaylor, Michael S. Dell; Paul Maritz, Egon Durban, William D. Green, Marcy S. Klevorn, Khozema Z. Shipchandler, Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Barclays Capital Inc., Credit Suisse Securities (USA) LLC, RBC Capital Markets, LLC, UBS Securities LLC, Wells Fargo Securities LLC, Keybanc Capital Markets Inc., William Blair & Co., LLC, Mischler Financial Group, Inc., Samuel A. Ramirez & Co., Inc., Siebert Cisneros Shank & Co., LLC, and Williams Capital Group, L.P., (collectively, with Pivotal, the "Defendants").[1]

2. The allegations herein are based on Lead Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Pivotal; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Pivotal with knowledge of the matters alleged herein;[2] and consultation with experts in the areas of damages. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiffs believe that substantial additional

---

[1] Defendants Mee and Gaylor are collectively referred to as the "Executive Defendants." Defendants Dell, Maritz, Durban, Green, Klevorn, and Shipchandler are collectively referred to as the "Director Defendants." Defendants Morgan Stanley, Goldman Sachs, Citigroup, Merrill Lynch, Barclays, Credit Suisse, RBC Capital Markets, UBS, Wells Fargo, Keybanc, William Blair, Mischler Financial, Ramirez & Co., Siebert Cisneros, and Williams Capital are collectively referred to as the "Underwriter Defendants."

[2] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2, etc.). All CWs will be described in the masculine to protect their identities.

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Lead Plaintiffs allege as follows:

## II.     NATURE OF THE ACTION

3.      This is a federal securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired: (1) Pivotal common stock pursuant or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with Pivotal's April 2018 initial public offering (the "Offering" or "IPO"); and/or (2) Pivotal publicly traded securities during the period from April 20, 2018 through June 4, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class").[3] Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

4.      Pivotal is a San Francisco-based information technology and software company. Founded in 2013 as a spin-off of EMC Corporation ("EMC") and VMware, Inc. ("VMware") (both subsidiaries of Dell Technologies, Inc. ("Dell Technologies")), the Company provides a cloud-native platform, Pivotal Cloud Foundry ("PCF"), which purportedly assists software developers in streamlining the process of modernizing applications for the cloud. The Company also offers strategic services through Pivotal Labs ("Labs"), a unit of software development experts that help the Company's customers co-develop new or improve existing cloud-based applications through PCF.

5.      Pivotal generates a substantial majority of its revenue from the sale of PCF subscriptions to its enterprise customers. The Company's flagship PCF product is Pivotal Application Service ("PAS"), a cloud-native application platform the Company released in November 2013. PAS is a purported "industry-standard cloud platform," which can "let anyone deploy network apps or services and make them available to the world in a few minutes." In

---

[3] See ¶ 136 for exclusions to the Class.

effect, PAS is Pivotal's distribution of Cloud Foundry software for hosting applications.[4]  In August 2017, the Company teamed up with VMware to release a new PCF product, Pivotal Container Service ("PKS"), a container management platform that allows customers to more easily deploy and operate Kubernetes, an open-source system similar to PAS, but designed for managing containerized workloads and services.  Kubernetes was originally developed by Google.

### A.    The Securities Act Claims

6.    In April 2018, Defendants commenced the IPO of Pivotal pursuant to the Registration Statement signed by Defendants Maritz, Gaylor, Durban, Green, Klevorn, Shipchandler, and Michael Dell.

7.    The claims asserted in Section IV relate to misstatements and omissions in the Registration Statement that Pivotal used to register the shares sold in connection with its IPO and in the prospectus Pivotal used to offer and sell those shares.  The claims asserted in Section IV do not allege fraud.

8.    In the Registration Statement, Pivotal repeatedly promoted its "leading" and "turnkey cloud-native platform," claiming that it "combine[d] the latest innovations from open-source projects such as application containers," had "a built-in advanced container networking and security engine," and "integrat[ed] PCF with leading open-source projects such as Kubernetes."  The Registration Statement also touted the Company's sales and customer success model, emphasizing Pivotal's "partnerships" and joint-selling opportunities with technology giants Amazon, Microsoft, and Google and claiming the Company "work[ed] closely" with these large cloud providers.

9.    These statements and others in the Registration Statement were false and misleading and omitted to state material facts both required by governing regulations and necessary to make the statements made therein not misleading. At the time of the IPO:

---

[4] *PAS Overview*, Pivotal (last updated, Jan. 27, 2020), https://docs.pivotal.io/pivotalcf/2-6/concepts/overview.html.

(a)  Pivotal was experiencing lengthening sales cycles and diminished growth in new subscription customers as a result of increased competition and decreased demand for its antiquated PAS product, Pivotal's principal Cloud Foundry offering, materializing in a "disastrous" Q1 FY20 performance, with deferred revenue and remaining performance obligations ("RPO") falling substantially.[5]

(b)  Pivotal was at a sales disadvantage against larger public cloud providers such as Amazon Web Services ("AWS"), Microsoft Azure ("Azure"), Google Cloud Platform ("GCP"), VMware vSphere, and Red Hat's OpenStack because Pivotal's primary offering (PAS) had become obsolete and antiquated due to its inability to integrate Kubernetes, the recognized standard to manage application containers.  As a result, Pivotal would be forced to engage in an expensive redesign and marketing effort of PAS (which wasn't available until July 2019) to make the product compatible with Kubernetes and competitive against these larger public cloud providers.

10.  Pivotal also had a disjointed product mix that couldn't individually, or in tandem, satisfy its enterprise customers' needs.  This disjointed product mix -- on the one hand, an outdated primary PAS offering, incompatible with Kubernetes, the industry standard; on the other hand, a limited PKS add-on that, although compatible with Kubernetes, could only handle a narrow subset of enterprise customer's needs -- hamstrung Pivotal's sales force who were responding to customers who were demanding a versatile, fully Kubernetes-compatible platform. It also rendered Pivotal's flagship PAS offering increasingly obsolete, requiring the Company to reengineer PAS from the ground up to be compatible with Kubernetes and, thus, competitive against large public cloud providers like Amazon, Microsoft, and Google.

11.  At the same time, PKS, Pivotal's new and only Kubernetes-compatible Cloud Foundry offering introduced in August 2017 and made commercially available in approximately February 2018, had a number of undisclosed drawbacks and could not satisfy the full scope of large enterprise customers' needs.  In addition, Pivotal did not permit its enterprise sales staff to

---

[5] Quarters are described herein in the format Q# FY YY, where # is the quarter number and YY is the fiscal year.  Q1 FY20 ended May 3, 2019.

sell PKS individually, but only as part of a suite of products including PAS and services. Moreover, PKS lacked key automation features and failed to provide adequate support for certain Infrastructure as a Service (IaaS) systems, while at the same time facing stiff competition in the Kubernetes-compatible market.

12. Based on the Registration Statements' material misrepresentations and omissions, the IPO was a huge success for Pivotal, which sold more than 42 million shares of its common stock to the investing public at $15.00 per share and raised more than $638 million in gross proceeds. The Underwriter Defendants also benefitted, sharing approximately $3.7 million in fees collectively, exclusive of the underwriting discounts and commissions.

13. Following its IPO, Pivotal's share price nearly doubled from $15 per share to an all-time high near $30 per share in June 2018, and again in September 2018.

**B. The Exchange Act Claims**

14. The claims asserted in Section V allege that from April 20, 2018 to June 4, 2019, Pivotal and the Executive Defendants made materially false and misleading statements regarding the Company's business and operations which failed to disclose: (i) increasing competition, (ii) increasingly apparent obsolescence of its primary offering (PAS), (iii) competitive disadvantages hampering its sales force and consequently lengthening its sales cycles, (iv) diminished growth, (v) decreasing deferred sales growth and decreasing remaining performance obligations ("RPO"), and (vi) other financial metrics that materially and adversely affected Pivotal's future results and prospects.

15. Indeed, during the Class Period, the Company continuously downplayed investor concerns about increased competition and repeatedly touted the superiority and adoption of its products. For example:

(a) On June 12, 2018, Defendant Mee stated: "***We're seeing a lot of adoption from existing customers. A lot of our existing customers are investing in PKS. . . . we have a lot of customers that are jumping in and getting their feet wet with that right now***."[6]

---

[6] Unless otherwise noted, all emphasis in bold and italics has been added.

(b)     On June 12, 2018, Defendant Mee stated: "***So we think it's good to have multiple players in the market. And we think there's plenty of room for competition, and that's good for innovation. We're not particularly looking at one competitor or another, or looking over our shoulders to figure out who is competing on exact feature****s*."

(c)     On September 12, 2018, Defendant Gaylor represented that Pivotal was "***feeling very good about the number of new customers and new logos***" and that PKS "***had been a driver not only of new logos coming to Pivotal but also existing customers kind of buying new products***."[7]

(d)     On September 12, 2018, Defendant Mee stated: "***On the sales and marketing front, we are investing to address strong and growing customer demand. . . . We are encouraged by the early traction we are seeing with PKS in our customer pipeline***."

(e)     On September 12, 2018, Defendant Gaylor represented that Pivotal was seeing "***no real changes***" in trends and no "***changes in the [ Company's] sales cycle***."

(f)     On December 11, 2018, Defendant Gaylor falsely assured investors that she was "***comfortable with current expectations on deferred revenue***."

(g)     On January 8, 2019, Defendant Gaylor falsely represented that "***competition in the past hasn't really been direct competition***."

(h)     On March 14, 2019, Defendant Mee stated that the Company was in the "***early stages of [a] high-growth market.***"

(i)     On March 14, 2019, Defendant Gaylor falsely stated that there were "***no specific anomalies to point out***" with respect to Pivotal's deferred revenue, and that there was no elongation of Pivotal's contract terms.

(j)     On March 14, 2019, in connection with comments that the Company was "***really pleased***" with its RPO, Defendant Gaylor stated that Pivotal's RPO "***demonstrates the visibility that we have into our business and the health of our business.***"

---

[7] Throughout the Class Period, the Company used the term "new logos" to refer to new subscription customers.

16. As set forth herein, Defendants' statements were materially false and/or misleading and failed to disclose, among other things, that Pivotal was facing major problems with its sales execution and a complex technology landscape resulting in lengthening sales cycles and diminished growth, as well as the industry's sentiment shifted away from Pivotal's principal product, which was incompatible with Kubernetes, the industry-standard platform. And while Defendants blamed some problems Pivotal was having on seasonal or quarterly variability in contract start dates and timing, the truth is, these problems were due to severe difficulty that the Company was having in closing new deals and expanding their footprint with existing customers.

17. Former Pivotal employees confirm that facts existed which contradicted Defendants' representations and omissions made throughout the Class Period regarding Pivotal's business, prospects, and its competition, and that the Executive Defendants knew, or recklessly disregarded those facts when issuing the false and misleading statements alleged herein. For example, former Pivotal employees confirm that:

(a) Even before the Class Period, Pivotal's competitors in the open-source market had caught up both in price-point and quality, and competitor's products allowed customers to do more for less money.

(b) The impact of Kubernetes and other competitors' products decreased interest in Pivotal's non-Kubernetes-compatible PAS platform and limited the ability of Pivotal to compete prior to and during the Class Period.

(c) Pivotal's legacy PAS product was both antiquated and expensive compared to other products on the market. Due to its lack of innovation, Pivotal was facing "significant headwinds" in the open-source market with many companies competing within this space.

(d) By the time of the IPO, Pivotal had already begun suffering from problems with sales execution and competition. Prior to the IPO, Pivotal had tried to expand to the Fortune 200 – 1000 market with their existing PAS products, but those products were too pricey for the "down-market." Indeed, Kubernetes and other competitors made Pivotal's expansion into the "down-market" very tough.

(e)     Because Pivotal's products were too expensive for the down-market, the Company mostly pursued business with large customers (referred to by some salespeople as "elephant hunting"), but this business took more time to close.

(f)     Sales Cycles elongated, in part, during the Class Period, because the sales teams were directed to only focus on the "whales," or larger potential customers which were the harder deals that took longer to close.

(g)     Pivotal's platform was difficult to implement and competitors such as Amazon, Google, and Microsoft were offering more attractive and innovative options.

(h)     Compounding these problems was the fact that Pivotal's Kubernetes-compatible product (PKS) took a long time to come to market (PKS was launched in August 2017, but was only commercially available starting in approximately February 2018), which hindered the ability of Pivotal's sales employees to compete against the newer Kubernetes-compatible products of competitors that customers preferred.

(i)     Indeed, in the government/federal market, sales employees at Pivotal "pushed [the] daylights" out of PKS, but Pivotal's government team couldn't move PKS at its Federal accounts.  In fact, PKS only had a small base of customers.

(j)     Part of the problem with promoting PKS was that the sales team at Pivotal was "deterred" from Kubernetes/PKS specific conversations with customers because there were so many competitors in that market.  Instead, the sales team was directed to steer customers towards a suite of Pivotal products and services, rather than just Pivotal's PKS offering.  By offering "custom solutions" to clients, Pivotal hoped clients could not compare the products to other competitors' products, such as Red Hat, because the customers did not know exactly what they were receiving.  It wasn't until approximately March 2019, that Pivotal finally permitted sales of PKS only.

(k)     Also starting in the March 2019 timeframe, internally, sales projections were routinely modified by senior staff prior to internal sales meetings in an effort to change the breakdown of projected sales to now show a focus on selling PKS as a standalone product, which was a turnaround from prior months where such practices were discouraged.

(l)     Sales Reports were provided to senior executives at Pivotal on a weekly basis, and weekly meetings led by Chad Sakac were regularly attended by Pivotal's senior executives, occasionally including CEO Robert Mee and CFO Cynthia Gaylor.

(m)     Defendant Gaylor also was kept apprised of Pivotal's revenues during the quarter by members of Pivotal's Accounting Department who also were tracking Pivotal's RPO and the effects of the competition the Company was facing.

## C.     Common Allegations Regarding the June 4, 2019 Disclosure and Announcement of the Deal with VMware

18.     On June 4, 2019, after the market closed, Pivotal reported its financial results for the first quarter of 2020 ("Q1 FY20") ended May 3, 2019.  Defendant Mee revealed that despite revenue and earnings slightly exceeding expectations in the quarter, leading metrics followed by the market, including "remaining performance obligation," or RPO, and deferred revenue, were substantially below expectations due to the fact that the Company "closed fewer deals than we expected in Q1 due to sales execution and a complex technology landscape that is lengthening our sales cycle. Some of the deals we expected to close in Q1 slipped."[8]

19.     Indeed, due to a deceleration in core growth and a proliferation of contracts with shorter durations, billings were down 23% year-over-year and RPO growth decelerated to 10% in Q1 FY20 and was guided to be flat year-over-year in Q2 FY20 – a serious cause for concern among investors.  Moreover, deferred revenue was $417.1 million, down 11% quarter-over-quarter, and substantially below the Street's consensus of $436.9 million, indicating that while Pivotal was recognizing revenue from existing subscriptions, it was failing to sign new or renew existing contracts that would sustain its deferred revenue growth for the future.  At odds with the fact that Defendants claimed this poor result was caused by deals slipping in the quarter, the Company lowered guidance for Q2 FY20 and provided guidance for full year 2020 that was below consensus estimates, suggesting the poor results were not a temporary blip.

---

[8]  According to the Company, RPO equals deferred revenue plus backlog, whereas backlog represents future performance obligations that have yet to be invoiced.  In other words, RPO represents the estimated value of Pivotal's billed and unbilled subscriptions and services, and purportedly demonstrates the visibility associated with the Company's revenue model.  Pivotal has described RPO as "basically all contracted revenue. . . . it's contracted, noncancelable contracts."  Citi Global TMT West Conference – January 8, 2019.

20.     On this news, Pivotal's stock price fell $7.65 per share, or more than 40%, from a close of $18.54 per share on June 4, 2019 to a close of $10.89 per share on June 5, 2019.

21.     Pivotal's disappointing earnings report and guidance triggered a cascade of negative forecasts from analysts.  Following the call, Wedbush analyst Daniel Ives called the quarter a "train wreck" and characterized the Company's operating results as "disastrous," asserting that Pivotal's "management team does not have a handle on the underlying issues negatively impacting its sales cycles and the activity in the field which gives us concern that this quarter will be the start of some 'dark days ahead' for Pivotal (and its investors)."  Jennifer Swanson Lowe of UBS echoed that lower than expected billings and RPO growth were a "cause for concern."  Analysts from RBC Capital Markets added that the stock is "likely to remain in the penalty box until results improve."

22.     Following Pivotal's disclosures on June 4, 2019, the Company's stock failed to recover and fell even further during July 2019 and the first half of August 2019, until reports surfaced on August 14, 2019 that VMware was in talks to acquire the Company.  Indeed, Pivotal's market capitalization fell from $5.8 billion on May 30, 2019 to $2.2 billion on August 14, 2019, a loss of $3.8 billion.

23.     On August 22, 2019, Pivotal's Board of Directors entered into a merger agreement with VMware pursuant to which Pivotal's Class A stockholders would receive $15.00 in cash for each share of Pivotal Class A common stock they owned.  On December 30, 2019, VMware announced it had completed the acquisition of Pivotal's Class A common stock and Pivotal was removed from listing on the New York Stock Exchange ("NYSE").  UBS opined that Pivotal's willingness to sell so soon after its IPO suggested that "sales execution issues persist."[9]  Wedbush noted that Pivotal's "disastrous deferred revenue/billings performance in FY1Q20 which significantly missed Street expectations (by 12%) due to company specific execution issues" made the deal a "head scratcher."[10]

---

[9] "*Pivotal Software Inc. - Poised to Pivot Away From the Public Domain*," UBS Global Research, August 14, 2019.

[10] "*VMW In Process of Acquiring Rest of PVTL; Would End the Dark Days for PVTL*," Wedbush, August 15, 2019.

24.     As a result of Defendants' false and misleading statements and omissions, Lead Plaintiffs and other Class members suffered significant losses and damages when Pivotal's stock precipitously declined upon the materialization of the undisclosed risks.

## III.     COMMON ALLEGATIONS

### A.     Jurisdiction and Venue

25.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, §§ 77l(a)(2), and 15 U.S.C. §§ 77o) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

28.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### B.     Parties

#### 1.     Lead Plaintiffs

29.     Court-appointed Lead Plaintiff Oklahoma City ERS provides pension and survivor benefits to full-time civilian employees of the municipality of Oklahoma City, where Oklahoma City ERS is headquartered.  Established in 1958, Oklahoma City ERS is a sophisticated institutional investor with approximately $760 million in assets under management as of June 2019.  As set forth in the Certification previously submitted to the Court (ECF No. 22-1), Oklahoma City ERS purchased or otherwise acquired Pivotal's securities at artificially

inflated prices during the Class Period and was damaged as a result of the materially false and misleading statements and omissions alleged herein.  In addition to purchasing Pivotal's stock in the secondary market, Oklahoma City ERS also purchased Pivotal shares pursuant or traceable to the Registration Statement.

30.     Court-appointed Lead Plaintiff St. Louis Police provide retirement benefits for all commissioned members of the St. Louis Metropolitan Police Department and their legal survivors and dependents.  St. Louis Police is a sophisticated institutional investor that had approximately $798 million in total pension assets under management as of June 2019.   As set forth in the Certification previously submitted to the Court (ECF No. 22-1), St. Louis Police purchased or otherwise acquired Pivotal's securities at artificially inflated prices during the Class Period and was damaged as a result of the materially false and misleading statements and omissions alleged herein.

## 2.     Defendants

### (a)     Pivotal

31.     Defendant Pivotal is a Delaware corporation with its principal executive offices located at 875 Howard Street, Fifth Floor, San Francisco, California, 94103.  Pivotal's main product is its PCF platform, a software program sold on a subscription basis that developers and IT departments use to help build, deploy and operate cloud-based software and applications.  The Company also offers strategic consulting services through a division called Pivotal Labs, which helps companies develop software and make changes to adapt to the extensive use of cloud computing.  Pivotal Labs is a Software–as-a-Service, or SaaS.

(a)     Until December 30, 2019, Pivotal securities traded in an efficient market on the NYSE under the symbol "PVTL."

(b)     Both before and after the IPO, Pivotal was controlled by Dell Technologies and Dell affiliates and subsidiaries, and through Dell's designation of its employees as officers and directors of Pivotal.  As a result, Dell has been the majority stockholder of Pivotal, controlling approximately 70% of outstanding shares of Pivotal common stock and approximately 95% of the voting power. As Pivotal admits in the Registration

Statement, Pivotal is a "controlled company," subject to the control of Dell Technologies, which is able to "exercise control over all matters requiring approval of [Pivotal] shareholders, including the election of [Pivotal] directors and approval of significant corporate transactions," *e.g.*, the IPO. Through "its control of shares of common stock representing a majority of the votes entitled to be cast . . . Dell Technologies [] control[led] the vote to elect all of [Pivotal's] directors."

### (b)  Executive Defendants

32.     Defendant Robert Mee ("Mee") was, at the time of the IPO, the Chief Executive Officer ("CEO") and a director of Pivotal. Mee has served as CEO of Pivotal since August 2015. In 1989, Mee co-founded Pivotal Labs, which was acquired by EMC in 2012. Mee continued to lead the Pivotal Labs Division until April 2013 when he became the SVP of Products and Research and Development. Mee reviewed, contributed to, approved and signed Pivotal SEC filings during the Class Period, including the Registration Statement. Mee was nominated to the Pivotal board pursuant to nomination rights granted to Dell Technologies. Under Pivotal's Fiscal Year 2019 Executive Incentive, Mee received a bonus of $347,325.

33.     Defendant Cynthia Gaylor ("Gaylor") was, at the time of the IPO, the Chief Financial Officer ("CFO") of Pivotal. Gaylor has served as Pivotal's CFO since May 2016. Gaylor reviewed, contributed to, approved and signed Pivotal SEC filings during the Class Period, including the Registration Statement.

34.     Defendants Mee and Gaylor are referred to herein as the "Executive Defendants."

35.     The Executive Defendants possessed the power and authority to control the contents of Pivotal's SEC filings, press releases, and other market communications. The Executive Defendants were provided with copies of Pivotal's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Pivotal, and their access to material information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were

then materially false and misleading. The Executive Defendants are liable for the false statements and omissions pleaded herein.

### (c) Director Defendants

36. Defendant Paul Maritz ("Maritz") was, at the time of the IPO, Chairman of the Board of Directors (the "Board"). Maritz was the former CEO of Pivotal (until August 2015) and has served as Chief Strategist at DellEMC and as Chief Executive Officer, President, and a director of VMware. Maritz was also President of DellEMC's Cloud Infrastructure and Services Division. Maritz reviewed, contributed to, and signed the Registration Statement. Maritz was nominated to the Pivotal board pursuant to nomination rights granted to Dell Technologies.

37. Defendant Egon Durban ("Durban") was, at the time of the IPO, a director of Dell Technologies and VMware, a director of Pivotal, and a Managing Partner at private equity firm Silver Lake Partners which, at the time, owned 24% of Dell and a substantial stake in Pivotal. In his capacity as a representative of Dell Technologies, Durban reviewed, contributed to, and signed the Registration Statement. Durban was nominated to the Pivotal board pursuant to nomination rights granted to Dell Technologies.

38. Defendant William D. Green ("Green") was, at the time of the IPO, a director of Dell Technologies and a director of Pivotal. In his capacity as a controlled representative of Dell Technologies, Green reviewed, contributed to, and signed the Registration Statement. Green was nominated to the Pivotal board pursuant to nomination rights granted to Dell Technologies. Green previously served as a director of DellEMC.

39. Defendant Marcy S. Klevorn ("Klevorn") was, at the time of the IPO, a director of Pivotal and President of Mobility at the Ford Motor Company, which as set forth herein, owned approximately 6% of Pivotal at the time of the IPO. In his capacity as a representative of Ford, Klevorn reviewed, contributed to, and signed the Registration Statement.

40. Defendant Khozema Z. Shipchandler ("Shipchandler") was, at the time of the IPO, a director of Pivotal and CFO of GE Digital. As set forth herein, GE owned approximately 5% of Pivotal at the time of the IPO. In his capacity as a representative of GE, Shipchandler reviewed, contributed to, and signed the Registration Statement.

41.     Defendant Michael S. Dell ("Dell") was, at the time of the IPO, the Chairman and CEO of Dell Technologies and a director of Pivotal.  In his capacity as an employee representative of Dell Technologies, Dell reviewed, contributed to, and signed the Registration Statement.  Dell was nominated to the Pivotal board pursuant to nomination rights granted to Dell Technologies.  Dell remains subject to a permanent injunction that resulted from a settlement arising out of an SEC investigation into prior federal securities law violations by Dell and Dell Technologies.  As set forth herein, Michael Dell visited Pivotal's offices frequently around the time of the IPO and spoke regularly with CEO Robert Mee during that time. Defendant Mee has represented to investors that "Michael Dell and Dell Technology as a whole was very, very helpful in customer introductions and co-selling and so forth."[11]

42.     Defendants Maritz,  Durban, Green, Klevorn, Shipchandler, and Dell are referred to herein as the "Director Defendants."

43.     The Director Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended roadshows and other promotions to meet with and present favorable information to potential Pivotal investors, all motivated by their own and the Company's financial interests.

### (d)     Underwriter Defendants

44.     Defendant Morgan Stanley & Co. LLC is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

45.     Defendant Goldman Sachs & Co. LLC is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

46.     Defendant Citigroup Global Markets Inc. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

---

[11] Q3 2019 Earning Call, December 11, 2018.

47.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

48.     Defendant Barclays Capital Inc. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

49.     Defendant Credit Suisse Securities (USA) LLC is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

50.     Defendant RBC Capital Markets, LLC is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

51.     Defendant UBS Securities LLC is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

52.     Defendant Wells Fargo Securities, LLC is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

53.     Defendant KeyBanc Capital Markets Inc. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

54.     Defendant William Blair & Company, L.L.C. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

55.     Defendant Mischler Financial Group, Inc. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

56. Defendant Samuel A. Ramirez & Company, Inc. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

57. Defendant Siebert Cisneros Shank & Co., L.L.C. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

58. Defendant Williams Capital Group, L.P. is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Pivotal securities issued pursuant thereto.

59. The Defendants referenced in ¶¶ 44-58 are referred to herein as the "Underwriter Defendants." Pursuant to the Securities Act, the Underwriter Defendants each are liable for the statements in the Registration Statement as follows:

(a) The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Pivotal stock in the IPO. The Underwriter Defendants arranged a roadshow prior to the IPO. So successful was the roadshow selling effort that days prior to the IPO, it was reported that IPO research and advisory firm IPOboutique.com "felt demand for shares among institutional investors is strong" as the deal "remains multiple times-oversubscribed."

(b) Representatives of the Underwriter Defendants also assisted Pivotal and the Executive Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Pivotal, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriting Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Pivotal's operations and financial prospects.

(c) In addition to availing themselves of virtually unfettered access to internal corporate documents, agents of the Underwriter Defendants met with Pivotal's management and top executives and engaged in "drafting sessions" between at least December 2017 and April

2018.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Pivotal stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Pivotal would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew, or should have known, of Pivotal's existing problems as detailed herein.

(d)　　The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Lead Plaintiff and the Class.

## C.　Substantive Allegations

60.　Pivotal provides a cloud-native application platform and services in the United States.[12]  The Company's Cloud Foundry (also known as "PCF") purportedly provides a consistent way to launch, and quickly iterate on, applications in programming languages and frameworks across private, public and multi-cloud environments.  This supposedly enables customers' development and IT operations teams to spend more time writing code and deploying applications and less time on expensive re-writes.  PCF, which is sold on a subscription basis, integrates several software technologies to provide what is commonly referred to as a Platform-as-a-Service, or PaaS.  PaaS delivers hardware and software tools -- usually those needed for application development -- to users over the internet.  A PaaS provider hosts the hardware and software on its own infrastructure.  This allows customers to develop, run, and manage applications without the complexity of building and maintaining the infrastructure typically associated with developing and launching an app.

---

[12]　The cloud is generally described as "the practice of using a network of remote servers hosted on the Internet to store, manage, and process data, rather than a local server or a PC." "*Pivotal Software Inc., These are Pivotal times; initiate at Sector Perform with $21 price target,*" RBC Capital Markets, May 15, 2018.

61. PCF combines open-source software with proprietary software to provide organizations a platform to develop and manage hybrid-cloud applications; that is an application that can be deployed on an enterprise's private cloud or leading public-cloud environments, such as Amazon Web Services (AWS), Microsoft Azure (Azure), Google Cloud Platform (GCP), VMware vSphere and OpenStack.[13]  Enterprises use PCF as one platform to run many different workloads in what is increasingly becoming a multi-cloud world.  That means on premises as well as public and private cloud environments.

62. Additionally, Pivotal boasts that PCF customers can accelerate their adoption of modern software application development through the Company's strategic services unit, Pivotal Labs (a/k/a Labs).  The Company also offers strategic services through Labs for organizations to adopt and implement development and to transform existing legacy applications to run on PCF. With Labs, Pivotal helps customers co-develop new applications and re-write legacy applications while accelerating software development, streamlining IT operations, and ultimately driving self-sustaining business transformation.  Labs is sold on a time and materials basis and recognized over time as services are delivered.

63. PCF includes these offerings:

(a)      PAS is Pivotal's distribution of Cloud Foundry software for hosting applications, which purportedly takes a developer's latest changes and, within seconds, has them running securely in a production environment.  PAS is sold as a subscription service.  Unlike the Company's newer PKS offering, which is Kubernetes-compatible, PAS did not run on Kubernetes during the Class Period.  Kubernetes is an open-source orchestration platform that allows the use of containers to easily deploy applications, turn applications on and off, and move apps between different servers.

(b)      PKS was a joint collaboration between Pivotal, VMware, and Google Cloud, launched on August 28, 2017, which allows enterprises to deploy and operate Kubernetes

---

[13] "*Pivotal Software Inc., These are Pivotal times; initiate at Sector Perform with $21 price target*," RBC Capital Markets, May 15, 2018.

across a hybrid architecture of public and private-cloud.[14]  Pivotal purportedly developed PKS

because its customers "told us they wanted to run Kubernetes as part of their cloud perform."[15]

PKS 1.0 was released in February 2018, PKS 1.1 was released in June 2018, and PKS 1.2 was

released in September 2018.  According to the Company, "[a]s with every release, we've

updated to the latest version of Kubernetes maintaining constant compatibility with Google

Kubernetes Engine."[16]  Analysts noted that Pivotal serviced the high end of the Kubernetes

market with PKS while competitor Heptio was viewed as the easier-to-use Kubernetes-

compatible infrastructure offering.[17]  Although Kubernetes-compatible, throughout the Class

Period, Pivotal's PKS deals were smaller than its PAS deals.[18]

(c)     The Pivotal Marketplace: this features products built by Pivotal and

more than 75 Independent Software Vendors, or ISV partners. These products are made to work

seamlessly with PCF, enhancing the value of the platform.  For example, Pivotal Cloud Cache,

or PCC, is a high-performance data caching solution designed to support cloud-native

applications.

64.     Pivotal sells various types of software offerings and services which can be

categorized as follows:

(a)     ***Subscriptions*** – arrangements in which a customer receives a software

license with Pivotal Cloud Systems ("PCS").  These arrangements are Pivotal's primary

products.  Pivotal's PCF subscription licenses are predominantly composed of Open Source

---

[14]  PKS is sold independently as a software subscription by both Pivotal & VMware. Pivotal & VMware entered into a Master Collaboration Agreement on December 5, 2017 in relation to the development of PKS. The first sales of PKS occurred in Q4 FY18 ended February 2, 2018. Per the Master Collaboration Agreement, revenue relating to sales of PKS was shared between Pivotal & VMware based on a 50/50 split of booked values (minus channel commission fees).

[15]  Q1 2020 Earning Conference Call, June 4, 2019.

[16]  Q3 2019 Earnings Conference Call, December 11, 2018.

[17]  "*Pivotal Software Inc. - Initial thoughts around Dell 13D filing and potential VMware combination*," RBC Capital Markets, LLC, August 15, 2019.

[18]  Q1 2020 Earning Conference Call, June 4, 2019, at 11 (Gaylor noting that PKS deals tend to be smaller than the Company's PAS deals).

Software (OSS) code,[19] substantially from Cloud Foundry, along with many other open-source projects, as well as the Company's proprietary software code. Depending on the offering, the OSS is combined with proprietary Pivotal software to create the Company's subscription offerings. The subscription provides the customer with the right to download the software, unspecified updates and upgrades & access premium support maintenance throughout the subscription term. Pivotal's subscription offering is sold on an annual basis, with many customers purportedly purchasing a 36-month term. Pivotal releases a new PCF version approximately every quarter. Therefore, the version of software that was supported at the onset of the subscription period usually is no longer the supported version during a majority of a customer's contract term. The following products are sold as subscriptions:

     (i)  Pivotal Application Service (Formerly Elastic Runtime);

     (ii)  PCF Operations Manager;

     (iii)  Pivotal Services Suite for PCF;

     (iv)  Pivotal Cloud Cache;

     (v)  Pivotal Container Service;

     (vi)  Pivotal App Suite;

     (vii)  Pivotal Tracker Enterprise SaaS; and

     (viii)  Pivotal Data Suite.

   (b)  **_Licenses_** – provide Pivotal's customers use of the licensed nonessential software for a specified term. At the end of the license term, a customer typically has the option of renewing the license. PCS is typically purchased for the term of the license, and may be renewed if and when the license is renewed.

   (c)  **_PCS_** – provides the customer with some level of support. The services vary depending on whether the customer purchases limited, enhanced, or premium support. Services that may be offered depending on the support package purchased by the customer could

---

[19] The term "open source" refers to something people can modify and share because its design is publicly accessible. *What is Open Source*, OpenSource.com, https://opensource.com/resources/what-open-source.

include: (i) Rights to new releases of subscriptions; and/or (ii) Installation of subscription releases.

(d) **Services Revenue** – Services Revenue for Pivotal consists of Consulting and Education Services. Consulting Services include Pivotal Labs (development services) and Customer Success Organization (CSO). Services may be invoiced as delivered or upfront, depending upon the offering and terms of the arrangement.

65. Pivotal sells its products and services to the market in three predominant ways including direct sales through the Company and indirect sales through VMware and EMC. For fiscal 2019, approximately 66% of bookings came through Pivotal, 27% came through the EMC channel and 7% came through the VMware channel.

(a) **Pivotal** – During the Class Period, Pivotal sold its offerings to customers through direct sales.

(b) **EMC** – During the Class Period, EMC acted as a sales agent for Pivotal, selling the same subscription offerings as Pivotal, on a standalone basis or in conjunction with other EMC offerings. EMC's channel pricing for Pivotal products was consistent with Pivotal direct pricing.

(c) **VMware** - During the Class Period, VMware acted as a sales agent for Pivotal, selling the same subscription offerings as Pivotal, on a standalone basis or in conjunction with other VMware offerings. Because PKS was a software subscription offering that was jointly developed with VMware, Pivotal expected to see increased sales through VMWare in fiscal 2020.

66. Pivotal has described its subscription-based business model as providing the Company with "a high level of visibility into future revenue":

> We have a subscription-based business model for our software,
> with PCF at the core of our offering. This provides us with a high
> level of visibility into future revenue. Our subscription revenue is
> recognized ratably over the term of our contracts, which are
> typically between one and three years. We price our software
> primarily on the number of application workloads, or instances, a
> customer expects to deploy on the platform. This means that our
> revenue grows as existing customers expand the use of our
> platform and as we add new customers. We generally bill our

customers annually in advance, although for our multi-year
contracts, some customers pay the full contract amount up front.

Our strategic services have been a critical driver of our rapid
subscription growth, as we use Labs to acquire new customers who
have PCF affinity while helping existing customers get more out of
the platform, leading to the expansion of their overall software
spend. We typically price our strategic services on a time and
materials basis.[20]

67. Because the Company uses a subscription model, the vast majority of amounts
billed to customers associated with current period sales are recorded as "deferred revenue."[21]
For example, assume the sale of a twelve-month subscription. Even if that sale was billed in the
first month of a quarter, Pivotal could only recognize three months of revenue in the instant
quarter. The remaining nine months of the subscription revenue would be accounted for as
"deferred revenue" at the quarter's end. In other words, the maximum amount of current quarter
revenue from a new subscription was 25% of the annual contract value. ***For this reason, the***
***vast majority of total revenue reported by Pivotal in any quarter was attributable to sales made***
***in prior periods***.

68. For example, the Company's SEC filings describe:

We generally recognize subscription revenue from customers
ratably over the terms of their contracts, which are typically one to
three years. As a result, most of the subscription revenue we report
for each quarter is derived from the recognition of deferred
revenue relating to subscriptions entered into during previous
periods.[22]

\*      \*      \*

Contract liabilities consist of deferred revenue and include
payments received in advance of performance under the contract.
Such amounts are recognized as revenue over the contractual
period.[23]

---

[20] Q1 2019 Earnings Conference Call, June 12, 2018. *See also* Q2 2019 Earnings
Conference Call, September 12, 2018.

[21] Defendants describe the relationship between deferred revenue and subscription sales in
their Registration Statement as follows: "a decline in subscription sales in any single quarter
would likely have only a small impact on our revenue for that quarter. However, such a decline
would negatively affect our revenue in future quarters."

[22] 10-Q for the quarterly period ended May 4, 2018.

[23] 10-Q for the quarterly period ended May 4, 2018.

69.     The combination of revenue and changes in "deferred revenue" in a given period is sometimes referred to by the Company and analysts as "billings."[24]

70.     While this revenue recognition method provides visibility to Pivotal's management, it also causes investors to place greater focus on the change in deferred revenue as compared to the Company's total reported revenue in any given quarter.

71.     As mentioned above, the Company also utilizes a metric known as "remaining performance obligation," ("RPO") which equals deferred revenue plus backlog, where backlog represents future performance obligations that have yet to be invoiced.  In other words, RPO represents the estimated value of Pivotal's billed and unbilled subscriptions and services, and purportedly demonstrates the visibility associated with the Company's revenue model.[25]  Pivotal has described RPO as "basically all contracted revenue. There's a slight discount, it includes subscription and it includes services. . . . it's contracted, noncancelable contracts."[26]

## 1.     Pivotal's IPO

### (a)     Pre-IPO - December 2017 to mid-April 2018.

72.     The Underwriter Defendants arranged a roadshow for Pivotal prior to its IPO. Representatives of the Underwriter Defendants assisted Pivotal and the Executive Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Pivotal, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriting Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Pivotal's operations and financial prospects.

73.     The Underwriter Defendants also met with Pivotal's management and top executives and engaged in "drafting sessions" between at least December 2017 and April 2018. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the

---

[24]  10-Q for the quarterly period ended May 4, 2018.
[25]  Q1 2019 Earnings Conference Call, June 12, 2018.
[26]  Citi Global TMT West Conference, January 8, 2019.

1    IPO; (ii) the terms of the IPO, including the price at which Pivotal stock would be sold; (iii) the

2    language to be used in the Registration Statement; (iv) what disclosures about Pivotal would be

3    made in the Registration Statement; and (v) what responses would be made to the SEC in

4    connection with its review of the Registration Statement.  As a result of the constant

5    communications between the Underwriter Defendants' representatives and the Company's

6    management and top executives, the Underwriter Defendants knew, or should have known, of

7    Pivotal's existing problems as detailed herein.

8          74.    Defendant Michael Dell frequently visited Pivotal's offices around the time of the

9    IPO and spoke regularly with CEO Robert Mee during this time.

10                 **(b)    Filing of Registration Statement and Prospectus**

11          75.    On December 15, 2017, Defendants filed with the SEC a confidential draft

12   Registration Statement on Form S-1, which would be used for the IPO following a series of

13   amendments in response to SEC comments, including comments from the SEC emphasizing the

14   importance of adequately disclosing material trends and risk factors, as required by Item 303.

15          76.    On March 23, 2018, Defendants publicly filed its Registration Statement on Form

16   S-1.

17          77.    On April 9, 2018, Defendants filed an amendment to the Registration Statement

18   on Form S-1/A.

19          78.    On April 12, 2018 Defendants again filed an amendment to the Registration

20   Statement on Form S-1/A.

21          79.    On or about April 18, 2018, Defendants filed a final amendment to the

22   Registration Statement, which registered over 37 million Pivotal common stock shares for public

23   sale.  The SEC declared the Registration Statement effective on April 19, 2018.

24                 (a)     The Director Defendants and the Executive Defendants each signed the

25   Registration Statement.

26                 (b)     The Underwriter Defendants caused the Registration Statement to be

27   filed with the SEC and declared effective in connection with offers and sales thereof, including

28   to Lead Plaintiffs and the Class.

80.     On or about April 20, 2018, Defendants filed the Prospectus for the IPO, which forms part of the Registration Statement.

81.     On or about April 24, 2018, the Company completed its IPO, which, upon the Underwriters Defendants exercising their full overallotment option to purchase additional shares, issued a total of 42,550,000 shares to the public priced at $15.00 per share, generating over $638 million for Pivotal.

82.     In connection with Pivotal's IPO, the Underwriter Defendants shared approximately $3.7 million in fees collectively, exclusive of the underwriting discounts and commissions.

### (c)     Post-IPO

83.     Following the IPO, a large number of shares were restricted from resale as a result of market standoff and "lock-up" agreements.  Approximately 37.8 million restricted shares were available to be sold 180 days after the IPO (or October 17, 2018).

84.     Due to the expiration of the post-IPO share lock-up, on October 17, 2018, Pivotal's stock price fell from a close of $19.92 per share on October 16, 12018 to a close of $18.94 per share on October 17, 2018, a drop of approximately 5%.  Pivotal share price continued to fall on October 18 and October 19, 2018.

### 2.     Pivotal's Largest Shareholders

### (a)     Dell Technologies

85.     Pivotal was formed through the combined assets of Dell, EMC, and VMware in 2013.  Transactions processed through strategic partners under their agency agreements with Dell, EMC and VMware purportedly generated 46% of total revenue in fiscal year 2016, 44% of total revenue in fiscal year 2017, and 37% of total revenue in fiscal year 2018.[27]

86.     Post-IPO, and the over-allotment, Dell Technologies, including its VMware subsidiary, owned approximately 175 million shares of Class B common stock, **which represented approximately 69% of the total outstanding shares of Pivotal's common stock**

---

[27] "*Pivotal Software Inc., Providing the Pivot Point for Digital Transformation*," UBS Global Research, May 15, 2018.

and approximately **95% of the combined voting power**. Of the 175.5 million Pivotal shares controlled by Dell, only 131.3 million were held by Dell directly, while the other 44.2 million shares were held by VMWare.

87. Dell was also a controlling stockholder of VMware, beneficially owning all of the outstanding VMware Class B common stock and 30,678,605 shares, or approximately 28.2% of the outstanding VMware Class A common stock, representing in the aggregate approximately 97.5% of the combined voting power of both classes of VMware's common stock and approximately 80.9% of the total outstanding common stock of VMware, in each case as of August 30, 2019.

88. Indeed, Defendant Mee has represented to investors that "Michael Dell and Dell Technology as a whole is very, very helpful in customer introductions and co-selling and so forth."[28]

### (b) General Electric

89. In 2013 and in conjunction with the formation of Pivotal, General Electric International Holdings ("GE") invested $105 million in Pivotal for a stake of 10% (at the time). GE also invested in Pivotal in a 2016 round led by Ford – which brought GE's total Pivotal holdings to approximately 19.4 million shares.

90. On April 17, 2018, Pivotal issued an additional 19,415,075 unregistered shares of its Class A common stock to GE.

91. During Pivotal's IPO, GE registered and sold 3,883,000 of its pre-IPO Class A shares, **for total proceeds of approximately $58.2 million**. The balance of GE's unregistered 15,532,075 shares were restricted and subject to a 180-day lock up period.

92. On November 6, 2018, after the expiration of the 180-day lock up period, GE sold 9,836,521 unregistered shares of Pivotal Class A common stock, or approximately 63 percent of its 15.5 million shares, for $17.60 per share **for proceeds of $173.1 million**. According to its SEC filings, that substantially reduced GE's stake in Pivotal from 20.8 percent to 7 percent.

---

[28] Q3 2019 Earning Conference Call, December 11, 2018.

93.    Then, on December 12, 2018, GE sold its remaining 5,695,554 unregistered shares of Pivotal Class A common stock for $17.20 per share, or **approximately $98 million**.[29]

94.    Thus, by December 12, 2018, approximately 36 percent of total Pivotal Class A common stock in the market were non-IPO shares and 64 percent were issued in connection with the IPO.

### (c)    Ford

95.    In 2016, Ford invested $182.2 million in Pivotal.  After the IPO and the over-allotment, Ford owned approximately 6% of Pivotal.

96.    In July 2019, Ford announced it had written down the value of its Pivotal stake by an amount equal to nearly its entire initial investment in the Company.[30]  Although Ford did not itself cite to reasons for the write down, commentators have noted that Ford "got on the wrong side of an open-source software push led by Google," the original developer of Kubernetes.[31]

### 3.    Confidential Witnesses

### (a)    Background of CWs

97.    Lead Plaintiffs interviewed numerous former employees of Pivotal employed during the Class Period who provided information in further support of the allegations herein.

98.    CW-1 was a former Accountant for Pivotal in the Company's Finance and Accounting Department from before the beginning of the Class Period until Spring 2019.  CW-1 was two reporting levels below CFO Cynthia Gaylor.

99.    CW-2 was employed by Pivotal from February 2013 to October 2018 and held the title of Strategic Account Manager during the last 4 years of his tenure. He was responsible for selling to and managing relationships with some of Pivotal's top customers (Fortune 100 – 200

---

[29] GE was also a customer of Pivotal. Revenue from GE in fiscal year 2016, 2017, and 2018 was $3.6 million, $10.8 million, and $11.0 million respectively.

[30] Ford was also a customer of Pivotal. Revenue from Ford in fiscal year 2017 and 2018 was $32.0 million and $31.3 million respectively.

[31] Lashinsky, Adam & Presman, Aaron, *How Ford Lost $181 Million Betting on a Technology Startup—Data Sheet*, Fortune (July 29, 2019), https://fortune.com/2019/07/29/ford-pivotal-write-down/.

companies). In his first two years as a Strategic Account Manager, CW-2 focused on a few of these customers, while in the last two years, he focused on one of the top customers.

100. CW-3 was a Software Strategic Accounts Director in Healthcare and Retail at Pivotal from October 2013 through January 2019.

101. CW-4 worked at Pivotal from February 2014 to May 2019. During CW-4's tenure, he was an Executive Assistant (June 2015 to May 2019) and an Office Manager (February 2014 to June 2015). CW-4 reported to Helyn Corcos (Vice President Investor Relations) and Chad Sakac (head of Americas Sales, PKS, Dell Technology Alliance). According to CW-4, Sakac reported to Pivotal President Bill Cook who reported to CEO Mee.

102. CW-5 was a former Senior Federal Account Sales Manager at Pivotal from February 2018 to November 2018. CW-5 was responsible for "hunting [and] prospecting" potential Federal clients.

103. CW-6 was a Senior Director of Sales at Pivotal from June 2017 to June 2018. CW-6 led a sales team that sold to all types and sizes of customers in his sales region which consisted of Texas, Oklahoma, Louisiana, and Arkansas. CW-6 initially reported to Rob Schmitt (Vice President, Sales and Operations), and then to Mathew Wilcox (Vice President of Sales – South). According to CW-6, Wilcox reported to Andrew Ettinger, who he believed reported to a senior executive who reported to CEO Robert Mee.

104. CW-7 worked at Pivotal from March 2018 to August 2019 as an Enterprise Sales Executive with a focus on Media & Entertainment and Financial companies.

### (b) Competition and an Antiquated Product Offering Contributed to An Elongated Sales Cycle at Pivotal

105. CW-2 stated that prior to the IPO, Pivotal faced challenges with its "down-market," referring to Fortune 200 – 1000 customers, and especially those considered between Fortune 500 – 1000 companies. CW-2 explained that Pivotal was trying to expand to the Fortune 200 – 1000 market with their existing products, but that those existing products were too pricey for the "down-market" (especially Fortune 500 – 1000 companies).

106.    According to CW-2, pricing and competition from Kubernetes technology –
including AWS, Microsoft, and Google's versions of Kubernetes – challenged Pivotal's ability to
expand down-market, and that this was becoming obvious starting soon before the IPO and
increasing throughout the rest of his tenure.  CW-2 stated that PAS was the Company's main
product that larger customers liked like, but it ran up against very competitive and more
affordable products, especially Kubernetes technology, that appealed more to the "down-
market."

107.    CW-2 identified Kubernetes as the technology most often cited by his colleagues
who were trying to build Pivotal's customer base among Fortune 200 – 1000 companies.  CW-2
reiterated that Kubernetes was making Pivotal's expansion into that "down-market" very tough.
He explained this was because Kubernetes was "materially cheaper" and "could do many things
that PAS could do."

108.    CW-2 confirmed that problems in expanding Pivotal's customer base became
apparent to him and some of his colleagues leading up to the IPO.  According to CW-2, he and
some of his colleagues at Pivotal "saw signs leading up to the IPO."  CW-2 explained that what
he and his colleagues were seeing was that "more and more" of Pivotal's revenue was coming
from existing clients (or "logos"), and not new clients. CW-2 recalled that this started occurring
around March 2017, and that from around that time and throughout the rest of his tenure,
business with "new logos didn't accumulate" as expected.  CW-2 further described the
approximate March 2017 to March 2018 time frame as "over-weighted" in going after existing
clients, since the Company "continuously" went back to existing logos for business and revenue
because growth with new logos was not accumulating.

109.    According to CW-2, it was believed by him and some of his Pivotal colleagues
that by late 2017/early 2018, and definitely by the time of the IPO, Pivotal's competitors had
caught up in both price-point and quality, and by quality he meant that competitor's products
allowed them to do more for less money.  CW-2 recalls competitors coming up in conversation
amongst his Pivotal colleagues more and more by no later than late 2017/early 2018.  CW-2
confirmed that competition had "no question" caught up by the time of the IPO.

110.     CW-6 confirmed that both before and after the IPO, Pivotal's leadership only pursued business with large customers, and the "elephant hunting" strategy led to very little in CW-6's sales pipeline. CW-6 reported that the pressure to focus on large customers, and virtually ignore medium and smaller sized customers, came from Vice President of Sales, Andrew Ettinger. CW-6 explained that larger deals with larger companies took more time to pursue and complete and led to an elongated sales cycle at Pivotal.

111.     CW-6 stated that the impact of Kubernetes and other competitors' products on his ability to compete in his region existed throughout his tenure. CW-6 advised that Pivotal's newer products, such as PKS, were taking a long time to come to market, which hindered his ability to compete against their competitors' newer products that customers of all sizes and types (enterprise, medium, small, federal) preferred. CW-6 advised that Pivotal developed PKS specifically because the Company knew that Kubernetes was causing decreased interest in Pivotal's Cloud Foundry (PAS platform). According to CW-6, based on the sales information he had access to, Pivotal was "against headwinds in a very big way." CW-6 advised that PKS was being released to the market just as his tenure ended in June 2018.

112.     CW-6 reported that his region experienced a "big drop in revenue, year over year" by the time he left in June 2018. According to CW-6, this was due to competition that Pivotal faced with the increasing popularity of Kubernetes and other competitor's products, as well as being forced to only pursue larger customers.

113.     CW-5 reported that when it came to PAS sales, there were a lot of macro level factors that had an impact on sales, including that Red Hat (Pivotal's main competitor) would continuously "spew" that Pivotal's cloud foundry was antiquated. CW-5 also explained that he was consistently hearing in the marketplace that Pivotal's Cloud Foundry (PAS offering) was expensive compared to other products on the market.

114.     CW-5 also reported that the competitive landscape for Pivotal's consulting services in the Washington DC area and specifically with Federal customers was very challenging. CW-5 explained that Pivotal was competing in an already extremely saturated market when it came to consulting services and they were not making many inroads.

115.     CW-4 also confirmed hearing, in Pivotal's office, concerns about competition and reported that colleagues told him about customers no longer wanting Pivotal's services.

116.     CW-7 explained that at Pivotal the goal with the larger, enterprise accounts was to get the customers to commit to a suite of Pivotal's products.  CW-7 explained that with the larger enterprise accounts, smaller wins were possible (i.e., get the customer to commit to Pivotal Labs/Services or PKS), but he was instructed by Pivotal management to focus on closing only larger sales which combined everything into a customized PAS system.  According to CW-7, the directive on whether to try to get the smaller win or wait for the larger scale win was an "internal battle" at Pivotal.

117.     CW-7  reported that the sales team was "deterred" from Kubernetes/PKS specific conversations with customers.  CW-7 was specifically told, "do not go into any account talking about PKS."  CW-7 explained that because VMWare owned 50% of PKS and because there were so many competitors in that market, there was an internal decision at Pivotal for the majority of his tenure to avoid selling PKS as a standalone product because it would become "commoditized."  CW-7 also explained that because there was a lot of competition for Kubernetes-compatible products, the thought was to not go down that path, but instead to steer customers towards a suite of Pivotal products and services, rather than just PKS.  CW-7 advised that by offering "custom solutions," clients could not compare Pivotal's products to other competitors' products, such as Red Hat, because they did not know exactly what they were receiving.  CW-7 stated that the goal was to stay away from VMWare because they had hundreds of products, and instead get the customer to a place where they wanted Pivotal to "craft" them a customized Pivotal system.

118.     While confidential witnesses assert that Pivotal was pushing PAS over Kubernetes-compatible PKS, there was often "mixed messag[ing]" internally regarding what product to sell.  CW-7 stated that the goal had been to differentiate Pivotal, but everyone knew that was the long game and Pivotal was consistently putting out "mixed messages" about shifting to PKS/Kubernetes.  CW-7 reiterated that with large customers like his enterprise customers, there was a "legit fight" on the "narrative of the customer journey."  CW-7 advised that from the

time he joined the Company until approximately March 2019, there were mixed messages about whether to push PKS to their customers.

119.    At the time of the IPO, Pivotal was also suffering from having to push an inflexible product.  CW-3 stated that during his tenure, Pivotal had "a monolithic product that was expensive and operated with poor sales execution/strategy."  According to CW-3, Pivotal's platform was difficult to implement and competitors such as Amazon, Google, and Microsoft were offering more attractive and innovative options.  CW-3 stated: "So, yes the lack of a strategy and new products affected them . . . that did it!"

(c)    **Pivotal's PKS Offering Was Late to the Kubernetes-Compatible Market and Was Difficult to Sell Because of its Limited Capabilities**

120.    CW-2 stated that Kubernetes was "materially cheaper [compared to PAS]" and "could do many things that PAS could do."  CW-2 added that during his tenure, Pivotal was "still pushing PAS hard" because it was a mature technology, while PKS was not fully developed even by the end of his tenure.  CW-2 described the Company as "late to the Kubernetes game."

121.    CW-2 reported that Google's Kubernetes was a product that Pivotal was "slow to adapt to," and he believed that Pivotal was "slow to come to market with a solution" (which he identified as PKS) for Kubernetes.  CW-2 recalled his colleagues telling him (during and after his tenure), that customers were asking "more and more" for Kubernetes.  According to CW-2, there was a smaller market for PAS but with higher price-points because it was more expensive and a "more mature" (more fully developed) product, and a larger market for PKS with the higher amount of smaller companies because of the less expensive price points.  CW-2 reiterated that Pivotal's market for PKS amongst the smaller, more plentiful customers also did not develop as hoped and was not fully developed by the time of the IPO or the end of his tenure (October 2018).

122.    CW-1 stated that once on the market, PKS was jointly sold by Pivotal and VMWare and was a 50/50 revenue share deal, but that depending on how the sale transpired, the revenue split could vary.  CW-1 explained that if VMWare made the PKS sale, they got a more favorable split.  CW-1 believed that whomever sold PKS got an extra 2.5%.

123. CW-5 recounted that although all of the sales personnel at Pivotal "pushed [the] daylights" out of PKS, the government team "did not sell a lick" of it as the Federal accounts were not interested in PKS at the time. In fact, according to CW-5, when it came to overall sales of PKS, there was "not a lot of PKS sold." According to CW-5, PKS did not have a large reoccurring base of customers as compared to Cloud Foundry.

124. CW-4 also confirmed hearing the customers did not want Pivotal's new product, PKS.

125. CW-7 advised that throughout his tenure, more and more companies were adopting Kubernetes, yet Pivotal continued to push its customizable solution rather than its PKS offering. CW-7 stated that Pivotal could have adapted sooner to where the market was headed which was towards Kubernetes. CW-7 added that it was clear that the market had been moving towards Kubernetes and that "the trend" had steadily increased throughout his tenure at the Company. CW-7 suggested that Pivotal was "intentionally late" to the Kubernetes party, recounting how they claimed to be solutions driven rather than product driven.

### (d) Failure to Replace Lost Employees Also Negatively Affects Pivotal's Sales Efforts

126. Testimony from confidential witnesses further supports that at the time of going public, Pivotal was suffering from attrition especially amongst Lab employees.

127. CW-4 recalled that around the time of the IPO and continuing after the IPO, Pivotal was cutting existing Lab employees, but not hiring new Lab employees, which led to additional attrition from remaining Lab employees.

128. CW-1 also confirmed that Pivotal had an employee attrition problem following the IPO.

129. CW-7 explained that he was one of 14 sales representatives hired by Pivotal in anticipation of their IPO. He described it as a "massive ramp-up" of hiring. According to CW-7, most of the 14 sales personnel that were brought on in anticipation of the IPO were terminated for not making their numbers despite the fact that Pivotal had put significant restraints on the

way they were selling and forced them to focus on the larger solution sales, rather than the smaller wins.

### 4. VMWare Acquires Pivotal in Late 2019

130. On August 14, 2019, Dell released a 13D filing noting that special committees from the boards of Pivotal and VMware were "proceeding to negotiate definitive agreements with respect to a transaction to acquire all of the outstanding shares of Class A common stock of Pivotal for cash at a per share price equal to $15.00" and all Class B common stock of Pivotal held by Dell for VMware stock at an exchange rate to be determined later. VMware followed with a statement that it "regularly evaluates potential partnerships and acquisitions that would accelerate our strategy" and valued Pivotal as a long-term strategic partner. Similarly, Pivotal acknowledged the ongoing negotiations. All parties also stated there would be no further comments unless a definitive agreement had been reached.

131. In connection with the filing of 13D/A by Dell, and confirmed by a follow-up press release regarding the potential deal, Jennifer Swanson Lowe of UBS issued an analyst report on Pivotal which noted:

> The proposed $15/share price is in line with PVTL's April 2018 IPO price of $15, and below the ~$20/share the stock traded at for much of 2019 up until the disappointing Q120 print which sent the stock down ~50%. **We think PVTL's willingness to sell here suggests that sales execution issues persist,** but we also note VWM's willingness to acquire Pivotal affirms our view that Pivotal's technology remains sound . . . .Our existing $15 price target is already in line with the proposed $15/share acquisition price, and reflects 4.8x EV/CY19 Sales. Our target multiple is derived from our EV/Sales vs. revenue growth + FCF margin regression analysis.[32]

132. On August 22, 2019, Pivotal's Board of Directors entered into an agreement and plan of merger (the "Merger Agreement") with VMware which valued Pivotal at approximately $2.7 billion. Pursuant to the terms of the Merger Agreement, Pivotal's Class A stockholders would receive $15.00 in cash for each share of Pivotal Class A common stock they own. Dell Technologies was entitled to receive 0.0550 of a share of VMware's Class B common stock per

---

[32] *"Pivotal Software Inc. - Poised to Pivot Away From the Public Domain,"* UBS Global Research, August 14, 2019.

each share of Pivotal's Class B common stock that Dell owns (other than shares owned directly or indirectly by VMware).

133. According to the press release announcing the Proposed Transaction:

> VMware, Inc. (NYSE: VMW), a leading innovator in enterprise software, and Pivotal Software, Inc. (NYSE: PVTL), a leading cloud-native platform provider, today announced that the companies have entered into a definitive agreement under which VMware will acquire Pivotal for a blended price per share of $11.71, comprised of $15 per share in cash to Class A stockholders, and the exchange of shares of VMware's Class B common stock for shares of Pivotal Class B common stock held by Dell Technologies, at an exchange ratio of 0.0550 shares of VMware Class B stock for each share of Pivotal Class B stock.
>
> In total, the merger consideration represents an enterprise value for Pivotal of $2.7 billion. The Board of Directors of each of VMware and Pivotal have approved this transaction, following the recommendations of special committees composed of independent directors of each company. Following the close of the transaction, VMware will be positioned to deliver the most comprehensive enterprise-grade Kubernetes-based portfolio for modern applications.
>
> . . .
>
> Details Regarding the Transaction
>
> Under the terms of the transaction, Pivotal's Class A common stockholders will receive $15.00 per share cash for each share held, and Pivotal's Class B common stockholder, Dell Technologies, will receive approximately 7.2 million shares of VMware Class B common stock, at an exchange ratio of 0.0550 shares of VMware Class B common stock for each share of Pivotal Class B common stock. This transaction, in aggregate, results in an expected net cash payout for VMware of $0.8 billion. The impact of equity issued to Dell Technologies would increase its ownership stake in VMware by approximately 0.34 percentage points to 81.09% based on the shares currently outstanding. VMware currently holds 15 percent of fully-diluted outstanding shares of Pivotal.
>
> The transaction is expected to be funded through cash on the balance sheet, accessing short-term borrowing capacity, and approximately 7.2 million shares of VMware Class B common stock to Dell. Closing of the transaction is subject to customary closing conditions including the approval of the merger agreement by the holders of at least a majority of the outstanding shares of Pivotal common stock not owned by VMware or Dell Technologies or their affiliates (a "majority-of-the-minority" vote) and is expected in the second half of VMware's fiscal year 2020, which ends January 31, 2020.

134. On October 10, 2019, Defendants filed a proxy statement (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

135.    On December 30, 2019, VMware announced it has completed the acquisition of Pivotal.  As a result of the completion of the acquisition, Pivotal's Class A common stock was removed from listing on the NYSE with trading suspended prior to the open of the market on December 30, 2019.  Effective December 30, 2019, Pivotal would operate as a wholly owned subsidiary of VMware.  According to VMware's December 30, 2019 press release, the transaction represented an enterprise value for Pivotal of approximately $2.7 billion.

### 5.    Class Action Allegations

136.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired: (1) Pivotal common stock pursuant or traceable to the Registration Statement issued in connection with Pivotal's IPO; and/or (2) Pivotal publicly traded securities during the Class Period, and were damaged thereby (the "Class").   Excluded from the Class are: (i) all defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii) any person who is or was an officer or director of Pivitol; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) Pivotal's employee retirement and benefit plan(s) and its participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.  Also Excluded from the Class are the following entities which held significant financial interests in the Company during the Class Period and who had representatives on Pivotal's Board of Directors during the Class Period: (a) Dell Technology; (b) GE International Holdings B.V., (c) Ford Motor Co.; (d) Silver Lake Partners; (e) EMC Corp. and (f) VM Ware.

137.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pivotal securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pivotal or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

138. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

139. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

140. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pivotal;
- whether the Executive Defendants caused Pivotal to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Pivotal securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

141. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

142. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Pivotal securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiffs and members of the Class purchased, acquired and/or sold Pivotal securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

143. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

144. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### 6. Applicability of Presumption of Reliance: Fraud on the Market Doctrine

145. Lead Plaintiffs allege that throughout the Class Period, Defendants omitted to disclose material information of which Defendants were aware or were reckless in not knowing.

Such statements artificially inflated or artificially maintained the price of Pivotal publicly traded securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described in Section V, it was important that Defendants not mislead investors or withhold material information. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Pivotal and its deferred revenue business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah*, 406 U.S. at 153.

146. Alternatively, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiffs and other members of the Class purchased Pivotal's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f) At all relevant times, the market for Pivotal shares was an efficient market for the following reasons:

(i) Pivotal shares met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(ii) As a regulated issuer, Pivotal filed periodic public reports with the SEC and the NYSE;

(iii) Pivotal regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    Pivotal was followed by several securities analysts employed by major brokerage firm(s) including Wedbush Securities, Morgan Stanley, Goldman Sachs, Citigroup, Credit Suisse, KeyBanc Capital Markets, UBS, Bank of America Merrill Lynch, Barclays Capital, RBC Capital Markets, Wells Fargo Securities, and William Blair & Company, which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace;

147.    As a result of the foregoing, the market for Pivotal's securities promptly digested current information regarding the Company from publicly available sources and reflected such information in Pivotal's securities price(s).  Under these circumstances, all persons and entities who purchased or otherwise acquired Pivotal's securities during the Class Period suffered similar injury through their purchase of Pivotal at artificially inflated prices and the presumption of reliance applies.

## IV.    SECURITIES ACT ALLEGATIONS

### A.    Defendants' False and Misleading Statements and Omissions in Pivotal's Registration Statement

148.    The Registration Statement contained untrue statements of material facts and omitted to state material facts both required by governing regulations and necessary to make the statements made therein not misleading.[33]

149.    For example, within the Registration Statement, Defendants promoted the "[m]arket opportunit[ies]" purportedly currently available for Pivotal, stating that its "cloud-native software addresses IT spending across *the rapidly growing market* for public cloud workloads, sometimes referred to as Platform-as-a-service ('PaaS'), and the market for application infrastructure, middleware and development software."  To that end, the Registration Statement touted an estimated market of "over $50 billion" for its cloud-native platform.

---

[33] Plaintiffs allege that the statements highlighted in *bold and italics* within this section were materially false and misleading.

150.     The Registration Statement characterized Pivotal's PAS offering as providing a "***cutting-edge***," "***leading***" and "***turnkey cloud-native platform***," including offering  "***a built-in advanced container networking and security engine***," "***combin[ing] the latest innovations from open-source projects such as application containers***," and "***integrat[ing] PCF with leading open-source projects such as Kubernetes***."  The Registration Statement touted that this platform provided competitive strengths, including "***Blue-Chip customer adoption***" and "***Viral adoption together with C-level focus.***"

151.     Within the Registration Statement, Pivotal also touted the "***ability to innovate and rapidly respond to customer needs and changing open- source software standards***."

152.     In addition, the Registration Statement stressed that the Company's sales execution had led to increasing new customer subscriptions, explaining that Pivotal markets and sells PCF and Labs through its sales force and "ecosystem partners," which included Google, Microsoft and Amazon.  Indeed, the Registration Statement explained the Company "***work[s] closely with large public cloud providers, including Google and Microsoft, to bring [Pivotal's] customers' workloads to their cloud infrastructure***."

153.     The Registration Statement further contained pages and pages of generalized possible "Risk Factors" that "may" occur and, "if" they did "actually occur," "could" "materially and adversely affect[]" Pivotal's business.  For instance, as to market adoption of its product, Pivotal stated "***our future growth is largely dependent on PCF and platform-related services, and challenges in market acceptance, adoption and growth of PCF could harm our business, results of operations and prospects***."  The Registration Statement further stated,

(a)     "The introduction of third-party solutions embodying new technologies and the emergence of new industry standards, including any open-source projects that have become widely adopted, ***could*** make our existing and future software offerings obsolete and unmarketable."

(b)     "Our business and prospects will be harmed ***if*** our customers do not renew their subscriptions and expand their use of our platform."

154. Indeed, as set forth herein, at the time of the IPO, these risks had already materialized and were negatively affecting Pivotal's business.

155. Similarly, as to customer demand, the Registration Statement stated that Pivotal's "business and prospects will be harmed *if* our customers do not renew their subscriptions and expand their use of our platform." The Registration Statement went on to state, "*If* we are unable to meet customer demands, to leverage the strengths of PCF and Labs as a complementary offering or to achieve more widespread market acceptance of our offerings, our business, results of operations, financial condition and growth prospects will be adversely affected."

156. The Registration Statement also stated that "operating results *could* suffer due to" "declines in demand for PCF," and that "*if* demand for PCF does not grow as quickly as we anticipate, whether as a result of competition, pricing sensitivities, product obsolescence, technological change, unfavorable economic conditions, uncertain geopolitical environment, budgetary constraints of our customers or other factors, our business, results of operations and prospects will be harmed."

157. Likewise, with respect to competition, the Registration Statement provided, "we operate in a highly competitive industry, and any failure to compete effectively *could* materially and adversely affect our business, results of operations and financial condition."

158. The Registration Statement further stated that the Company's "subscription revenue growth rate, both in absolute terms and relative to total revenue, in recent periods *may not* be indicative of our future performance" and stated that "[o]ur customers' renewal rates *may* decline."

159. Similarly, as to the Company's sales cycles, the Registration Statement stated, in relevant part:

> *Our sales cycles can be long, unpredictable and vary seasonally, which can cause significant variation in the number and size of transactions that close in a particular quarter.*

160. Likewise, in addressing the changes to the technology landscape, the Registration Statement stated, in relevant part, "*We may not be able to respond to rapid technological*

*changes with new offerings, which could have a material adverse effect on our sales and profitability.*"

161. Further, in discussing competition, the Registration Statement stated, "*It is possible for competitors with greater resources than ours to develop their own open-source software-based products and services, potentially reducing the demand for our solutions and putting price pressure on our offerings*."

162. Defendants repeated the same false and misleading statements within the Prospectus, which was filed pursuant to 17 CFR § 230.424 on April 20, 2018 with the SEC.

163. The IPO was successful. Based on above-described misrepresentations and omissions, Defendants were able to sell more than 42 million shares of Pivotal common stock to the investing public at $15.00 per share, the mid-point of the Company's expected price range of the $14 to $16 range. Overall, the IPO raised more than $638 million in gross proceeds.

164. Analyst coverage over the following weeks was very positive. For example, on May 15, 2018, analysts at RBC Capital Markets launched coverage of the Company. In justifying its Sector Perform rating and $21 price target, the report stated, "Given that PCF now supports containers and Kubernetes, we believe Pivotal's public cloud usage should increase."

165. Similarly, on May 15, 2018, Key Banc Capital Markets supported its $24 target by noting:

> ***The container wave lifts all boats.*** The rapid adoption of containers as an alternative to traditional virtual machine-based infrastructure has become a strategic shift for many IT organizations, with the expectation that containers will become the standard model for most modern PaaS offerings. Pivotal, Red Hat, and the broader PaaS marketplace (Docker) are benefiting as spending shifts to containers and the accompanying management layers, ***such as Kubernetes (Pivotal Container Services, PKS) and PCF***.

166. The statements in ¶¶ 149-153, 155-161 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO:

1        (a)      Pivotal was already experiencing lengthening sales cycles and

2    diminished growth in new customers as a result of increased competition and decreased demand

3    as customers and industry sentiment shifted away from Pivotal's principal, yet outdated, PAS

4    offering because it was incompatible with the industry-standard Kubernetes platform.

5        (b)      At the same time, PKS, Pivotal's Kubernetes-compatible PCF offering,

6    had a number of undisclosed drawbacks and could not satisfy the full scope of large enterprise

7    customers' needs.[34]  Among other things, to ensure proper security, enterprise customers

8    operating PKS would have to install PKS on a separate "instance," forcing operators to manage a

9    number of separate environments and thus increasing operational expenses.  In addition, PKS

10   lacked key automation features and failed to provide adequate support for certain Infrastructure

11   as a Service (IaaS) systems.

12       (c)      This disjointed product mix – on the one hand, an outdated primary

13   PAS offering, incompatible with the industry standard; on the other, a limited secondary PKS

14   add on that, although compatible with the industry standard, could only handle a narrow subset

15   of enterprise customer's needs – hamstrung Pivotal sales force responding to customers who

16   were demanding a versatile, Kubernetes-compatible platform. It also rendered Pivotal's primary

17   PAS offering increasingly obsolete, for Pivotal would be forced to reengineer its flagship PAS

18   product from the ground up to be compatible with Kubernetes and thus competitive against large

19   public cloud providers like Amazon, Microsoft, and Google.

20       (d)      Rather than engaging in partnerships and joint selling opportunities,

21   Pivotal was increasingly competing for enterprise clients with its cloud partners, Amazon Web

22   Services, Microsoft Azure, and Google Cloud, as well as competing with its sister company,

23   VMware. In fact, at the time of the IPO, competitors with greater resources had already

24   developed their own open-source software-based products and services, which drastically

25   reduced the demand for Pivotal's solutions and put price pressure on Defendants' offerings.

26   

---

27   [34] *See also Nolle*, Tom, *Managed container services face-off: Enterprise PKS vs. OpenShift*, TechTarget (May 17, 2019), https://searchitoperations.techtarget.com/feature/Managed-container-services-face-off-Enterprise-PKS-vs-OpenShift ("Enterprises with no previous

28   VMware investments are less likely to find PKS intuitive and might also see limitations in the open source tools and Kubernetes ecosystem extensions that PKS supports.").

(e)     Defendants' failure to disclose the then-increasing competition, the obsolescence of its PAS offering and technical limitations in its PKS product, competitive disadvantages hampering its sales force, and consequently decreased deferred sales, lengthening sales cycles, diminished growth, and other financial metrics, and the likely material effects these omissions would have on Pivotal's share price, rendered false and misleading the Registration Statement's many references to known "*risks*" which "*if*" occurring "*may"* or "*could*" materially affect the Company, as these "risks" had already materialized at the time of the IPO.

(f)     These undisclosed negative events, trends, and uncertainties also rendered false and misleading Pivotal's reported financial and operational statements incorporated in the Registration Statement.

167.    In addition to the foregoing affirmative misrepresentations, Defendants' failure to disclose the material information described herein in the Registration Statement violated at least the following independent duties to disclose, and therefore independently caused the Registration Statement to be misleading.

(a)     First, pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303") and the SEC's related Interpretative Releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. As set forth above, at the time of the IPO, unbeknownst to investors, Pivotal was experiencing deferred sales, lengthening sales cycles and diminished growth in new customers as a result of increased competition and decreased demand for its PCF offerings. The adverse events and uncertainties associated with these negative trends were reasonably likely to have a material impact on Pivotal's profitability, and, therefore, were required to be disclosed in the Registration Statement, but were not.

(b)     Second, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that make the Offering risky or speculative and that each risk factor adequately describe the risk. The Registration Statement's discussion of risk factors did not even

mention, much less adequately describe, the risk posed by the increasingly apparent obsolescence of its primary offerings, competitive disadvantages hampering its sales force, and consequently lengthening sales cycles, diminished growth and other financial metrics, and the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

**B.    Expiration of IPO share lock-up - October 2018**

168.    Following the IPO, a large number of shares were restricted from resale as a result of market standoff and "lock-up" agreements.  On October 17, 2018, 180 days after the IPO, approximately 37.8 million restricted shares were available to be sold on the market.

169.    Due to the expiration of the post-IPO share lock-up, on October 17, 2018, Pivotal's stock price fell from a close of $19.92 per share on October 16, 12018 to a close of $18.94 per share on October 17, 2018, **a drop of approximately 5%.**  Pivotal share price continued to fall on October 18 and October 19, 2018.

170.    On or about November 6, 2018, GE sold 9,836,521 unregistered shares of Pivotal Class A common stock, or approximately 63 percent of its 15.5 million shares, for $17.60 per share **for proceeds of $173.1 million**.  According to its SEC filings, that substantially reduced GE's stake in Pivotal from 20.8 percent to 7 percent.

171.    Then, on or about December 12, 2018, GE sold its remaining 5,695,554 unregistered shares of Pivotal Class A common stock for $17.20 per share, or **approximately $98 million**.[35]

**C.    Decline in Price of Pivotal Shares On June 4, 2019 Disclosure**

172.    On June 4, 2019, after the market closed, Pivotal issued a press release, reporting its financial results for the first quarter of 2020 ended May 3, 2019.  Therein, Defendant Mee disclosed that "**<u>sales execution and a complex technology landscape impacted the quarter</u>**," which resulted in the Company revising its fiscal 2020 subscription revenue guidance, less than

---

[35] GE was also a customer of Pivotal. Revenue from GE in fiscal year 2016, 2017 and 2018 was $3.6 million, $10.8 million and $11.0 million respectively.

three months after it was first touted to the market.[36]  Importantly, deferred revenue was $417.1 million, which was down 11% quarter-over-quarter and came in substantially below the Street's consensus of $436.9 million, indicating that while Pivotal was recognizing revenue from existing subscriptions, it was failing to produce new contracts that would sustain its deferred sales for the future.

173.    The following chart demonstrates the decline in Pivotal's deferred revenue:



174.    In addition, the Company's year-over-year growth rate, which Defendants had previously characterized as more accurate than quarter-over-quarter growth rate,[37] also drastically declined:

---

[36] Text which is **bolded and underlined** indicates the materialization of previously undisclosed risks.

[37] *See, e.g.*, 4Q19 Tr. at p.6, "We encourage investors to look at trailing twelve month growth rates for these balance sheet metrics in order to smooth out the quarter to quarter variability."



175. Billings were also down 23% year-over-year and RPO growth decelerated to 10% in Q1 2020 and was guided to be flat year-over-year in Q2 2020 – a serious cause for concern among investors. Indeed, RPO, which was emphasized as a key metric,[38] declined 11% from $990M at Q4 FY19 to $880M at Q1FY20, which compares to an RPO decline of only 2% a year earlier ($820M at Q4FY18 to $800M as of Q1FY19):



176. That same day, the Company held a conference call with analysts to discuss the Company's financial results for the first quarter of 2020 ended May 3, 2019. During the call, Defendant Mee revealed that despite "a solid Q1" with subscription growth and a strong net expansion rate, the Company "**closed fewer deals than we expected in Q1 due to sales**

---

[38] *See* 4Q19 Tr. p. 11, "The other thing I would say is when we think about the *health of the business and the key indicators*, we're really thinking about subscription revenue growth and then net expansion rate *as well as RPO*. And those are the metrics that we track most closely internally to really indicate the health of the business and the growth profile." (emphasis added).

1  **execution and a complex technology landscape that is lengthening our sales cycle. Some of**

2  **the deals we expected to close in Q1 slipped**." As a result, services and deferred revenue

3  growth rates were lower than expected.  However, Defendants statements were directly at odds

4  with their actions – Defendants claimed the poor result was caused by 1Q19 deals slipping, while

5  at the same time, the Company actually lowered guidance for Q2 2020 and provided guidance

6  for fiscal 2020 that was below consensus estimates, suggesting the poor results were here to stay.

7       177.    Mee also disclosed that the Company was finally introducing a Kubernetes-

8  compatible version of its main product offering PAS (to be available for its PKS offering) to

9  combat increasing competition in the market and confusion with respect to its product offerings:

10          Because of our traction with PKS, we are now moving on to the
next phase of our Kubernetes journey. **Next month, we will**

11  **introduce a version of PAS that is built to run on Kubernetes.**
**PAS on Kubernetes will initially be available for PKS.**

12  **Eventually, it will run on public cloud Kubernetes services as**
**well. In addition to PAS on PKS, we will be introducing new**

13  **product offerings on top of PKS to expand our market**
**opportunity, simplify our sales process and make it easier for**

14  **new customers to get started with Pivotal.  These product**
**updates will grow our addressable market and accelerate our**

15  **sales cycle**.

16                          *      *      *

17  **And the challenges of people taking longer to make decisions**
**and some of that market confusion is holding us back at the**

18  **moment,** but I am truly optimistic about the future because I think
we're really well positioned. And there is an awful lot of activity,

19  there's a lot of great partnership. And we continue to do the same
kind of work that we've always done with really amazing outcomes

20  for strategic customers. So I do think the future is still very bright
despite our challenges this quarter.

21

22       178.    During her prepared statements, Defendant Gaylor revealed the following:

23          Now turning to RPO. **We finished the quarter with $880 million**
**of RPO, up 10% year-over-year. This was lower than we**

24  **expected mainly driven by sales execution and shorter contract**
**duration**. We expect approximately 55% of these obligations to be

25  delivered in the next 12 months. As we've noted previously, RPO
will have variability quarter-to-quarter based on the timing of deals

26  and renewals as well as contract duration. In Q2, we expect RPO to
be flat year-over-year relative to Q2 of last year.

27          Short-term deferred revenue was $351 million, up 34% year-over-
year, and total deferred revenue was $417.1 million, up 23% year-

28  over-year. **These growth rates were slightly lower than expected**
**due to deals that slipped from Q1**. As a reminder, deferred

revenue is impacted by timing of deals and renewals as well as prepayments.

Looking ahead to Q2, we expect short term and total deferred revenue growth to be in the low- to mid-20% range compared to the same period last year. For the fiscal year, we expect short-term deferred revenue growth to be in the mid-single to low-teens percent range and total deferred revenue growth to be in the low- to high-single-digit percent range relative to last year.

179. During the Q&A portion of the call, Gaylor also revealed that the deals that slipped were a combination of new customers delaying deals and renewals: "We had some deals kind of across categories that slipped out of the quarter."

180. In response to a question from Sanjit Kumar Singh of Morgan Stanley about the elongating sales cycle, Defendant Mee stated:

[I]n terms of -- the larger deals that we've traditionally done and the strategic relationships that we have with our customers, **we are seeing lengthening in the sales cycles and I think it really is due to a lot of complexity in the technology landscape**. If you think about the public clouds coming on-[premise], if you think about the rise of Kubernetes and related technologies, people are experimenting with those. They are wondering where to go. There've been acquisitions in the market. **So I think it's really causing customers to take their time and think about what they're doing. And as Cynthia said, we've -- some of the Q1 deals have slipped into Q2** . . . They are taking longer.

181. In response to a question from Brad Alan Zelnick of Crédit Suisse regarding how "slipped deals landing in 2Q" is reconciled with "guidance for significant deceleration and deferred revenue and RPO," Defendant Gaylor skated around the question and further admitted the elongating sales cycle that Pivotal had been facing:

**I guess, in terms of the quarter itself, we did have some deals that slipped in Q1** and as Rob said, the good news there is that we didn't lose the deals. So they're very much still in play and a few of them have already closed in Q1 and we're expecting others to close in the coming quarters. **Our sales cycle in places is elongating, I think partly due to a lot of the things that Rob talked about in terms of the complex tech landscape. And then from a sales execution perspective, I think you hit the nail on the head. These things tend to take time. And we think we have kind of the right team and the right process in place to make it happen, but it takes time. And I think that's what you're seeing reflected in the balance sheet metrics, if you will**.

182.　On this news, Pivotal's stock price fell $7.65 per share, or more than 40%, from a close of $18.54 per share on June 4, 2019 to close of $10.89 per share on June 5, 2019.

**D.　Securities Act Counts**

    **1.　<u>Count I</u>: Violations of Section 11 of the Securities Act Against Pivotal, the Director Defendants, the Executive Defendants and the Underwriter Defendants**

183.　This claim is brought under Sections 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Lead Plaintiff Oklahoma City ERS and Class Members who purchased or otherwise acquired Pivotal stock pursuant or traceable to the materially false and misleading Registration Statement and documents incorporated therein, against Pivotal, the Director Defendants, the Executive Defendants and the Underwriter Defendants.

184.　This Count does not sound in fraud. With respect to this Count, Lead Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based on strict liability. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.

185.　Lead Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in Section V.

186.　At all times, including when it was declared Effective, the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

187.　Defendant Pivotal is the registrant and issuer of the stock sold in the Offering. As issuer of the stock, the Company is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions in the Registration Statement.

188.　The Director Defendants, Executive Defendants, and Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.

189. Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.

190. By virtue of each of Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

191. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

192. By reason of the conduct alleged herein, each of the Defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act.

193. None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

194. Lead Plaintiff Oklahoma City ERS acquired Pivotal shares pursuant or traceable to the materially false and misleading Registration Statement. Lead Plaintiff Oklahoma City ERS and the Class have sustained damages. The value of Pivotal securities declined substantially subsequent and due to Defendants' violations.

195. At the time of their purchases of Pivotal securities, Oklahoma City ERS and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

196. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiffs filed this Complaint. Less than three years have elapsed between the time that

the securities upon which this Cause of Action is brought were offered to the public and the time Lead Plaintiffs filed this Complaint.

197.    By virtue of the foregoing, Oklahoma City ERS and Class Members who purchased or otherwise acquired Pivotal stock pursuant or traceable to the materially false and misleading Registration Statement are entitled to damages under Section 11 of the Securities Act from the Defendants, jointly and severally.

## 2.    Count II: Violations of Section 12(a)(2) of the Securities Act Against Defendant Pivotal, the Director Defendants, and the Executive Defendants

198.    This claim is brought under Sections 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff Oklahoma City ERS and Class Members who purchased or otherwise acquired Pivotal stock pursuant or traceable to the materially false and misleading Registration Statement,[39] documents incorporated therein, and other related oral communications, against Defendant Pivotal, the Director Defendants, and the Executive Defendants.

199.    This Count does not sound in fraud.  With respect to this Count, Lead Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.

200.    Lead Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in Section V.

201.    By means of the defective Registration Statement, Pivotal, the Director Defendants, and the Executive Defendants promoted and sold Pivotal shares to Lead Plaintiff Oklahoma City ERS and other members of the Class.

---

[39] "Registration Statement" is defined to include the Prospectus.

202.     Pivotal, the Director Defendants, and the Executive Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Offering.  These Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Offering.  The Registration Statement was used to induce investors, such as Lead Plaintiff Oklahoma City ERS and other members of the Class, to purchase the Company's shares.

203.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  Defendants' acts of solicitation included participating in the preparation of the false and misleading Registration Statement.

204.     Lead Plaintiffs and the other Class members did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Registration Statement at the time they purchased Pivotal shares.

205.     The Defendants named in this count were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

206.     By reason of the conduct alleged herein, Pivotal, the Director Defendants, and the Executive Defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Lead Plaintiffs and the other members of the Class who purchased Pivotal shares pursuant to the Registration Statement sustained substantial damages in connection with their purchases of the shares.

207.     Accordingly, Lead Plaintiff Oklahoma City ERS and the other members of the Class who hold Pivotal shares issued  pursuant to the Registration Statement have the right to

rescind and recover the consideration paid for their shares, and hereby tender their shares to Defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

208. This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's shares were sold to the Class in connection with the Offering.

### 3. Count III: Violations of Section 15 of the Securities Act Against Michael S. Dell, and the Executive Defendants

209. This claim is brought under Section 15 of the Securities Act, 15 U.S.C. § 77, on behalf of Lead Plaintiff Oklahoma City ERS and Class Members who purchased or otherwise acquired Pivotal stock pursuant or traceable to the materially false and misleading Registration Statement and documents incorporated therein, against Michael S. Dell and the Executive Defendants.

210. This Count does not sound in fraud. With respect to this Count, Lead Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based on strict liability. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims and do not incorporate any of the allegations contained in Section V.

211. Michael S. Dell, as Chairman and CEO of Dell controlled Dell, and consequently controlled Pivotal and its employee representatives serving as officers and directors of Pivotal. In addition, Michael S. Dell, as a member of Pivotal's Board of Directors, signed the Registration Statement.

212. The Executive Defendants were controlling persons of the Company by virtue of their ownership interest in, senior management positions at, and/or directorships held at the Company, and as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised control over the Company to cause it to engage in the conduct complained of herein. Indeed, the Executive Defendants each had a series of direct or

indirect business or personal relationships with other directors or officers or major stockholders of Pivotal.

213.    Michael S. Dell and the Executive Defendants were each culpable participants in the violations of Section 11 of the Securities Act alleged herein, based on their having signed, or authorized the signing of, the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

214.    By reason of such wrongful conduct, Michael S. Dell, and the Executive Defendants are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of said wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Pivotal stock.

## V.    EXCHANGE ACT ALLEGATIONS

### A.    Additional Allegations from Confidential Witnesses in Support of Exchange Act Claims

#### 1.    Pivotal and the Executive Defendants Had Access to Information Which Contradicted Their Statements and Omissions During the Class Period

215.    Former Pivotal employees confirm that facts existed which contradicted Defendants' representations and omissions made throughout the Class Period regarding Pivotal's business, prospects, and its competition, and that the Executive Defendants knew, or recklessly disregarded those facts when issuing the false and misleading statements alleged herein.

#### (a)    As Sales of Pivotal's Antiquated PAS Stall, Contract Start Dates Are Modified

216.    CW-1 described that at Pivotal, especially for the larger contracts, revenue was recognized upon completion of a milestone. CW-1 explained that for revenue recognition purposes, the contract "start date" is the date the contract is signed, but that at Pivotal there was approximately three months "leeway" or wiggle room with respect to the official contract start date.

#### (b)    Pivotal's Belated Focus on Kubernetes

217.    CW-7 advised that it was around March 2019 when he and his sales colleagues were instructed to break their customer base up into A, B, and C accounts. CW-7 stated that the

A accounts were what they deemed their best or largest accounts. CW-7 and his sales colleagues were told to only hold onto their A accounts, and give the B and C accounts to VMWare. CW-7 advised that this directive forced the sales team to only focus on the "whales" which were the harder deals that took longer to close. According to CW-7, with the sudden shift at Pivotal that began in March 2019, if the A customers just wanted PKS, Pivotal all of sudden would sell PKS to them with the hopes that they would eventually commit to PAS.

218. CW-7 reported that in the March 2019 timeframe, sales projections, including his sales projections, were routinely modified by his higher-ups prior to internal sales meetings in an effort to change the breakdown of projected sales to now show a focus on selling PKS as a standalone product, which was a turnaround from prior months where that was discouraged.

### (c) Meetings and Reports

219. CW-1, former Accountant at Pivotal, stated that Tracy Thompson (Senior Director, Revenue Accounting) who reported directly to Defendant Gaylor (for part of the Class Period) kept CFO Gaylor apprised of what was happening as it related to revenue. CW-1 knew this because Thompson would tell him if Gaylor asked for something specific or wanted information on a particular deal that CW-1 was working on. CW-1 stated that Thompson was relied on heavily by the executives at Pivotal, including Hugo De La Torre (Vice President, Accounting and Tax) and CFO Gaylor. According to CW- 1, Thompson would have been aware of and possibly tracking Pivotal's RPO. CW-1 confirmed that during his tenure, Thompson was tracking Pivotal's competition.

220. CW-1 confirmed that there were weekly pipeline calls which Thompson took a "heavy part" in and were led by leaders in sales and operations where all bookings, the pipeline, and live opportunities were reviewed.

221. CW-1 stated that Pivotal had internal systems that tracked deals and that the Company conducted post-quarter performance meetings which CW-1 attended. CW-1 confirmed that Pivotal had a bookings report that fed into its deal tracker. CW-1 reviewed deals up to $15 million, but any deal larger than $15 million went directly to his boss for review.

According to CW-1, if the same customer had multiple deals in a quarter, the threshold for review was the aggregate amount of deals for a customer.

222. CW-1 also described forecasting meetings that occurred at least bi-weekly which included the sales team, Andrew Murray (Revenue Manager-Global), Ian Andrews (Senior Vice President Products), De La Torre, Thompson (who only sometimes attended), and others, possibly including Gaylor.

223. CW-1 noted that Pivotal had three legacy accounting systems which they did not upgrade following the IPO: one for deals, one for revenue, and one for general ledger. CW-1 advised that in order to prepare forecasts, they had to "mash" all three systems together, and the whole process was extremely manual involving the use of spreadsheets.

224. CW-4 confirmed that reports on sales were given to senior executives at Pivotal on a weekly basis and that weekly meetings (which CW-4 set up) were led by Chad Sakac and regularly attended by Pivotal's senior executives, occasionally including CEO Robert Mee and CFO Cynthia Gaylor.

225. CW-7 advised that everything was tracked in the Company's Salesforce database and that the executives including Defendants Mee and Gaylor received reports generated from Salesforce.

**B.     Defendants' Materially False and Misleading Statements and Omissions During the Class Period**

226. Lead Plaintiffs allege that the statements highlighted in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or artificially maintained the price of Pivotal publicly traded securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. As described below, Defendants created an impression of a state of affairs at Pivotal that differed in a material way from the one that actually existed.

227. On June 12, 2018, after the market closed, Pivotal reported its financial results for the first quarter of fiscal 2019 ended May 4, 2018. That same day, the Company hosted its first earnings call as a public company to discuss its quarterly results and its estimates for subscription revenue, total revenue, and operating loss for fiscal year 2019 ended February 1, 2019.

228. In connection with its first quarter results, Defendant Gaylor stated: "[w]e are pleased with our strong first-quarter results as we establish our track record as a public company. Pivotal is addressing a very large market *and we have a differentiated multi-cloud platform. We generate strong growth at scale and will continue to focus on adding new customers and expanding existing customers across sectors*."

229. Defendant Gaylor also touted the Company's investment in sales and marketing, stating, in part:

> [W]e are investing heavily, as we mentioned, in sales and marketing and to drive new customer growth but also to drive expansion, and that our net expansion rate does include churn. And so I think as you look at that number, again, *we're at scale; we're expecting it to come down, but it is pretty compelling. That shows our strategy of landing and expanding is working. And we think we're at the leading edge of really the technology to expand with customers.*
>
> *            *            *
>
> And as I mentioned earlier, we did make some pretty significant investments in the back half of last year to really helped drive the field on new customer acquisition and making sure that we were both renewing our existing customers *and expanding their footprints, but also adding new customers. And so I think what you saw in Q1 is the -- starting to kind of realize the benefits of some of those earlier investments.*

230. During the call, Defendant Mee stated, in part: "Specifically with PKS, we have started to see the VMware salesforce extend our account coverage and *accelerate our sales cycles*. We expect PKS will seed cross-selling opportunities for other products across our portfolio over time." Mee also stated: "*What we're also seeing with PKS is that the interest in building services that integrate with that is -- there is a plot of demand for that as well. So we*

*think we'll see our marketplace expand with PKS as well, and we're going to continue to press on that. We have a lot of great joint go-to-market opportunities with a lot of the ISP providers.*"  In the Q&A portion of the call, a Goldman Sachs analyst inquired about the traction the Company was seeing with its newer PKS offering:

> Heather Bellini - Goldman Sachs
>
> Yes, so for PKS, I know it's early days, but can you help us with what's driving the early adoption that you mentioned? Is there anything you can hone in on about the competitive differentiators that you're hearing from customers? And I also was wondering, how helpful is the VMware tie-in with this adoption? Thank you.
>
> Defendant Mee
>
> Sure. Thanks, Heather. **We're seeing a lot of adoption from existing customers. A lot of our existing customers are investing in PKS. They have workloads that they want to run that aren't necessarily a great fit for our PAS offering. And so they are really glad that Pivotal is bringing a Kubernetes offering to market and that it runs on the same platform as PAS. And so there -- we have a lot of customers that are jumping in and getting their feet wet with that right now**. . .
>
> What we think is a real advantage of it is that it enables a very small team of operators to deploy and update dozens or hundreds of Kubernetes clusters with relative ease, and that's something that's differentiated.  The VMware connection there is very helpful because we're activating their large salesforce to help us go to market there. We're also integrating with their networking capability, NSX-T, and that's something that solves one of the biggest challenges of using Kubernetes in a private cloud setting.

231.    Defendant Mee further expanded on that answer when noting that: "***We're definitely seeing PKS expanding both the addressable workloads for our existing platforms, and also driving a lot of new customers to us***. And that's -- some of the customers are customers that haven't considered PCF in the past, so that's good for us."

232.    In response to a question from a Bank of America/Merrill Lynch analyst about competition from Red Hat, Defendant Mee responded as follows:

> Nikolay Beliov - BofA Merrill Lynch
>
> One question we keep on getting from investors is competitive differentiation versus Red Hat OpenShift, and they seem to be doing a renewed push there. Rob, maybe you can just talk about -- contrast and compare your solution versus theirs, and the change in win rates over time that you've seen. Thank you.

1  Defendant Mee

2  Yes. So I think having competition for a platform offering --
   having competition for a platform is a real validation [for] our
3  market opportunity and how large it is. ***So we think it's good to
   have multiple players in the market. And we think there's plenty
4  of room for competition, and that's good for innovation. We're
   not particularly looking at one competitor or another, or looking
5  over our shoulders to figure out who is competing on exact
   features. That said, we now offer PKS, which is comparable to
6  OpenShift and it's offered within the PCF platform. And the
   platform allows customers to run those workloads anywhere, in
7  on-prem or off-prem. So we think that -- in terms of customer
   acquisition, our average relationship with customers is quite
8  large relative to the competition. And that represents more of a
   strategic relationship and mission-critical workloads getting onto
9  the platform***.

10  233.    With respect to Pivotal's deferred revenue, Defendant Gaylor explained that:

11      From a deferred perspective, our long-term deferred includes
        prepayments from some of the subscription customers, so that can
12      tend to be lumpy. If you're looking at short-term deferred, though,
        that's definitely a closer proxy for subscription growth. And just
13      remember that both short-term and long-term deferred include
        services, and services is still a material portion of our revenue, so
14      that can also impact the trend.

15  234.    As a result of Defendants' misrepresentations and omissions, Pivotal's stock price

16  was artificially inflated and/or artificially maintained.  Indeed, Defendants' statements drove the

17  price of Pivotal's shares up $6.99 per share, or about 33%, to close at $28.20 per share on June

18  13, 2018.

19  235.    On June 12, 2018, Matthew Hedberg of RBC Capital Markets, LLC issued an

20  analyst report on Pivotal titled, "Pivotal Software Inc. - Good first quarter."  In the report,

21  Hedberg noted that:

22      **Our view: Pivotal reported a strong debut with most metrics
        ahead of expectations, highlighted by 69% subscription
23      growth.** Guidance was ahead but still appears reasonable to us. We
        remain constructive on the opportunity and raise our price target to
24      $24 from $21 on higher estimates and peer multiple expansion,
        although we still view the shares as fairly valued.
25
        Key points: **All you need to know: Pivotal reported a strong
26      debut as a public company, with outperformance across most
        metrics driven by better than- expected new customer
27      contribution, expanded usage by existing customers, and better
        linearity**. Highlights included . . . . favorable trends in newer
28      products such as PKS as well as better partner synergies including
        Dell/EMC/VMware. . . . New customer additions and net

expansion rates were essentially in line with our estimates while guidance for Q2/19 and FY/19 were slightly ahead of consensus. Our forward estimates move higher, but expectations remain reasonable in our view.

236. On June 12, 2018, Jennifer Swanson Lowe of UBS issued an analyst report on Pivotal titled, "Pivotal Software Inc., Getting Off to a Healthy Start With Solid Q1 Strong Performance Out of The Gate." In the report, Lowe stated:

> Pivotal reported its first quarter as a public company and beat on all key metrics. Subscription revenue growth of 69% beat our/consensus estimates of 44% growth, benefitting from a combination of healthy customer adds, upsells, and favorable linearity in the quarter allowing for greater revenue recognition in period. Total revenue growth of 28% came in higher than consensus of 16% growth. Subscription mix moved higher from 56% last quarter to 58% in Q1, with subscription gross margins improving nearly 300 bps Y/Y leading to total GMs of 64%. We believe that Pivotal is benefitting from enterprise initiatives for application modernization but also see this healthy demand outlook as priced in at current levels.

> **Healthy New Wins and Expansion With Existing Accounts**

> Pivotal added 20 net new customers in Q1 (vs. our 18 estimate) compared to 5 last quarter and 7 in the year-ago quarter, taking the total to 339 subscription customers. **We think the introduction of PKS can drive more new adds later this year as Pivotal introduces a lower-priced offering that can help the company get in the door.** Net expansion rate of 156% (vs. our 155% estimate) vs. 164% in the year-ago quarter benefitted from strong renewals in the quarter.

> **Revenue Estimates Move Higher on Positive Guide**

> Our FY19 subscription revenue estimate moves 8% higher on guidance of $380-384M (vs. our prior $357M), while our total revenue estimate moves 5% higher. . . .

237. On June 13, 2018, Bloomberg reported that "Pivotal Software Inc. soared in early trading Wednesday after its first earnings report since its April IPO was 'well above expectations,'" according to analysts. According to the Bloomberg report, Goldman Sachs analyst Heather Bellini reported that first quarter revenue which exceeded the Street's expectations was driven largely by strong subscriptions. William Blair analyst Bhavan Suri noted:

> • that Pivotal looks for accelerating software growth, customer additions and expansion, and incrementally more software vs services revenue;.

• second-quarter view beat, and full-year guidance "registered comfortably" ahead of expectations across the board; and

• "all signs suggest" the Company's platform strategy is resonating with the market and allowing it to pull away from the competition.

238. Defendants' statements concerning Pivotal's product offerings, including PKS, and the Company's competition, contained in ¶¶ 228-232 were materially false and misleading because notwithstanding the fact that Defendants were closely tracking both Pivotal's competition and sales, they failed to disclose that:

(a) Pivotal was already experiencing lengthening sales cycles and diminished growth in new customers as a result of increased competition and decreased demand as customers and industry sentiment shifted away from Pivotal's principal, yet outdated, PAS offering because it was incompatible with the industry-standard Kubernetes platform.

(b) At the same time, PKS, Pivotal's Kubernetes-compatible PCF offering, had a number of undisclosed drawbacks and could not satisfy the full scope of large enterprise customers' needs.[40] Among other things, to ensure proper security, enterprise customers operating PKS would have to install PKS on a separate "instance," forcing operators to manage a number of separate environments and thus increasing operational expenses. In addition, PKS lacked key automation features and failed to provide adequate support for certain Infrastructure as a Service (IaaS) systems.

(c) This disjointed product mix – on the one hand, an outdated primary PAS offering, incompatible with the industry standard; on the other, a limited secondary PKS add on that, although compatible with the industry standard, could only handle a narrow subset of enterprise customer's needs – hamstrung Pivotal sales force responding to customers who were demanding a versatile, Kubernetes-compatible platform. It also rendered Pivotal's primary PAS offering increasingly obsolete, for Pivotal would be forced to reengineer its flagship PAS

---

[40] *See Nolle*, Tom, *Managed container services face-off: Enterprise PKS vs. OpenShift*, TechTarget (May 17, 2019), https://searchitoperations.techtarget.com/feature/Managed-container-services-face-off-Enterprise-PKS-vs-OpenShift ("Enterprises with no previous VMware investments are less likely to find PKS intuitive and might also see limitations in the open source tools and Kubernetes ecosystem extensions that PKS supports.").

product from the ground up to be compatible with Kubernetes and thus competitive against large public cloud providers like Amazon, Microsoft, and Google.

(d)     Rather than engaging in partnerships and joint selling opportunities, Pivotal was increasingly competing for enterprise clients with its cloud partners, Amazon Web Services, Microsoft Azure, and Google Cloud, for enterprise clients, as well as competing with its sister company, VMware.

(e)     Pivotal was suffering from employee attrition problems throughout the Class Period, especially with engineers.

(f)     The Defendants' Class Period statements were further misleading as supported by the additional CW allegations described in ¶¶97-129, 215-225.

(g)     Pivotal's problems were not due to seasonal or quarterly variability in contract start dates and timing, but were due to severe difficulty the Company was having closing new deals and expanding their footprint with existing customers.

(h)     Defendants' failure to disclose the then-increasing competition, the obsolescence of its PAS offering and technical limitations in its PKS product, competitive disadvantages hampering its sales force, and consequently decreased deferred sales, lengthening sales cycles, diminished growth, and other financial metrics, and the likely material effects these omissions would have on Pivotal's share price, rendered its statements and omissions about these issues false and misleading.

### 2.     Second Quarter Fiscal 2019 Results – September 12, 2018

239.     On September 12, 2018, after the market closed, Pivotal reported its financial results for the second quarter of fiscal 2019 ended August 3, 2018.  That same day, the Company hosted a conference call to discuss its second quarter results which were short of what analysts were expecting with a sharp deceleration in quarter-over-quarter subscription revenue growth and softer-than-expected subscription billings and short-term deferred revenue. Notwithstanding, the Company raised its guidance for its third quarter and full year fiscal 2019 (ended February 1, 2019) based, in part, on its visibility into its subscription revenues.

240. During the call, Defendant Mee reiterated that the PAS was "really . . . offering . . . a single platform with consistent application runtime for all of these different things; the cloud-native applications and legacy workloads and one platform essentially that can provide for the major workload abstraction, apps, containers and functions, and to do that on any public cloud or on-prem, we feel like *we're unmatched in the market by any of the competitive solutions*."

241. When questioned about customers' commitment to multi-year timelines around modernization and the impact on the Company, Defendant Mee stated the following:

> [W]e're definitely seeing that as compared to several years ago, a much greater variety of customers in all segments that are on these initiatives and *that's essentially becoming a larger market for us.* And that is – it's a little bit difficult to quantify it, but *just from the perspective of the market getting bigger for us* and more customers wanting to become more competitive at building software and building digital products, it's really great for us. And the other part of that is that I think they're recognizing that it is an essential question for them, becoming good at software. And that is a multiyear, very dedicated kind of a movement…. *It's definitely a multi-year thing and I think that's good for us*.

242. During the call, Defendant Mee noted that PKS 1.1 was released in June 2018 and "includes an update to the latest version of Kubernetes and important enhancements to make deployments easier, more secure and robust. . . . Our development efforts are focused on making PKS the best way for enterprises to run Kubernetes on-prem or in any cloud." Mee also noted that: "*On the sales and marketing front, we are investing to address strong and growing customer demand. . . . We are encouraged by the early traction we are seeing with PKS in our customer pipeline*." Mee also stated:

> *In summary, we remain excited about Pivotal's opportunity and the business we are building at scale.* Our focus on delivering an industrialized open-source platform, complemented with strategic services to help enterprises modernize their most important applications, *uniquely positions us to capture a major market opportunity*.

243. During the call, Defendant Gaylor stated: "*Overall, we are pleased with our* . . . *outlook for the remainder of the year.*" Gaylor reiterated this sentiment later in the call, stating: "[w]e are pleased with our performance in the first half of the year, and we had a strong quarter

overall based on the metrics that we do publicly disclose." Galyor also represented that Pivotal was "*feeling very good about the number of new customers and new logos*" and that PKS "*had been a driver not only of new logos coming to Pivotal but also existing customers kind of buying new products*, which kind of fit into the business model as well."

244. In response to a question from Sanjit Kumar Singh of Morgan Stanley regarding how the Company felt about its Q4 2019 pipeline, Defendant Gaylor stated, in part:

> So we're -- *I think we're feeling good about our second half of the year and our pipeline.* As you probably noted, we raised our guidance for Q3 and the full year from where we were coming into the quarter on our last call. *And so we're feeling good about the pipeline.* As you know, Q4 is a big quarter for us. And you may remember as well that, just over a year ago, we were on a calendar year basis, right? So our year ended in December 31. And now we're on a fiscal year basis where we are a 4-4-5 calendar, and so that definitely plays into some of the dynamic around quarterly variability as well in terms of when renewals will be coming due on a big Q4 as well as expansions. *And so we're feeling good going into the second half of the year, and that's reflected in our guidance that we gave today.*

245. On the Company's PKS offering, Defendant Mee stated, in part:

> *We're definitely seeing a lot of uptake in our pipeline for PKS and a lot of our existing customers jumping onto PKS quite quickly and in fact, now getting into production, which in its first year of delivery, we've seen some pretty, pretty fast uptake.* And as we continue to expand the abstractions that we support on the platform, not just containers but soon-to-come functions with PFS, we see that we're going to attract not just additional workloads from existing customers but new customers coming on who are attracted by those particular abstractions. *We're starting to see a lot of customers coming in, wanting to buy PKS, wanting an enterprise Kubernetes solution. And we're seeing some momentum now coming from the VMware partnership in the pipeline there as well. So I think in terms of new logos, we're going to see continued improvement.*
>
> *         *         *
>
> I would actually say that we're delivering PKS in an opinionated way. PKS -- or perhaps say with PKS, we are delivering Kubernetes in an opinionated way. And really, our customers think of PKS as part of the PCF platform and has all of the day 2 and security and update capabilities that come with the PCF platforms they've known before. And if they don't know that, then they are attracted to those capabilities because what we're seeing in the market is that people are really struggling with the complexity of running Kubernetes at scale. *And so we think we've got a really good way to do that. I will say that definitely in terms of the potential to expand the ecosystem, because the Kubernetes*

*ecosystem and the third-party services, data services, for example, are growing very rapidly, PKS expands our ecosystem quite a bit, and I think that's going to be very helpful going forward.*

246. In response to a question from a Barclays analyst about the competitive field now that Pivotal had a Kubernetes offering, Defendant Mee responded as follows:

Raimo Lenschow - Barclays

Quick question on competition. Like now that you have PKS and PCF, like how are you kind of -- if you're going to customers, like how are you seeing the competitive field shaping out with your offering versus what's out in the market?

Defendant Mee

*I think with PCF really operate -- offering the -- a single platform with a consistent application runtime for all of these different things, the cloud-native applications and legacy workloads and one platform essentially that can provide for the major workload abstraction, apps, containers and functions, and to do that on any public cloud or on-prem, we feel like we're unmatched in the market by any of the competitive solutions.*

Raimo Lenschow - Barclays

And did it change when you -- now that you have PKS with -- and so that was my second question. Like what's the customers' appetite, PCF versus PKS? Are they seeing it complementary? Is there -- are they favoring one over the other? How do you see that playing out?

Defendant Mee

*They're definitely complementary, and we see it as expanding our ability to support more of the customer workloads.*

247. In the Q&A portion of the call, Nikolay Ivanov Beliov, a Bank of America/Merrill Lynch analyst asked about trends the Company was seeing, including sales cycle trends. Defendant Gaylor responded that Pivotal was seeing "*no real changes*" in trends. Gaylor also falsely stated: "*no, we haven't seen any changes in the sales cycle.*"

Nikolay Ivanov Beliov - BofA Merrill Lynch

I was hoping – it's a question both for Rob and Cynthia – to dig into some of the underlying metric. When you look at your sales organization, at least at the high level, what trends are you seeing in terms of sales productivity, hiring plans, sales retention, sales cycles and win rates against the competition?

Defendant Gaylor

Sure. I might take those in backwards order. We're very pleased with our win rates that we've been seeing in the first half of the year and in Q2. We are continuing to make significant investments in the field and across sales and marketing, which includes enabling the field as well as building out technical talent to help support the field and support our customers. And so we're continuing to make investments there, and you can kind of see that in our P&L. In terms of productivity, *we're seeing no real changes in terms of ramping the fields*, although we do have a heightened focus on enabling the new folks as we hire them, and so that's an area of investment for us, for sure.

*     *     *

Nikolay Ivanov Beliov - BofA Merrill Lynch

And just to go back to my very first question, have you seen any changes in the sales cycle?

Defendant Gaylor

*No, we haven't seen any changes in the sales cycle. I would say we are -- just as a reminder, and again, we talked about this in Q1 as well, I mean, we are an enterprise-focused subscription business and we have sales cycles that are typical for large enterprise type of customers who are making strategic purchases*.

248.    Moreover, the Company boasted that despite "quarter-to-quarter" revenue lumpiness due to contract start dates, timing, and prepayments, the beauty of Pivotal's subscription business model was that "we do have quite a bit of revenue visibility and that's reflected in our guidance and some of these metrics we've been talking about, and it smooths out some of the lumpiness you might see on the balance sheet." Specifically, Defendant Gaylor stated:

Short-term and total deferred revenue, which are components of RPO, can vary from quarter-to-quarter due to contract start dates, timing and multi-year prepayments. RPO smooths the lumpiness associated with deferred revenue quarter-to-quarter. In Q1, start dates and prepayments worked in our favor, while in Q2, we did not experience the same level of favorability. Looking ahead to Q3, we expect short-term and total deferred revenue to be flat to slightly down compared to Q2, in line with historical seasonality.

*     *     *

So it gives you kind of that future look, and it also -- because deferred can be lumpy quarter-to-quarter due to contract start dates, timing and multi-year prepayments, *RPO really smooths the variability that you'd see in some of the other balance sheet*

*items, and we think it provides visibility into our revenue streams on a go-forward basis.*

\*     \*     \*

So I think a couple of things. So we do have seasonality in deferred, and you noted kind of the trend on Q3-- Q2 to Q3 of last year, which we're expecting to see again this year. The other piece of it, so there's seasonality, but there's also lumpiness because you have to remember, we have 354 subscription customers. Our net expansion rate is 150%, which is market-leading. And when you think about kind of an enterprise-software business with -- and when we talked about this on the Q1 call as well, but we have fewer customers, our average revenue per customer is at a higher level, this can accentuate the variability quarter-to-quarter relative to another type of subscription company that's maybe high volume, lower value on a revenue-per-customer basis. So there's definitely lumpiness due to the contract start dates, due to the timing and due to the multi-prepayments -- multi-year prepayments. And then I think on top of that, as we talked about on the Q1 call, when you look at Q1 going into Q2, in Q1, on the P&L, that also flowed to the balance sheet. We had some tailwinds related to favorable in-quarter linearity. So I think what you're seeing is partly related to the dynamic of Q1 to Q2, partly related to the typical seasonality you would see Q2 to Q3 and then the contract start dates, timing and multi-year prepayments just given where we are in terms of the strategic nature of our customers, what our expansion rates are and again, timing, contract start dates and multi-year prepayments associated with that type of customer base.

\*     \*     \*

*I think the beauty of subscription is we do have quite a bit of revenue visibility, and that's reflected in our guidance and some of these metrics we've been talking about, and it smooths out some of the lumpiness you might see on the balance sheet specifically.*

249.    In light of the second quarter results falling short of analysts' expectations, a decline in quarter-over-quarter subscription revenue growth, and softer-than-expected subscription billings and short-term deferred revenue, Pivotal's stock price fell by $5.78 per share, or 20%, from a close on September 12, 2018 of $28.78 to a close of $23.00 on September 13, 2018. However, the true problems with Pivotal's elongating sales cycle and the increased competition in the market remained concealed by Defendants' alleged misrepresentations and omissions.

1       250.    On September 12, 2018, Jennifer Swanson Lowe of UBS issued an analyst report

2 on Pivotal titled, "Pivotal Software Inc. - Quarter-to-Quarter Volatility Overshadows

3 Fundamentally Strong Trends."  In the report, Lowe stated, in part:

**Smoothing Over Quarterly Bumps**

> After a big Q1 beat, investors had high hopes for a Q2 repeat and
> were disappointed when Q2 subscription revenue "only" beat by
> 5% vs. 17% in Q1, causing the stock to drop more than 20% in
> after-hours trading. We think PVTL's exposure to a relatively
> small number of large customers means that there will be
> lumpiness quarter-to-quarter and while we were reluctant to chase
> the stock higher post a very strong Q1, we're also reluctant to read
> too much into a relatively weaker Q2 report. We remain Neutral
> rated on the stock with our PT unchanged at $23 on what
> fundamentally remains a good business with exposure to key
> secular trends. It's possible that overly negative sentiment could
> see investors over-shoot to the downside. . . .We think the
> introduction of PKS can drive more new adds later this year as
> Pivotal introduces a lower-priced offering that can help the
> company get a foot in the door. . . .Our FY19 subscription revenue
> estimate moves 1.2% higher on guidance of $386.5-390.5M (vs.
> our prior $383M), while our total revenue estimate moves 0.6%
> higher. . . .For Q3, subscription revenue guidance of $97.5-98.5M
> exceeded the Street at $95M and total revenue guidance of $163-
> $165M was more in line with the Street on slightly lower services
> expectations as partners take on more of the load.

16       251.    On September 13, 2018, Matthew Hedberg of RBC Capital Markets, LLC issued

17 an analyst report on Pivotal titled, "Pivotal Software Inc. - Disappointing vs expectations, but

18 long-term trends still look good to us."  In the report, Hedberg stated, in part:

> **Our view:** The quarter was more mixed than expected and
> illustrated the inherent lumpiness in the business. **Subscription
> trends and fundamentals remain solid**, but with mixed billings
> results against elevated expectations and a premium valuation,
> shares are likely to be under near-term pressure. Maintain SP and
> lower PT to $24.
>
> **Key points:**
>
> **All you need to know:** Due to inherent lumpiness in the business,
> the quarter and outlook were mixed vs. expectations and a change
> from the across-the-board out-performance and guidance last
> quarter. Despite some positive subscription trends, investors are
> likely to focus on weaker than-expected ST deferred revenue and
> subscription billings (20% growth vs 76% last qtr), and guidance
> that implies minimal sequential subscription growth throughout the
> year. **We remain constructive on the opportunity and positively
> biased on the fundamentals,** but with points of contention against
> elevated expectations and a premium valuation, shares are likely to
> be under near-term pressure.

252. On September 13, 2018, Bloomberg reported the reactions of other analysts following Pivotal, including Keybanc, William Blair, and Morgan Stanley:

Keybanc (Alex Kurtz)

- Says PVTL reported a mixed 2Q with subscription growth ahead of its ests. and total rev. upside, but offset by a $30m billings miss vs. consensus due to deal lumpiness

- Says the concern was squarely focused on the billings miss and if there was a substantive change in demand for PVTL's subscription business after such a strong 1Q19

- Says "stock likely moved too quickly after F1Q19 blowout results"

- Continues to like the LT opportunity for PVTL in the growing PaaS market;

- Maintains overweight, PT $27

William Blair (Bhavan Suri)

- Says the dip "is entirely attributable to the large miss on calculated billings"

- Believes investors have focused on billings instead of bookings because PVTL has not provided the historical RPO disclosures needed to analyze y/y growth

- Does not see cause for "undue concern" due to continued strength across net new customer additions and net expansion rates, PVTL's favorable pipeline commentary and the positive nature of recent field checks

Morgan Stanley (Sanjit Singh)

- Says the billings miss overshadowed a solid FY19 guide that called for 50% subscription rev. growth; sees the shortfall reflecting the timing of contract start dates rather than a deceleration in core growth.

- "We would be buyers on weakness given growth at scale with improving unit economics."

253. Defendants' statements concerning Pivotal's pipeline, sales cycle, revenue visibility, new customers, competitors, and product offerings, contained in ¶¶240-248 were materially false and misleading for the reasons described in ¶238.

### 3. Third Quarter Fiscal 2019 Results – December 11, 2018

254. On December 11, 2018, after the market closed, Pivotal reported its financial results for the third quarter of fiscal 2019 ended November 2, 2018. That same day, the Company hosted a conference call to discuss its quarterly results. Commenting on the results, Defendant Gaylor stated, in part:

> We delivered a strong quarter with total revenue of $168.1 million, representing growth of 30% year-over-year driven by subscription revenue growth of 53%. Our subscription out-performance was driven primarily by customer expansions as more workloads move onto the platform. Subscription revenue of $100.8 million represented 60% of total revenue compared to 51% a year ago, and continues to be the primary driver behind our top line growth and in turn, revenue mix shift and margin improvement.

255. Responding to a question about the competitive landscape following IBM's purchase of Red Hat, Defendant Mee stated, in part:

> As I think I mentioned in the comments it's a pretty complex landscape and then rapidly changing with some of the consolidation that you mentioned and as well as the -- honestly, the public cloud is getting on-premises as I discussed. ***Overall, we think the challenging landscape is a long-term positive for Pivotal.*** All these various options are destinations for us. And so we simplified the complexity there for a lot of these things. Specifically, with regard to IBM's acquisition, I think, again, it reinforces the importance of multi-cloud, and of course, ***I think we have a good position in the marketplace here. We don't comment directly on other company's acquisitions, but we don't think that this is a negative for Pivotal.***

256. During the call, Defendant Mee stated, "[a]s a company, our focus continues to be on driving innovation and providing customers with a proven model they can adopt and scale to enable their transformation journey." Defendant Mee also reiterated the adoption of Pivotal's primary offering, stating: "***we continue to gain share with the most valuable enterprises and public sector entities as they address their modern software development needs for both on-prem and cloud. We remain focused on executing for the long-term, driving innovation and customer satisfaction as we broaden our portfolio of differentiated offerings***."

257. In the Q&A portion of the call, a Citigroup analyst, asked about how PKS was trending, to which Defendant Mee stated that the PKS pipeline was "mostly new customers."

Walter H Pritchard – Citigroup

Two questions, I think, for Rob. On PKS, I know it's early, I'm wondering if you're seeing adoption more come from new customers there or existing maybe, especially, in terms of what you're seeing in terms of pipeline for Q4 and into next year?

Defendant Mee

Yes, I think the initial bulk of the sales is really expansions with existing customers. ***But if you look into the pipeline, then you are seeing new customers coming in, and especially with VMware sales force gets -- is ramped up, that pipeline is really mostly new customers***. And expansion, one of the examples I can give you is T-Mobile, which started with PAS and then they really expanded PAS significantly and they've recently added workloads with PKS, and they actually have some mission-critical, high-volume, consumer-facing workloads using PKS in production.

258.    When a William Blair analyst asked about the deferred revenue aspect of the Company's business, Defendant Gaylor falsely assured investors that she was "***comfortable with current expectations on deferred revenue***."

Bhavanmit Singh Suri - William Blair & Co.

Got it. And a quick one for Cynthia here. You've had some moving parts in the deferred revenue part of the business, billing terms, et cetera. Just as we look at Q4, is there anything you want to point out or highlight about sort of the billing terms, duration, contract or anything else that might be affecting those or impact sort of what we might see optically when that comes through?

Defendant Gaylor

***Nothing specific other than I did mention that we're comfortable with current expectations on deferred revenue for Q4***. And so I would point you to that for sure and then on any other balance sheet metric in general, we spent some time on this last quarter and the quarter prior, but we would encourage folks if they're looking at balance sheet metrics to look at them on a trailing 12-month basis because in -- from a quarter to quarter perspective, they can be lumpy due to the contract start date, the timing and the multiyear prepayments and so I would just keep that in mind.

259.    Defendant Gaylor also stated:

As we have shared on our prior calls, we have quarter-to-quarter variability in our deferred revenue due to contract start dates, timing and multiyear prepayments. As such, this variability may not always accurately reflect the momentum in our business. We encourage investors to look at trailing 12-month growth rates for these metrics in order to smooth out the quarter-to-quarter variability. ***Looking ahead to Q4, we are comfortable with the***

*current expectations for short-term and total deferred revenue and expect both of these metrics to increase compared to Q3.*

260.     On December 11, 2018, Matthew Hedberg of RBC Capital Markets, LLC issued an analyst report on Pivotal titled, "Pivotal Software Inc. - Improved results vs expectations." In the report, Hedberg stated:

> Our view: Relative to Q2/19, Pivotal reported better results with metrics ahead of expectations, highlighted by 57% subscription billings growth. Although management remains more conservative in their tone, forward estimates move slightly higher. We remain constructive on the opportunity but believe the risk/reward is balanced at current levels.
>
> Key points:
>
> All you need to know: Pivotal reported a nice bounce-back quarter with outperformance across most metrics driven by better-than-expected new customer contribution and expanded usage by existing customers. . . .  After an improved quarter vs Q2/19, we remain constructive on the opportunity. Our $22 target reflects 9.4x our CY/19E software revenue and 2.5x services or 7.2x total CY/19E EV/S. We maintain a positive bias on the fundamentals and look for continued momentum in the business, but believe the risk/reward is balanced. . . . Management expects the expansion rate to decline gradually from here as the model matures, but see no change in the macro environment or customer demand. We continue to view net expansion as a source of upside to our estimates driven by additional products like PKS and increasing leverage from Dell/EMC/VMware salesforce.

261.     On December 11, 2018, Jennifer Swanson Lowe of UBS issued an analyst report on Pivotal titled, "Pivotal Software Inc. - Settling Into the ~50% Subscription Growth Groove," stating:

> **Establishing the Baseline**
>
> After a big Q1 beat and more modest upside in Q2, we think Q3 results and Q4 guidance should give investors comfort that ~50% subscription growth is a sustainable baseline for the business, with significant upside from time to time as particularly large deals roll in (although this should lessen as the customer base diversifies). We think predictability makes the stock easier to own and we like the digital transformation theme. We remain generally cautious on cash-burning companies in a choppy tech tape during which we expect investors to favor profitable growth, and as such we're modestly trimming our PT to $21. . . .Our FY19 subscription revenue estimate moves 2.6% higher on guidance of $398-399M (vs. our prior $389M), while our total revenue estimate moves 0.9% higher.

262. On December 12, 2018, Daniel Ives of Wedbush issued an analyst report on Pivotal titled, "PVTL Answers the Bell, Solid 3Q Rights the Ship with a Billings Rebound." In the report, Ives noted:

> **Last night PVTL bounced back from its July quarter billings miss by delivering a nice 3Q beat driven by accelerating subscription revenue and billings coming in 5% ahead of the Street.** While 2Q was a tough one for PVTL, leaving them in the investor penalty box and the Street wondering if the company would be able to navigate through its near-term billings volatility; **3Q represents growth in key areas with customer expansion rates strong and subscription growth rates of 50%+. PVTL answered the bell speaking to our thesis that the company has a significant opportunity for further expansion within its customer base as the shift to the private cloud and public workloads within enterprises is still in its early innings of playing out in the field** . . . . In addition we continue to hear from the field that the channel/distribution partnerships with VMware and Dell are starting to see some points of inflection in the field and could be incremental growth drivers for FY20 that will help PVTL further spread the PKS gospel to enterprise customers. . . .Despite the speed bump in the July quarter with the billings miss that had the company in the investor penalty box, **we do believe core fundamentals and the market opportunity for Pivotal remains healthy and in the medium term as evidenced with a October bounce back quarter**. To this point we believe the company has a long runway ahead of itself after navigating through near-term billings volatility as evidenced last night with clear momentum heading into year-end and FY20 in our opinion. We see significant opportunity given a surge in cloud native spending, PVTL's attractive subscription-based financial model, and a clear path to profitability over the next few years. **We are optimistic about the opportunity for further expansion, as the shift to the private cloud and public workloads within enterprises is still in its early innings of playing out in the field**.

263. Defendants' statements concerning Pivotal's pipeline, its customers and its deferred revenue, contained in ¶¶255-259 were materially false and misleading for the reasons described in ¶238.

### 4. Citi Global TMT West Conference - January 8, 2019

264. On January 8, 2019, Pivotal presented at the Citi Global TMT West Conference. In response to a question about competition from Jacek Rycko, a Citigroup analyst, Defendant Gaylor falsely represented that "*competition in the past hasn't really been direct competition*."

> Jacek Rycko - Citigroup
>
> And over the past year, as we sort of seen you do your thing with PCF and then Red Hat had its OpenShift offering. And you seem

to kind of fulfill 2 different use cases, but now with PKS it seems like you're getting into more direct competition with Red Hat. How would you interpret IBM's acquisition -- announced acquisition of Red Hat?

Defendant Gaylor

Yes. I mean, we really don't comment on other people's acquisitions. We think it's not a negative. We think it reinforces our position in the market, the importance of multi-cloud. *I would say that the competition in the past hasn't really been direct competition, and probably PKS is more suited towards, like, if you were going to do a head-to-head comparison, we think PKS is very differentiated from that product in terms of a security, the embedded networking, the constantly updated Kubernetes, constant compatibility there. We think there is a lot of differentiation there, but there's also a lot of emerging technologies in the market, and so we think customers and we talked about this quite a bit on the Q3 call are really sorting through the emerging technologies, the consolidation that's going on in the market.* With VMware acquiring Heptio, we think that's great for PKS. I think -- we think that will accelerate the product road map around PKS, given that piece of the development effort and where those folks are focused. So we think that's a net positive and we were excited when that happened.

Jacek Rycko - Citigroup

If I may, because the #1 question that I get on Pivotal is what does the company do? And the second question is that, how is their offering different than OpenShift what Red Hat is offering? And you've mentioned 2 aspects of it, networking and security, would you mind just double clicking on that a little bit?

Defendant Gaylor

So I think we -- security is huge across the platform, but we think it's a key differentiator from OpenShift. And particularly, when you think about kind of the ubiquitous nature of OpenStack, right, and how they're selling it is very different than how we're selling it. Our sale is very strategic and there is bigger dollars coming from it. So I think a way to think about it is if you think about industrialized open source, I think that's kind of Pivotal. And there is kind of the PAS piece and the PKS piece and the functions piece, but it's basically, abstractions of new technology on top of our platform. *And so without getting too technical in terms of the security features, we think we have industrialized security that's really important to enterprises, and we think it's a key way that we differentiate.* And then with the networking, I think that's more NSX embedded in PKS and we think that's a differentiator relative to other offerings that may be out there that may have point pieces of it, but don't have the whole solution. The Kubernetes piece of it is also pretty important. *Kubernetes is continuously updating and having new releases and we're keeping up with that.* So you always have the latest fixes, bug fixes and security patches associated with that on top of the open source. And nobody else is

doing it in that manner like there is big gaps in time before that happens. And so that's, again, a kind of as part security, part networking and part just like constant compatibility that's really important.

265.     During the conference, Defendant Gaylor also represented that while most of Pivotal's revenues were still coming from its older PAS offering, not the recently released PKS offering, Pivotal was "*very encouraged by the traction*" PKS was getting and the help from Dell and VMware:

> PAS is where the majority of the revenue is coming from today from a subscription perspective on the platform, whereas PKS is nascent, *but we're very encouraged by the traction that we're seeing in the customer base and particularly in the pipeline. From a Pivotal perspective with PKS, we're seeing a lot of that traction with existing customers who are already very successful on PCF and on PAS, and we're seeing nice pipeline developing around new customers in through the VMware go-to-market it's more new customers because they're focused on kind of that longer tail that we don't really have direct coverage of toda*y.

> *        *        *

> And again, *we're encouraged by the early signs that we're seeing*.

> *        *        *

> *[W]e're encouraged by some of the early signs we're seeing around PKS, in particular. And so we're looking for that momentum to continue to build and translate to top line growth,* but it's just very early days. I would say from a Dell perspective, Michael is a huge supporter, particularly with customers that kind of elevate some of the dialogue within customers from a strategic perspective that he participates in a lot of our CIO roundtables and discussions. I mean, means some of our customers are our best salespeople just given the success that they've seen on the platform, particularly within subsectors or industries. And so we think the Dell, VMware being part of that broader family of companies is helpful, will be helpful in the future, but we are independently run. We have a majority shareholder and we're doing joint PKS development with VMware. *And we have a very tangible go-to-market around PKS,* but I think it's kind of early innings.

266.     In response to a question regarding customer additions, Defendant Gaylor falsely assured inventors that Pivotal was "strong across sectors, within the sectors that we are in."

Unidentified Analyst

Do you expect to see a flywheel effect in terms of customer additions like once people see Boeing and these larger companies see so much improvement in productivity the next customers is just easier to acquire. Are you seeing that? Or you expect to see that in the future?

Defendant Gaylor

Yes. I would say it's probably -- I mean, more of like of an enterprise, large enterprise subscription sales cycle versus like a SaaS application flywheel, but what I would say is that within – *we're strong across sectors, within the sectors that we are in*, there is a flywheel and network effect of those CIOs and CEOs and CTOs talking to each other, *but I wouldn't say that has pressed the sales cycle, if you will, to something shorter*. I wouldn't expect to see a huge difference in the net adds in the near term, but *over time, as PKS becomes bigger and more important, as part of -- as a percentage of revenue, if you will, you may see that effect*. But I would see that kind of much further off to the future [than] anything in the next 12 months.

267. Defendants' statements concerning Pivotal's sales cycle, its product offerings, traction with PKS, and its competition, contained in ¶¶264-266 were materially false and misleading for the reasons described in ¶238.

### 5. Fourth Quarter and Full Year Fiscal 2019 Results - March 14, 2019

268. On March 14, 2019, Pivotal issued a press release announcing its financial results for the fourth quarter and full fiscal year 2019 ended February 1, 2019. Pivotal's financial results included subscription revenue growth of over 50% year-over-year in 4Q19, and 55% year-over-year for FY19, and total revenue growth of 27% year over year in 4Q19 and 29% year over year for FY19. Defendant Mee stated that the Company was in the "*early stages of [a] high- growth market.*"

269. The March 14, 2019 press release also contained the Company's financial outlook for the first quarter of fiscal 2020 and the full fiscal year of 2020, stating:

For the first quarter of fiscal 2020, Pivotal currently expects:

- Subscription revenue of $124.5 to $125.5 million

- Total revenue of $183 to $185 million

- Non-GAAP loss from operations of $13.5 to $12.5 million

- Non-GAAP net loss per share of 6¢ to 5¢, assuming weighted average shares outstanding of approximately 267 million

For the full fiscal year 2020, Pivotal currently expects:

- Subscription revenue of $542 to $547 million

- Total revenue of $798 to $806 million

- Non-GAAP loss from operations of $38 to $36 million

- Non-GAAP net loss per share of 15¢ to 13¢, assuming weighted average shares outstanding of approximately 272 million.

270. Later on March 14, 2019, the Company held a conference call with analysts to discuss its financial results for fiscal year 2019 and its guidance for fiscal year 2020. On that call, Defendant Gaylor told analysts and investors that Pivotal "***continue[s] to attract new customer[s] and many of [its] existing customers grow their investments with [Pivotal]***."

271. Discussing the Company's net expansion rate for fiscal 2019, Defendant Gaylor stated that the Company "***continue[d] to see healthy expansion from existing customers***." Notably, after touting the Company's "industry-leading" net expansion rate, Defendant Gaylor stated that Pivotal "expect[s] the percentage to come down ***gradually over time***."

272. Moreover, Defendant Gaylor concluded her prepared remarks for the call by providing greater detail on the Company's 2020 guidance, stating in relevant part:

> I will conclude by providing guidance for the first quarter of fiscal '20 and for the full fiscal year. Please note that we are providing year-over-year growth rates based on the midpoint of the guidance range compared to Q1 or to fiscal year '19.
>
> For the first quarter, we expect subscription revenue between $124.5 million and $125.5 million, representing growth of approximately 39%; total revenue between $183 million and $185 million, representing growth of 18%; operating loss between $13.5 million and $12.5 million, representing improvement of 38%; and net loss per share of $0.06 to $0.05 based on weighted average shares outstanding of approximately 267 million.
>
> We estimate the fiscal year as follows: Subscription revenue between $242 million and $247 million, representing growth of approximately 36%; total revenue to be in the range of $798 million and $806 million, representing growth of 22%; operating loss between $38 million and $36 million, representing improvement at 48%; and net loss per share of $0.15 to $0.13

based on weighted average shares outstanding of approximately 272 million.

I would also like to share some assumptions that we have built into our guidance. I'm pleased to confirm that we will continue to be on track to reach breakeven profitability 8 to 10 quarters from the time we went public, which would be during the first half of our fiscal '21. With regards to revenue, we expect mix to continue shifting towards subscription. We expect services revenue for the year to be relatively flat to last year as we enable existing customers to be self-sufficient, leverage our SI partners and as maintenance revenue associated with legacy products continues to decline. And as we expect -- and we expect services gross margin to be in the low 20% range for the year.

\*        \*        \*

***In closing, we will continue to drive top line growth and operating leverage across the company. We are still in the early stages of executing against our long-term vision in this high-growth market, and I look forward to updating you on our progress throughout the year.***

273. Following Defendant Gaylor's description of the Company's guidance, an analyst at Credit Suisse pressed her on the Company's projected growth and potential risks to achieving the projected figures, to which Defendant Gaylor responded that Pivotal's guidance was "reasonable":

Kevin Ma, Credit Suisse

[Y]ou mentioned guidance implies flat growth next year and deceleration from this year. How should we think about the upside and downside risks to what you've baked into your 2020 outlook? And what are the major variables that might cause it to be higher or lower?

Defendant Gaylor

It's a great question. I would say, in general, our guidance is pretty consistent and each quarter reflects our expectations for at this point in time in the year. ***So we think it's reasonable.*** Clearly, there is some upside and downside in the guidance, ***but what we're putting out is what we think is reasonable for the year.***

274. Defendant Mee reiterated his statement in the March 14, 2019 press release, also parroted by Defendant Gaylor on the conference call, that Pivotal was "***still in the early stages of this high-growth market***." Defendant Mee further touted Pivotal's "***industry-leading net expansion rate*** of 149%" and added that "***we expect to see continued growth in these very large***

1   *accounts as they seek to modernize the applications that run their businesses.*" Defendant Mee

2   also stated:

3               *We're pleased with the early traction in PKS deals during the*
            *first year of availability and continue to be encouraged by the*
4           *growing pipeline. While the majority of PKS sales are from*
            *existing customers, we are continuing to see new customer*
5           *interest from both VMware and Pivotal sales forces.*

6                                   *       *       *

7               *[W]e are enthusiastic about the market opportunity and*
            *positioning and are confident our best-in-class technology and*
8           *services will continue to drive strong growth through fiscal '20.*

9           275.    Defendant Mee also falsely represented that Pivotal was "*feeling pretty optimistic*

10  *about the pipelines that we are seeing from VMware and also for the lift that we're getting*

11  *from Dell Technologies in terms of getting us new customers, so that's good as well.*"

12          276.    In response to a question about PKS and Kubernetes, Defendant Mee stated: "*we*

13  *think that PKS has the best enterprise Kubernetes offering, includes all the technology that*

14  *we've developed over the years that led to the success of PAS. And so that is an enterprise*

15  *offering. It's probably the strongest in the market.*"

16          277.    Defendant Gaylor echoed Mee's statements about PKS, adding:

17              *So as Rob talked about a little bit earlier, we're really encouraged*
            *by what we're seeing with PKS and the traction we're seeing with*
18          *customers, both new and existing, as well as the pipeline, our*
            *pipeline as well as VMware's pipeline there because it is a joint*
19          *go-to-market and a joint R&D effort. . . . And we expect our*
            *existing customers to continue to expand their footprint with*
20          *PKS. And so that's a little bit of additional color. We're not*
            *forecasting what that number will be through the year, but we*
21          *are encouraged by the pipeline that we're seeing.*

22          278.    In response to a series of questions from Nikolay Ivanov Beliov of Bank of

23  America/Merrill Lunch about Pivotal's deferred revenue and RPO projections, Defendant Gaylor

24  falsely stated that there were "no specific anomalies to point out there" and no elongation of

25  Pivotal's contract terms:

26              Nikolay Ivanov Beliov - BofA Merrill Lynch

27              Cynthia, I just wanted to clarify, long-term deferred revenue
            picked up significantly quarter-over-quarter and year-over-year.
28          Was there elongation of contract terms going on?

Defendant Gaylor

*No. I think in the -- I think what you're seeing is Q4 is a big expansion period for us, right, because of the seasonal nature of our business. And so I think that's what you're seeing. There's no specific anomalies to point out there.*

279. Defendant Gaylor also falsely represented that the Company was "***really pleased***" with its RPO which "***demonstrates the visibility that we have into our business and the health of our business.***"

Nikolay Ivanov Beliov - BofA Merrill Lynch

Okay. And I know you did not guide to RPO growth rate for the year, but relative to the short-term [deferred revenue] and total [deferred revenue] guide and easier comps versus fiscal year '19, how should we think about RPO for the year?

Defendant Gaylor

Yes. ***So at this point, I mean, we're not in a position to guide to RPO, but we are really pleased with the RPO. It's almost $1 billion of RPO that we reported in Q4. That provides significant revenue coverage for the year and so I think demonstrates the visibility that we have into our business and the health of our business.***

280. Defendant Gaylor also represented that the strength and growth of the Company's RPO helped smooth out any variability in the timing of deals closing:

Looking ahead to Q1, we expect short-term and total deferred revenue to decline sequentially from Q4. We expect year-over-year growth in Q1 for short-term deferred in the mid to high 30% range and for total deferred in the high 20% range. We expect year-over-year growth for the full year for short-term deferred in the mid-20% range and for total deferred in the high teens range.

As a reminder, Q1 of last year was strong for deferred revenue because we had favorability due to early renewals, timing of deals and prepayments, which make Q1 a more difficult compare. These factors may impact deferred revenue in any given quarter. We encourage investors to look at trailing 12-month growth rates for these balance sheet metrics in order to smooth out the quarter-to-quarter variability.

\*     \*     \*

I think when you're looking at the balance sheet items, you need to remember, we do have seasonality in our business and so things like early renewals, timing of deals and prepayments impact things like deferred revenue, both short term and long term, which fill in kind of some of the calculated billings that a variety of folks do. ***I think we've talked about RPO and how RPO helps smooth out***

*that variability. And we look at RPO from a revenue coverage
perspective in terms of how much future revenue are we covering
with that number. And we are comfortable with kind of the
strength of the RPO that we reported in Q4 and how that's
growing relative to what we're seeing in the market and in our
pipeline.* The other thing is when we -- when you look at the
balance sheet metrics, I also encourage you -- continue to
encourage you to look at the trailing 12-month type of metrics
because that will smooth out the variability in any one quarter.

281.    Market analysts received the Company's fiscal 2020 guidance and the Executive

Defendants' statements favorably.  For example, on March 14, 2019, Matthew Hedberg of RBC

Capital Markets, LLC raised RBC's price target on Pivotal from $25 to $27 and remained

constructive on Pivotal's opportunity and valuation, noting:

Pivotal reported strong results highlighted by 54% current
subscription billings growth and subscription revenue growth of
50%. The subscription outlook for Q1/20 and FY/20 was also
ahead and our main focus and could benefit from additional
leverage from VMW and PKS adoption. We remain constructive
on the opportunity and valuation. Maintain OP and increase PT to
$27 from $25.[41]

282.    On March 15, 2019, Morgan Stanley also raised its price target for Pivotal shares

from $24 to $26, citing the Company's expansion rates, billings, and revenue outlook and

pointing to "a large opportunity ahead."

283.    On March 15, 2019, Daniel Ives of Wedbush issued an analyst report on Pivotal

titled, "Another Step Forward; Penalty Box Stock Despite Eye Popping Billings Beat."  In the

report, Ives noted that:

Last night PVTL delivered mixed headline results which came in
slightly below Street expectations although the all-important
subscriptions (grew 50% year over year) and particularly the
billings beat by 20%+ was a major step in the right direction for
the PVTL story in our opinion. As with every PVTL quarter, good
news comes with some bad as the company gave conservative
guidance for FY1Q/FY20 which could disappoint some investors
and thus weighed on shares after hours. **We believe this is near-
sighted as the underlying subscription story at PVTL is
humming into FY20, net expansion rates of 149% look very
healthy, and the implied billings for the April quarter is a
"sand bag special" in our opinion as the company is under
promising and should over deliver over the next few quarters
in our opinion.**

---

[41] *"Pivotal Software Inc. - Strong subscription growth & outlook; Tgt to $27,"* RBC Capital
Markets, LLC, March 14, 2019.

284.    On March 15, 2019, Jennifer Swanson Lowe of UBS issued a report on Pivotal which maintained its $21 twelve-month price target on Pivotal, but noted that:

> Subscription growth of 50% came in 2% above consensus estimates and billings growth of 47% demonstrated healthy momentum for Pivotal as expansion deals remains strong. After a sharp growth deceleration between Q1 and Q2, three consecutive Qs of >50% subscription growth should calm fears of further slowing. We remain Neutral rated on the stock with our PT unchanged at $21 as we believe that healthy demand outlook and current cash burn is priced at these levels. However, we also like PVTL's exposure to the Digital Transformation theme and see a sizeable revenue opportunity ahead.
>
> *        *        *
>
> FY20 subscription revenue guidance of $542-547M came in higher than consensus estimate of $532M whereas total revenue guide of $798-806M was below consensus estimate of $812M due to Pivotal pushing Services business to SI partners.[42]

285.    Despite the strong subscription revenue growth, the true problems regarding Pivotal's elongating sales cycles, deepening competition and disjointed PAS/PKS offerings remained concealed by Defendants' alleged misrepresentations and omissions, causing Pivotal's stock price to fall by approximately 4%, from a close on March 14, 2019 of $22.40 to a close of $21.52 on March 15, 2019.

286.    On March 22, 2019, Wedbush analyst Ives was quoted as stating that Pivotal has "massive tailwinds" as businesses continue the shift towards cloud-based software systems, and concluded that Pivotal is on "a clear path to profitability over the next few years, which many investors are overlooking."[43]  Wedbush then placed a price target of $26 per share on Pivotal stock and rated it as an outperformer.

287.    On March 29, 2019, after the market closed, Pivotal issued its annual report on Form 10-K with the SEC for the fiscal year ended February 1, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendant Mee and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of financial reporting,

---

[42] "*Pivotal Software Inc. - Subscription Growth Settles Into a Steady Groove*," UBS Global Research, March 15, 2019.

[43] "P*ivotal Software (PVTL) - We Would Be Buying PVTL on Recent Choppiness; Unique Cloud Play for 2019/2020*," Wedbush, March 22, 2019.

and the disclosure of any material changes to the Company's internal controls over financial reporting.

288. The 2019 10-K touted the Company's subscriptions and services businesses, stating: "We expect that over time subscription revenue will continue to become a larger percentage of our total revenue as customers continue to adopt PCF and as our SI partner ecosystem ramps to deliver strategic services directly to our customers." In fact, one of the six "competitive strengths" the Company claims to have is its "***Leading cloud-native platform with strategic services***. Our cloud-native platform combines technology and agile development through our renowned Labs processes, enabling cloud-native transformation within enterprises." (Emphasis in original.)

289. Defendants' statements concerning Pivotal's growth and expansion, its pipeline and RPO, the adoption/early traction of its PKS offering, and the "high- growth market" the Company was purportedly operating in, contained in ¶¶268, 270-280 were materially false and misleading for the reasons described in ¶238.

### 6. Investor Meetings – March 2019

290. On or about March 25, 2019, Defendants Mee and Gaylor participated in investor meetings with UBS which UBS described as follows:

> **We recently hosted a day of investor meetings with Pivotal CEO Rob Mee and CFO Cynthia Gaylor, and came away with a positive view on the company's long-term growth opportunity as large corporations still remain in the early stages of digital transformation efforts**. Modest RPO growth in FY19 and billings volatility remain the biggest sources of investor pushback, but we think high-growth/high-margin subscription revenue increasing as a % of the mix, increasing customer diversification, and the potential to improve logo adds with PKS can ease these concerns over time, paving the way for the stock to work higher over a multi-year time horizon.
>
> *      *      *
>
> Management reiterated comments from the Q4 call stating that lack of services growth is impacting RPO along with tough comps, and that **the bigger read is that PVTL already has 60% of projected FY20 revenue in backlog**, but we expect RPO growth to remain a focus for investors. New customer adds was another focus and PVTL hopes the rate of adds will improve in FY20, in part benefitting from the ramp of PKS and the VMW partnership around that product.

## C. Materialization of the Previously Concealed Risks – June 4, 2019

291. On June 4, 2019, after the market closed, Pivotal issued a press release, reporting its financial results for the first quarter of 2020 ended May 3, 2019. Therein, Defendant Mee disclosed that "**sales execution and a complex technology landscape impacted the quarter**," which resulted in the Company revising its fiscal 2020 subscription revenue guidance, less than three months after it was first touted to the market.[44]

292. Specifically, the Company provided the following revised guidance:

For the second quarter of fiscal 2020, Pivotal currently expects:

- Subscription revenue of $131 to $133 million

- Total revenue of $185 to $189 million

- Non-GAAP loss from operations of $11 to $9 million

- Non-GAAP net loss per share of 4¢ to 3¢, assuming weighted average shares outstanding of approximately 274 million

For the full fiscal year 2020, Pivotal currently expects:

- Subscription revenue of $530 to $538 million

- Total revenue of $756 to $767 million

- Non-GAAP loss from operations of $49 to $44 million

- Non-GAAP net loss per share of 15¢ to 13¢, assuming weighted average shares outstanding of approximately 275 million

293. Importantly, deferred revenue was $417.1 million, which was down 11% quarter-over-quarter and came in substantially below the Street's consensus of $436.9 million, indicating that while Pivotal was recognizing revenue from existing subscriptions, it was failing to produce new contracts that would sustain its deferred sales for the future. The following chart demonstrates Defendants deferred revenue decline:

---

[44] Text which is **bolded and underlined** indicates the materialization of previously undisclosed risks.



294.     In addition, the Company's year-over-year growth rate, which Defendants had previously characterized as more accurate and more meaningful to investors than quarter-over-quarter, drastically declined:[45]



295.     Indeed, due to a deceleration in core growth and a proliferation of contracts with shorter durations, billings were too down (23% year-over-year) and RPO growth decelerated to 10% in Q1 2020 and was guided to be flat year-over-year in Q2 2020 – a serious cause for concern among investors.  In fact, RPO, which was emphasized as an important metric,[46]

    [45] *See, e.g.*, 4Q19 Tr. Defendant Gaylor stated: "We encourage investors to look at trailing twelve month growth rates for these balance sheet metrics in order to smooth out the quarter to quarter variability."

    [46] *See* 4Q19 Tr. Defendant Gaylor stated: "The other thing I would say is when we think about the *health of the business and the key indicators*, we're really thinking about subscription

declined 11% from $990M at 4Q19 to $880M at 1Q20, which compares to an RPO decline of only only 2% from $820M at 4Q18 to $800M as of 1Q19:



296.     Later on June 4, 2019, also after the market closed, the Company held a conference call with analysts to discuss the Company's financial results for the first quarter of 2020 ended May 3, 2019.  During the call, Defendant Mee revealed that the Company "**closed fewer deals than we expected in Q1 due to sales execution and a complex technology landscape that is lengthening our sales cycle. Some of the deals we expected to close in Q1 slipped.**"  As a result, RPO and deferred revenue growth rates were lower than expected.  This resulted in the Company revising its 2020 guidance, less than three months after it was first touted to the market.  Moreover, the Company projected losses for fiscal 2020 would be $44 million to $49 million, an increase of approximately $10 million from the previous guidance, to cover a ramping-up of marketing efforts to compete with established cloud infrastructure providers among other things.

297.     While Defendants credited the miss to deals slipping from Q1 into Q2, they did nothing to explain why the Company simultaneously guided lower for deferred revenue and RPO for the rest of FY2020.  For example, on the June 4, 2019 earnings call, Brad Alan Zelnick from Credit Suisse  asked this very question: "Just trying to reconcile the comments that you've made

revenue growth and then net expansion rate *as well as RPO*. And those are the metrics that we track most closely internally to really indicate the health of the business and the growth profile." (emphasis added).

about slipped deals landing in 2Q. With your guidance for significant deceleration and deferred

revenue and RPO, it would seem you're expecting the business gets worse. How much of that is

demand environment? How much is execution? And what's embedded in terms of close rates

and duration in that guidance that you've given us on deferreds and RPO?" Defendant Gaylor

responded by effectively evading the entire question. (¶303).

298.    Defendant Mee also disclosed that the Company was finally introducing a

Kubernetes-compatible version of its main product offering PAS (to be run on its PKS offering)

to combat increasing competition in the market and confusion with respect to its product

offerings:

> Because of our traction with PKS, we are now moving on to the
> next phase of our Kubernetes journey. Next month, we will
> introduce a version of PAS that is built to run on Kubernetes. PAS
> on Kubernetes will initially be available for PKS. Eventually, it
> will run on public cloud Kubernetes services as well. In addition to
> PAS on PKS, we will be introducing new product offerings on top
> of PKS to expand our market opportunity, simplify our sales
> process and make it easier for new customers to get started with
> Pivotal.  **These product updates will grow our addressable
> market and accelerate our sales cycle**.
>
> *          *          *
>
> **And the challenges of people taking longer to make decisions
> and some of that market confusion is holding us back at the
> moment,** but I am truly optimistic about the future because I think
> we're really well positioned. And there is an awful lot of activity,
> there's a lot of great partnership. And we continue to do the same
> kind of work that we've always done with really amazing outcomes
> for strategic customers. So I do think the future is still very bright
> despite our challenges this quarter.

299.    During her prepared statements, Defendant Gaylor disclosed that RPO, deferred

revenue, and service revenue came in lower than expected:

> Now turning to RPO. **We finished the quarter with $880 million
> of RPO, up 10% year-over-year. This was lower than we
> expected mainly driven by sales execution and shorter contract
> duration**. We expect approximately 55% of these obligations to be
> delivered in the next 12 months. As we've noted previously, RPO
> will have variability quarter-to-quarter based on the timing of deals
> and renewals as well as contract duration. In Q2, we expect RPO to
> be flat year-over-year relative to Q2 of last year.
>
> Short-term deferred revenue was $351 million, up 34% year-over-
> year, and total deferred revenue was $417.1 million, up 23% year-
> over-year. **These growth rates were slightly lower than expected**

**due to deals that slipped from Q1**. As a reminder, deferred revenue is impacted by timing of deals and renewals as well as prepayments.

Looking ahead to Q2, we expect short term and total deferred revenue growth to be in the low- to mid-20% range compared to the same period last year. For the fiscal year, we expect short-term deferred revenue growth to be in the mid-single to low-teens percent range and total deferred revenue growth to be in the low- to high-single-digit percent range relative to last year.

300. To address, the sales execution issues, Defendant Mee stated that the Company had put a new Head of Sales for Americas in place:

We have taken steps to improve our sales execution, including putting a new Head of Sales for the Americas in place, continuing to focus on building pipeline by increasing demand-gen and sales-enablement activities, and introducing a new version of PAS that runs on Kubernetes.

301. During the Q&A portion of the call, Defendant Gaylor revealed that the deals that slipped were a combination of new customers delaying deals and existing customer renewals: "We had some deals kind of across categories that slipped out of the quarter."

302. In response to a question from Sanjit Kumar Singh of Morgan Stanley about the elongating sales cycle and why Pivotal had waited so long to put PAS on Kubernetes, Defendant Mee stated:

[I]n terms of -- the larger deals that we've traditionally done and the strategic relationships that we have with our customers, **we are seeing lengthening in the sales cycles and I think it really is due to a lot of complexity in the technology landscape**. If you think about the public clouds coming on-[premise], if you think about the rise of Kubernetes and related technologies, people are experimenting with those. They are wondering where to go. There've been acquisitions in the market. **So I think it's really causing customers to take their time and think about what they're doing. And as Cynthia said, we've -- some of the Q1 deals have slipped into Q2 . . . They are taking longer.**

\*       \*       \*

And then the second part of your question, I think what you're really getting at here is why putting PAS on Kubernetes now. And the thing that you have to realize with the rise of Kubernetes and all of the related technologies, so it's not just the container orchestration that is represented by Kubernetes, but it's a lot of other pieces. A lot of that underlying technology that we built ourselves for PAS is very mature, very scalable, very reliable and very secure. And the Kubernetes ecosystem is only now in many of the areas that really matter to us with the PCF platform generally

and within PAS and really matter to our customers who are running mission-critical workloads on it. Only now are those capabilities in the Kubernetes community getting to the point where we can contemplate replacing the pieces in PAS that we build for ourselves. . . . And now that the Kubernetes community and the Kubernetes technology is maturing to the point where it can actually begin to replace some of what we have, we're going to aggressively do that because the real advantage in what we do is at a higher level. It's the higher level abstraction in the developer productivity and the operational efficiency and all the automation that we do. So the more plumbing -- and I consider Kubernetes container orchestration to be plumbing -- the more of that, that we can use mature, hardened industry standards, we will. And we're just now getting to that point.

Even so, you are going to see an evolution over time. A lot of the maturity isn't there. So for example, PAS runs Windows workloads -- mission-critical Windows workloads, tens of thousands of containers for many of our customers. You can't yet do that at the same level with Kubernetes. **So that technology integration, running PAS on Kubernetes is going to be a process.**

**And we're going to ship the first version in July, and it's going to be available for our customers to try out and then we're going to continue to iterate on it and integrate pieces of the Kubernetes ecosystem into our platform as appropriate**. We'll contribute to the Kubernetes ecosystem to help harden it to the level of our own technology that we've already built and we'll continue to converge those as they really all form pieces of a greater ecosystem anyway, right? So I think the answer -- I know that was a long answer, but I hope that information was relevant and informative because I think it is a really, really important point. And I'm very glad you asked the question why now, it's because it's finally time.

303.    In response to a question from Brad Alan Zelnick of Crédit Suisse, about why Pivotal was guiding down on RPO and deferred revenue if the Company really expected to book the deals that supposedly slipped in the following quarter (Q2 FY20), Defendant Gaylor simply reiterated that deals were taking longer to close without addressing whether the Company was losing deals:

Brad Alan Zelnick - Crédit Suisse

Great. And just a follow-up for Cynthia. Just trying to reconcile the comments that you've made about slipped deals landing in 2Q. With your guidance for significant deceleration and deferred revenue and RPO, it would seem you're expecting the business gets worse. How much of that is demand environment? How much is execution? And what's embedded in terms of close rates and duration in that guidance that you've given us on deferreds and RPO?

1    Defendant Gaylor

2    Sure. That's a great question, Brad. **I guess, in terms of the**
     **quarter itself we did have some deals that slipped in Q1** and as
3    Rob said, the good news there is that we don't lose the deal. So
     they're very much still in play and a few of them have already
4    closed in Q1 and we're expecting others to close in the coming
5    quarters. **Our sales cycle in places is elongating, I think partly**
     **due to a lot of the things that Rob talked about in terms of the**
6    **complex tech landscape. And then from a sales execution**
     **perspective, I think you hit the nail on the head. These things**
7    **tend to take time. And we think we have kind of the right team**
     **and the right process in place to make it happen, but it takes**
8    **time. And I think that's what you're seeing reflected in the**
9    **balance sheet metrics, if you will**.

10       304.    Indeed, Defendant Gaylor attributed the sale execution challenges to the ramp up

11   of sales of the Company's PKS product:

12       Analyst:

13   And just one follow-up. It seems like you've had a little bit of
     challenges as far as adding new customers in the previous quarters.
14   And just from the perspective of timing, by you lowering this
     guidance, are you implying that you observed some lightness on
15   expansion deals and not only on new customer acquisitions? What
     should we be reading with regards to your expectations for those
16   two separate drivers of defined growth for 2020?

17       Defendant Gaylor:

18   So I think from a customer perspective, I mean we're focused on
     continuing to grow our customer base. Rob talked a little bit about
19   PKS, and we have over 140 PKS customers. We're expecting that
     over time, there'll be more volume there, both in dollars but also in
20   accounts as the go-to-market strategy there ramps. **I think in**
     **terms of us – it's important for us to acquire new customers, and**
21   **we're very focused on that motion. I think part of that plays**
     **into kind of some of the sales execution pieces and making sure**
22   **we're building pipeline through both top of the funnel activity**
     **and enablement**, and those are 2 key priorities for us in terms of
23   continuing to build on the number of customers that we have.

24       305.    On this news, Pivotal's stock price fell $7.65 per share, or more than 40%, from a

25   close of $18.54 per share on June 4, 2019 to close of $10.89 per share on June 5, 2019.

26       306.    Pivotal's disappointing earnings report and guidance triggered a cascade of

27   negative forecasts from analysts.  Following the call, Wedbush analyst Daniel Ives called the

28   quarter a "train wreck" and characterized the Company's operating results as "disastrous,"

asserting that Pivotal's "management team does not have a handle on the underlying issues negatively impacting its sales cycles and the activity in the field which gives us concern that this quarter will be the start of some 'dark days ahead' for Pivotal (and its investors)."[47]

307.     Similarly, on June 5, 2019, Jennifer Swanson Lowe of UBS issued a report on Pivotal which stated, in part:

> Subscription rev. beat by 3%, but billings down -23% YoY was below cons. looking for -12%, as slipped deals, execution challenges and elongated sales cycles weighed on quarterly results. Rev Performance Obligation (RPO) growth decelerating to 10% in Q1 and guided to be flat YoY in Q2 is also cause for concern. We continue to believe that Pivotal's platform will play a key part as enterprises undergo application modernization initiatives. However, recent go-to-market challenges in North America issues may take a few quarters to resolve and we think shares will be range-bound until growth stabilizes and execution improves. We remain Neutral rated on the stock while lowering our PT to $15.

308.     On June 5, 2019, Matthew Hedberg of RBC Capital Markets, LLC issued a report on Pivotal which pointed to "lengthening sales cycles" and "sales execution challenges":

> Revenue and earnings slightly exceeded expectations while leading metrics were below due to sales execution challenges and a "complex technology landscape" that is lengthening sales cycles. With a number of slipped deals, the outlook to short-term/total deferred revenue moved lower, as Q2/20 RPO is expected to be flat to Q2/19 levels (down 10% q/q vs. down 1% in Q2/19), FY/20 guidance moved lower, and Q2/20 guidance was below consensus. We trim our FY/20 estimates to the lower end of the range (though ~75% was due to lower services revenue) as we look for signs of stabilization and improved execution, though importantly we still expect break-even in 1H/21.

**D.     Post-Class Period**

309.     On June 5, 2019, Defendants participated in the Bank of America/Merrill Lynch Global Technology Conference.  On that call, in response to a series of questions from Nikolay Ivanov Beliov of Bank of America/Merrill Lunch about Pivotal's deferred revenue and RPO projections, Defendant Gaylor stated:

> **In terms of RPO, the things that impact RPO are timing of deals. So RPO this quarter was impacted by some of the deals slipping.** Again, we closed some of those and expect others to close in the coming quarters. Contract duration is a big driver, right, of RPO. And then the timing of renewals, right? And so

---

[47] "*Train Wreck Quarter/Guidance; Thesis Changer-Downgrading to NEUTRAL*," Wedbush, June 5, 2019.

we've talked about on past calls, we do have customers who renew on schedule, we also have customers who will early renew, right? So they may have been consumed in their subscription and they're over deployed, and they may either do a true-up or they may say, "Hey, I want to renew the whole thing at an expanded level."

So we have kind of early renewals and early expansions that can impact both RPO and sometimes the balance sheet metrics depending on when the invoicing happens. So I think you have to look at kind of the different components of each of those pieces to really think about growth, and I think we gave some pretty solid guidance in terms of how to think about that in Q2 within a band of ranges based on what we're seeing in the business right now.

\* \* \*

**Yes. We didn't lose deals from a competitive environment perspective, we didn't lose any deals this quarter. It's really they didn't close in the quarter and that's what really shows up on the balance sheet. And I think some of the complexity in the market is elongating sales cycles in places, right?**

310.  On July 18, 2019, Pivotal finally released an alpha version of PAS powered by Kubernetes.

### E.  Additional Scienter Allegations Against Pivotal and the Executive Defendants

311.  As alleged herein, Pivotal and the Executive Defendants acted with scienter in that these Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; Pivotal and the Executive Defendants knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and Pivotal and the Executive Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Executive Defendants, by virtue of their receipt or access to information reflecting the true facts regarding Pivotal, their control over, or receipt, or modification of Pivotal's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

312.  Pivotal and the Executive Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing

public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of Pivotal personnel at the highest levels of the Company.

313. The following allegations all support a strong inference of scienter:

(a) Statements by former Pivotal employees corroborate that Defendants knew or were reckless in not knowing that Pivotal was facing major problems with its sales execution including decreased deferred sales, lengthening sales cycles, and diminished growth as its customers and the industry's sentiment shifted away from Pivotal's principal products because the Company's PAS product was outdated, inadequate, and incompatible with Kubernetes, the industry-standard platform, as well as the fact that the Company's PKS offering was late to the Kubernetes-compatible market and was limited in its capabilities; (¶¶97-129, 215-225).

(b) Statements by former Pivotal employees confirm that Pivotal tracked the then-increasing competition; (¶219).

(c) The close proximity between the alleged false and misleading statements and materialization of the risk on June 4, 2019: The fact that Defendants revealed the materialization of a previously undisclosed risk less than three months after Defendants provided false assurances to the market (¶¶268, 270-280) further supports a strong inference of scienter.

(d) The Company boasted often, including in its SEC filings and on earnings conference calls, that despite quarter-to-quarter revenue variability due to, among other things, contract start dates and prepayments, Pivotal's subscription business model provided for "quite a bit of revenue visibility" which "smooths out some of the lumpiness" on the Company's balance sheet. ¶¶ 66, 239, 248, 279.

(e) Defendants Mee and Gaylor were senior executives involved in Pivotal's daily operations with access to all material information regarding the Company's core operations including it sales of PAS and, more recently, PKS. Each of the Executive Defendants is presumed to have knowledge of all material facts regarding Pivotal's core business. Given the

importance of the Company's PAS and PKS subscriptions and licenses to Pivotal's financial results, including its deferred revenues and RPO, the inference of scienter is strong.

### F. Loss Causation/Economic Loss

314. During the Class Period, as detailed herein, Pivotal and the Executive Defendants engaged in a course of conduct that artificially inflated or artificially maintained the price of Pivotal's securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired Pivotal's securities during the Class Period.

315. The misstatements and omissions regarding Pivotal's business concealed risks related to deferred sales, lengthening sales cycles, and diminished growth in new customers that Pivotal was experiencing as a result of increased competition and decreased demand as customers and industry sentiment shifted away from Pivotal's principal, yet outdated, PAS offering because it was incompatible with the industry-standard Kubernetes platform. Thus, it was foreseeable that the value of Pivotal's securities would be adversely affected when the concealed risks materialized.

316. When the hidden risks materialized and became known to the market, the price of Pivotal's securities declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases and acquisitions of Pivotal's securities at artificially inflated prices during the Class Period, Lead Plaintiffs and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in Pivotal's securities was a foreseeable and direct result of the nature and extent of the materially false and misleading statements and omissions. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.

317. The concealed risks materialized on June 4, 2019, after the market closed, when Pivotal reported its financial results for the first quarter of 2020 ended May 3, 2019. Defendant Mee revealed that in the quarter, the Company "***closed fewer deals than we expected in Q1 due to sales execution and a complex technology landscape that is lengthening our sales cycle. Some of the deals we expected to close in Q1 slipped***." In addition, services revenue and

deferred revenue growth rates were lower than expected due to fewer customer engagements and fewer software deals than expected. This resulted in the Company revising its 2020 guidance, less than three months after it was first touted to the market. Moreover, the Company projected losses for fiscal 2020 would be $44 million to $49 million, an increase of approximately $10 million from previous guidance.

318. On this news, Pivotal's stock price fell $7.65 per share, or more than 40%, from a close of $18.54 per share on June 4, 2019 to a close of $10.89 per share on June 5, 2019.

**G.    No Safe Harbor**

319. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present and future information such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

320. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

321. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Pivotal who knew that the statement was false when made.

**H. Exchange Act Counts**

 **1.**  <u>Count IV</u>: **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Pivotal and the Executive Defendants**

322.  Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

323.  This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

324.  During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and Defendants employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Pivotal securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Pivotal securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

325.  Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Pivotal securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Pivotal's finances and business prospects.

326. By virtue of their positions at Pivotal, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended to deceive Lead Plaintiffs and the other members of the Class. In the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

327. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Pivotal, the Executive Defendants had knowledge of the details of Pivotal's internal affairs.

328. The Executive Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Executive Defendants were able to and did, directly or indirectly, control the content of the statements of Pivotal. As officers and/or directors of a publicly-held company, the Executive Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Pivotal's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Pivotal securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Pivotal's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Pivotal securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

329. During the Class Period, Pivotal securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Pivotal securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have done so at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Pivotal securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of Pivotal securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

330.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

331.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### 2.    <u>Count V:</u> Violations of Section 20(a) of the Exchange Act against the Executive Defendants

332.    Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

333.    During the Class Period, the Executive Defendants participated in the operation and management of Pivotal, and conducted and participated, directly and indirectly, in the conduct of Pivotal's business affairs. Because of their senior positions, they knew the adverse non-public information about Pivotal's misstatements of income and expenses and false financial statements.

334.    As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to Pivotal's

financial condition and results of operations, and to promptly correct any public statements issued by Pivotal which had become materially false or misleading.

335. Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Pivotal disseminated in the marketplace during the Class Period concerning Pivotal's results of operations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause Pivotal to engage in the wrongful acts complained of herein. The Executive Defendants therefore, were "controlling persons" of Pivotal within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Pivotal securities.

336. Each of the Executive Defendants, therefore, acted as a controlling person of Pivotal. By reason of their senior management positions and/or being directors of Pivotal, each of the Executive Defendants had the power to direct the actions of, and exercised the same to cause, Pivotal to engage in the unlawful acts and conduct complained of herein. Each of the Executive Defendants exercised control over the general operations of Pivotal and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

337. By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Pivotal.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a) Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, certifying the Lead Plaintiffs as Class Representatives pursuant to Federal Rule of Civil Procedure 23(c), and appointing Labaton Sucharow LLP as Class Counsel pursuant to Rule 23(g);

1        (b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other

2  Class members against all Defendants, jointly and severally, for all damages sustained as a result

3  of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4        (c)    Awarding Lead Plaintiffs and the other members of the Class rescission on

5  their Section 12(a)(2) claims;

6        (d)    Awarding Lead Plaintiffs' reasonable costs and expenses, including

7  attorneys' fees, expert fees, and its other costs and expenses; and

8        (e)    Awarding such equitable, injunctive or other relief as the Court may deem

9  just and proper.

10  **DEMAND FOR TRIAL BY JURY**

11      Lead Plaintiffs hereby demand a trial by jury.

12  Dated: February 11, 2020        **LABATON SUCHAROW LLP**

13                  */s/ Christine M. Fox*

14                  Carol Villegas  (admitted *pro hac vice*)
Christine M. Fox  (admitted *pro hac vice*)

15                  140 Broadway
New York, New York 10005

16                  Telephone: 212-907-0700
Facsimile: 212-818-0477

17                  cvillegas@labaton.com

18                  cfox@labaton.com

19                  ***Counsel for Lead Plaintiffs the Oklahoma City Employee Retirement System and Police***

20                  ***Retirement System of St. Louis and Lead Counsel***

21                  ***for the Class***

22                  **WAGSTAFFE, VON LOEWENFELDT,**

23                  **BUSCH & RADWICK LLP**
James M. Wagstaffe (#95535)

24                  100 Pine Street, Suite 725
San Francisco, California 94111

25                  Telephone: (415) 357-8900
Facsimile: (415) 357-8910

26                  wagstaffe@wvbrlaw.com

27                  ***Liaison Counsel for the Class***

28