**LABATON SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)
Christine M. Fox (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com

*Counsel for Lead Plaintiffs the*
*Oklahoma City Employee Retirement*
*System and Police Retirement System of*
*St. Louis and Lead Counsel for the*
*Class*

**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**
James M. Wagstaffe (#95535)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
wagstaffe@wvbrlaw.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE PIVOTAL SECURITIES LITIGATION | **Master File No. 3:19-cv-03589-CRB**<br><br>LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

SUMMARY OF THE ARGUMENT ........................................................................................ v

I.    BACKGROUND ............................................................................................................. 1

      A.    Defendants' False and Misleading Statements and Omissions............................. 3

      B.    Defendants Had Information Which Contradicted Their Statements and
            Omissions During the Class Period .................................................................... 3

      C.    The Truth Was Revealed ................................................................................... 4

II.   ARGUMENT .................................................................................................................. 5

      A.    Applicable Legal Standard.................................................................................. 5

      B.    False Statements in Pivotal's Offering Documents .............................................. 5

            1.    The Securities Act Claims Do Not "Sound in Fraud" ............................... 6

            2.    The Complaint Sufficiently Alleges Item 303 and 503 Violations............. 6

            3.    Plaintiffs Have Standing To Pursue Section 12 Claims............................. 8

      C.    The Complaint Adequately Alleges Falsity.......................................................... 8

            1.    The Allegations from the CWs Support the Falsity of Defendants'
                  Misstatements and Omissions................................................................. 9

            2.    Materially Misleading Omissions........................................................... 10

            3.    Statements Defendants Challenge as Opinion Are Actionable................. 11

            4.    Statements Defendants Challenge as Forward Looking Are
                  Actionable .......................................................................................... 12

            5.    Statements Defendants Challenge As Puffery Are Actionable................. 13

      D.    The Complaint Adequately Alleges Scienter........................................................ 13

            1.    Statements From the CWs Support a Strong Inference of Scienter.......... 13

            2.    The Core Operations Doctrine Supports a Finding of Scienter ............... 14

            3.    Defendants' Other Arguments Do Not Undermine Scienter .................... 15

      E.    The Complaint Sufficiently Pleads Control Person Liability .............................. 15

III.  CONCLUSION............................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .................................................................................... 12-13

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009).........................................................................11

*Baker v. SeaWorld Entm't, Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019).........................................................................15

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................9-10, 14-15

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ........................................................12

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009)..................................................................................8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ........................................................................................5

*City of Sunrise Firefighters Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)..........................................................11

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................6, 7

*In re Dynavax Sec. Litig.*,
2018 WL 2554472 (N.D. Cal. June 4, 2018).............................................................10

*Fosbre v. Las Vegas Sands Corp.*,
2013 WL 5970250 (D. Nev. Nov. 7, 2013) ..............................................................15

*Fouad v. Isilon Sys., Inc.*,
2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ........................................................8

*Gerneth v. Chiasma, Inc.*,
2018 WL 935418 (D. Mass. Feb. 15, 2018) ................................................................7

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...............................................................................5, 10

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) .................................................................................6

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..............................................................................................5, 10

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ......................................................................................10

*Mingbo Cai v. Switch, Inc.*,
   2019 WL 3065591 (D. Nev. July 12, 2019) ...................................................................7

*Mogensen v. Body Cent. Corp.*,
   15 F. Supp. 3d 1191 (M.D. Fla. 2014).........................................................................9

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................ 13, 14-15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).................................................................................... 11-12

*Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc.*,
   774 F.3d 598 (9th Cir. 2014) ...............................................................................11

*Pirani v. Slack Techs., Inc.*,
   2020 WL 1929241 (N.D. Cal. Apr. 21, 2020) ...................................................................8

*Primo v. Pac. Biosciences of Cal., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...................................................................8

*In re Puda Coal Sec. Inc. Litig.*,
   2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013)...................................................................8

*In re Quality Sys,, Inc. Sec. Litig.,,*
   865 F.3d 1130 (9th Cir, 2017) ..............................................................12, 13, 14

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019) ...................................................................7

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...............................................................................6

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...............................................................................10

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................................13

*S. Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................5, 13

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ...................................................................12

*In re Urban Outfitters, Inc. Sec. Litig*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................9

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ...............................................................................10

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ...............................................................................6

*In re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014).............................................................................7

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009).............................................................................14

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................................13

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) .................................................................................. 12-13

*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 983 (9th Cir. 2009) ........................................................................................ 13-14

**Statutes and Rules**

15 U.S.C. § 77l(a)(2)...............................................................................................................8

15 U.S.C. § 78u-4(b)(1)(B)................................................................................................. 8-9

15 U.S.C. § 78u-4(b)(2)(A)..................................................................................................13

17 C.F.R. § 229.303(a)(3)(ii) .............................................................................................. 6-7

17 C.F.R. § 229.503(c)............................................................................................................7

17 C.F.R. § 240.10b-5...........................................................................................................15

Fed. R. Civ. P. 8(a) .................................................................................................................8

Fed. R. Civ. P. 9(b) .................................................................................................................6

## SUMMARY OF THE ARGUMENT

Contrary to the contentions in Defendants' motion to dismiss,[1] the Consolidated Amended Complaint (the "Complaint") sets forth a straightforward narrative of Defendants' fraudulent conduct: Beginning before Pivotal pocketed $638 million in proceeds from its initial public offering ("IPO") on April 24, 2018, the Company had already begun suffering from problems with sales execution and increased competition.[2] The Company's main product, Pivotal Application Service, or "PAS," a cloud-native platform launched in 2013 and used by application developers, was difficult to implement and had become outdated since it failed to incorporate standard open-source software from Google called "Kubernetes."[3] Multiple accounts from confidential witnesses ("CWs"), former Pivotal employees, confirm that starting before and lasting throughout the Class Period (April 20, 2018 through June 4, 2019), Pivotal's competitors were offering more attractive, innovative, and cheaper alternatives to PAS, and customers were increasingly choosing competitors' products. Throughout the Class Period, Defendants failed to disclose this material information to investors and led the market to believe the Company was experiencing robust sales of its product suite.

---

[1] Defendants include: (i) Pivotal Software, Inc.; (ii) the Executive Defendants (CEO Robert Mee and CFO Cynthia Gaylor); (iii) the Director Defendants (Michael S. Dell, Paul Maritz, Egon Durban, William D. Green, Marcy S. Klevorn, Khozema Z. Shipchandler); and (iv) the Underwriter Defendants (Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Barclays Capital Inc., Credit Suisse Securities (USA) LLC, RBC Capital Markets, LLC, UBS Securities LLC, Wells Fargo Securities LLC, Keybanc Capital Markets Inc., William Blair & Co., LLC, Mischler Financial Group, Inc., Samuel A. Ramirez & Co., Inc., Siebert Cisneros Shank & Co., LLC, and Williams Capital Group, L.P.). The Underwriter Defendants have joined in the motion to dismiss filed by Pivotal, the Executive Defendants, and the Director Defendants. ECF No. 88.

[2] Pivotal was founded in 2013 as a spin-off of EMC Corporation ("EMC") and VMware, Inc. ("VMware")—both subsidiaries of Dell Technologies, Inc. ("Dell"). ¶4. In August 2019, Pivotal announced it was merging with VMware. ¶23.

[3] The cloud is generally described as "the practice of using a network of remote servers hosted on the Internet to store, manage, and process data, rather than a local server or a PC." ¶60 n.12.

## I.   BACKGROUND

During the Class Period, Pivotal primarily sold subscriptions to its cloud-based platform called the Pivotal Cloud Foundry (the "PCF").  PCF delivered hardware and software tools for creating applications over the internet—in what is commonly referred to as a "Platform-as-a-Service," or PaaS," which: (1) provides tools for application development, and (2) hosts finished applications so customers do not need to own physical computing space. ¶60.  Thus, if a company wanted to build a branded iPhone app, they could use PCF to build it and host it. Pivotal generated a majority of its revenue from the sale of PCF subscriptions to its large corporate, or "enterprise," customers.  ¶5.

Pivotal sells its PCF products on a subscription basis and recognizes revenue ratably over the term of its contracts which are typically between one and three years. ¶68. Because the Company uses a subscription model, the vast majority of amounts billed to customers associated with current period sales are recorded as "deferred revenue."[4]  Pivotal's revenue grows as existing customers expand the use of its platform and as Pivotal adds new customers (or new "logos"). The Company has described its subscription-based business model as providing "a high level of visibility into future revenue." ¶66. While this revenue recognition method provided visibility to Pivotal, it also caused investors during the Class Period to place greater focus on the change in "deferred revenue" and "remaining performance obligation" or ("RPO") – described as "deferred revenue" plus backlog (future performance obligations not yet invoiced) – as opposed to the Company's total reported revenue in any quarter. ¶¶70-71.[5]

PAS, Pivotal's flagship product for building applications within PCF, was released in November 2013, and by 2017 had become outdated and expensive for what it offered. ¶¶5, 9-10.

---

[4] Defendants describe the relationship between "deferred revenue" and subscription as follows: "a decline in subscription sales in any single quarter would likely have only a small impact on our revenue for that quarter. However, such a decline would negatively affect our revenue in future quarters." ¶67 n.21.

[5] Defendants counter Plaintiffs' strong allegations related to declining growth in RPO and deferred revenue during the Class Period by highlighting a metric called net expansion rate ("NER"), which they claim better demonstrates demand for Pivotal's platform. (MTD at 1-2). However, the introduction of evidence outside of that pled or relied on in the Complaint is disallowed on a motion to dismiss.

119.  Thus, in August 2017, Pivotal teamed up with VMware to create a new product, Pivotal Container Service ("PKS"), a container management platform that allowed customers to more easily deploy and operate Kubernetes, the recognized open-source standard used to run and manage containerized workloads on the cloud. ¶5. PKS was not commercially available until February 2018. ¶11. And even when it came to market, Pivotal did not allow its salesforce to sell PKS as a standalone product.  ¶117. Instead, Pivotal tied the sale of PKS to the sale of its outdated and expensive PAS product—forcing customers to buy a "suite" of multiple products. ¶116.  CW-7, who worked at Pivotal from March 2018 to August 2019 as an Enterprise Sales Executive, reported being instructed by Pivotal management to focus on closing only larger sales which combined everything into a customized PAS system.  ¶¶104, 116. According to CW-7: (i) the sales team was "deterred" from Kubernetes/PKS specific conversations with customers; and (ii), by offering "custom solutions," clients could not compare Pivotal's products to competitors' products because they did not know what they were receiving. ¶117.

Witnesses also confirm that Pivotal's failure to incorporate Kubernetes into its primary software offering caused its sales cycle to elongate even *before* the IPO.  For example, CW-2 a former Strategic Account Manager at the Company, explained that pricing and competition from Kubernetes compatible technology—including Amazon, Microsoft, and Google's versions of Kubernetes —challenged Pivotal's ability to expand in what CW-2 called the "down-market" (Fortune 200 – 1000 companies). CW-2 said that it was becoming obvious starting before the IPO and increasingly throughout his tenure that more of Pivotal's revenue was coming from existing clients, not from new clients. ¶¶106, 108. Similarly, CW-6, a Senior Director of Sales at Pivotal from June 2017 to June 2018, confirmed: (i) the impact of Kubernetes and other competitors' products on his ability to compete in his region throughout his tenure; and (ii) that his region experienced a "big drop in revenue, year over year" by June 2018.  ¶¶111-112; *see also* ¶110 (CW-6 explained that larger deals with larger companies led to an elongated sales cycle at Pivotal). CW-3, a Software Strategic Accounts Director until January 2019, also confirmed that Pivotal had "a monolithic product that was expensive and operated with poor sales execution/strategy," and that competitors such as Amazon, Google, and Microsoft were

offering more attractive and innovative options. ¶119.

### A.    Defendants' False and Misleading Statements and Omissions

Pivotal completed its IPO on April 24, 2018, issuing a total of 42,550,000 shares to the public at $15.00 per share and generating over $638 million in proceeds. ¶81. In its Registration Statement, declared effective on April 19, 2018, Defendants made numerous false and misleading statements regarding its product offerings, including that PCF was integrated "***with leading open-source projects such as Kubernetes***," and that Pivotal was able to "***innovate and rapidly respond to customer needs and changing open- source software standards***." ¶¶148–152.[6] But, in fact, Pivotal's primary software offering, PAS, was outdated and did not incorporate Kubernetes. Moreover, Defendants discouraged the sale of PKS as a standalone product, leading to decreased new business and lengthening sales cycles at the time of the IPO. Defendants omitted these facts and instead only told the market that the Company's sales cycles ***could*** be "***long, unpredictable***" and "***vary seasonally.***" ¶159.

Throughout the Class Period, Defendants continued to mislead the market.  For example, on September 12, 2018, Defendant Gaylor represented that Pivotal was seeing "***no real changes***" in trends and no "***changes in the [Company's] sales cycle***," and on December 11, 2018, Defendant Mee stated that "***Overall, we think the challenging landscape is a long-term positive for Pivotal.***" ¶¶247, 255. Most shocking, in the months prior to the "train wreck" of an earnings announcement, Defendants stated on March 14, 2019, that the Company was in the "***early stages of [a] high-growth market,***" and was "***really pleased***" with its RPO, which "***demonstrates the visibility that we have into our business and the health of our business.***" ¶¶268, 279. Defendant Gaylor also falsely stated on March 14, 2019 that there were "***no specific anomalies to point out***" with respect to Pivotal's deferred revenue, and there was no elongation of Pivotal's contract terms. ¶278. *See also* ¶¶229-232, 241-248, 255-259, 264-266, 268, 270-280.

### B.    Defendants Had Information Which Contradicted Their Statements and Omissions During the Class Period

Information from former Pivotal employees demonstrates that Defendants were apprised

---

[6] Defendants filed several amendments to the Registration Statement before it became effective. *See* ¶¶75–80.  These prior iterations too contain false and misleading statements.

of and tracked Pivotal's financial metrics throughout the Class Period, and thus would have been intimately familiar with the slowdown in closing new deals and signing up new customers. For example, CW-1, a former Accountant at Pivotal, reported that Defendant Gaylor was directly informed of Pivotal's revenue numbers by Tracy Thompson—the Senior Director of Revenue Accounting who reported to Defendant Gaylor—and who kept Gaylor apprised of revenue. ¶219. Defendants Gaylor and Mee also attended meetings, participated in weekly calls and received reports that would have alerted them to any delays in signing new customers or expansions with existing customers. ¶¶219-222. According to CW-4, a former Executive Assistant who reported to the Vice President of Investor Relations and head of Americas Sales, sales reports were given to senior executives at Pivotal on a weekly basis and weekly meetings (which CW-4 set up) were led by his boss, Chad Sakac, and regularly attended by Pivotal's senior executives, occasionally including Defendants Mee and Gaylor. ¶224. CW-1 also confirmed Pivotal had a bookings report that fed into its deal tracker. ¶221. CW-7, an Enterprise Sales Executive, explained that everything was tracked in the Company's Salesforce database and that Defendants Mee and Gaylor regularly received reports generated from Salesforce. ¶225. CW-7 advised that in March 2019, Defendants suddenly reversed course and started permitting sales teams to sell PKS as standalone product to the Company's larger customers with the hopes that those customers eventually would commit to purchasing PAS. ¶217. CW-7 added that in that same timeframe, his sales projections were routinely modified by his higher-ups, prior to internal sales meetings, to show an increased focus on PKS-standalone sales. ¶218.

### C.    The Truth Was Revealed

On June 4, 2019, Pivotal reported its financial results for the Q1 2020 ended May 3, 2019 and disclosed that, while it met analyst expectations for the quarter due to its deferred revenue (from subscription contracts providing predictable and recurring revenues), the Company had "closed fewer deals than [] expected in Q1 due to sales execution" and a lengthening sales cycle. As a result, key metrics followed by the market, including RPO and deferred revenue growth rates, were significantly lower than expected. ¶¶291-304. Importantly, deferred revenue was down 11% quarter-over-quarter and came in substantially below the Street's consensus,

indicating that while Pivotal was recognizing revenue from existing subscriptions, **it was failing to produce new contracts that would sustain its deferred sales for the future**. ¶293. In addition, the Company's year-over-year growth rate—which Defendants had previously characterized as more accurate and more meaningful to investors than quarter-over-quarter— drastically declined. ¶294. And despite claiming deals were only slipping from one quarter to the next, the Company revised its 2020 guidance, less than three months after it was first touted to the market. ¶296.  Moreover, the Company projected losses for fiscal 2020 would be $44 million to $49 million, an increase of about $10 million from previous guidance. *Id.*[7] On this news, Pivotal's stock price fell ***more than 40%***. ¶305.

## II.    ARGUMENT

### A.    Applicable Legal Standard

In order to withstand a motion to dismiss, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). The Court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 612 (9th Cir. 2017). When "faced with a . . . motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted . . . consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[8]

### B.    False Statements in Pivotal's Offering Documents

The Complaint asserts Section 11 claims against Pivotal, the Director Defendants, the Executive Defendants, and the Underwriter Defendants, and Section 12(a)(2) claims against Pivotal, the Director Defendants, and the Executive Defendants. ¶¶183–208.  These Defendants

---

[7] Pivotal also disclosed that it was finally introducing a Kubernetes-compatible version of PAS to combat increasing competition in the market and confusion with respect to its products. ¶298.

[8] Plaintiffs do not oppose Defendants' Request for Judicial Notice (ECF No. 83) of Pivotal's SEC filings during the Class Period, certain conference call transcripts, and analyst reports about Pivotal cited in the Complaint. However, Plaintiffs note that these documents only may be considered for their existence—not for the truth of the matters asserted therein or for matters that are disputed. *See Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018).

face Section 11 and 12 liability because Pivotal's IPO offering documents contained material misrepresentations and omissions about the Company's sales cycles, diminished growth in new customers, increased competition, and demand for its outdated PAS product offering and limited PKS offering.  ¶¶148–167.

### 1.    The Securities Act Claims Do Not "Sound in Fraud"

Contrary to Defendants' assertions, the heightened pleading standard of Rule 9(b) does not apply to Plaintiffs' Section 11 and 12 claims because fraud is not an element of the Securities Act claims and these claims do not "sound in fraud." *In re Rigel Pharm., Inc. Sec. Litig.,* 697 F.3d 869, 885–86 (9th Cir. 2012).  To state a Section 11 claim, the plaintiff must allege that "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material…." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005). Section 11 claims do not sound in fraud where, as here, the complaint explicitly disclaims any allegations of fraud and alleges "a basis for Section 11 liability other than fraud; i.e., the omission of a material fact from the Registration statement." *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005). Here, Plaintiffs' complaint is divided between the allegations that form the basis of the their Securities Act Claims (¶¶148–214), and those that allege fraudulent conduct (¶¶215–337) and Plaintiffs have expressly disclaimed any allegations of scienter or fraudulent intent in support of their Securities Act claims. ¶¶184, 199, 210. Further, because Plaintiffs do not "allege a unified course of fraudulent conduct in support of a claim, but rather . . . allege some fraudulent and some non-fraudulent conduct[,] . . . only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1104 (9th Cir. 2003).

### 2.    The Complaint Sufficiently Alleges Item 303 and 503 Violations

Defendants incorrectly claim that the Complaint does not sufficiently allege an Item 303 violation for purposes of imposing Section 11 liability because the Complaint does not plead Defendants' knowledge. Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. § 229.303(a)(3)(ii). However, under Section 11, it is sufficient to plead that Defendants acted negligently. *Daou*, 411 F.3d at 1027 ("No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions."). Thus, a trend that must be disclosed under Item 303 merely "requires an observed pattern that accurately reflects persistent conditions of the particular registrant's business environment." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019). Plaintiffs have sufficiently alleged the failure to disclose a known trend here—pleading that, according to multiple witnesses, sales cycles were elongating well before the IPO, beginning as early as March 2017. *See In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014) (upholding Item 303 violation when "in the months leading up to [an] IPO, there was a material negative trend related to federal government sales that should have been disclosed").

Defendants also are wrong in asserting that the Ninth Circuit has not recognized claims under Item 503. Item 503 is violated, and gives rise to actionable claims under Section 11, when the offering materials fail to provide "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c); *See Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (plaintiff plausibly pled that defendant violated Item 503 "by failing to discuss and explain the risks of its new sales strategy," notwithstanding that the "prospectus include[d] over thirty pages of risk disclosures" because those "kinds of boilerplate risk factors do not satisfy the requirements set forth in item 503"). There can be no dispute that the failure to attract new customers and expand offerings to existing customers meets this standard.[9] Moreover, at the time of the IPO, the risks Pivotal warned of (¶153; App. B) had already materialized and were negatively affecting the Company's business.

---

[9] *See Gerneth v. Chiasma, Inc.,* 2018 WL 935418, at *4 (D. Mass. Feb. 15, 2018) ("In essence, to survive a motion to dismiss, a complaint alleging violation of Section 11 in Item 503 disclosures must allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely affect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor.").

### 3. Plaintiffs Have Standing To Pursue Section 12 Claims

Section 12(a)(2) of the Securities Act imposes civil liability on "any person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77l(a)(2); *Pirani v. Slack Techs., Inc.*, 2020 WL 1929241, at *10 (N.D. Cal. Apr. 21, 2020). "Liability under §12 is not limited only to those who pass title to a purchaser. It also encompasses a 'person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Primo v. Pac. Biosciences of Cal., Inc.,* 940 F. Supp. 2d 1105, 1125 (N.D. Cal. 2013) (quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)). *See also In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *9 (S.D.N.Y. Oct. 1, 2013) (sufficient that plaintiff purchased securities as the result of a defendant's solicitation); *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *7 (W.D. Wash. Dec. 29, 2008) (same).

A plaintiff adequately pleads solicitation if she "allege[s] more than mere participation. As many courts have found, the registration statement is itself a solicitation document. . . .*" In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009) (citation omitted). Moreover, "[w]hether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy Rule 8(a)'s lenient pleading standards." *Id.* at 550. Here, Plaintiffs allege that the Individual and Executive Defendants signed the Offering Materials (see, e.g., ¶¶32, 33, 36-41), actively solicited buyers through roadshows (*see, e.g.,* ¶¶43, 59, 72) sold significant shares in the IPO (*see, e.g.,* ¶ 81), and were financially motivated to serve their own financial interests (*see, e.g.*, ¶¶12, 82).[10]

### C. The Complaint Adequately Alleges Falsity

Under the PSLRA, a complaint sufficiently pleads falsity where it "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is

---

[10] The Court has already found that Oklahoma City ERS has Section 11 standing "because it purchased and retained Pivotal shares prior to November 6, 201[8]" which are alleged to be have been traceable to the IPO. Lead Plaintiff Order, ECF No. 63, at 20.

misleading." 15 U.S.C. § 78u-4(b)(1)(B). Here, the Complaint specifies each statement alleged to have been false and misleading (highlighted in **bold and italics** in the Complaint) and the litany of reasons why the statements are false and misleading. ¶¶229-232, 241-248, 255-259, 264-266, 268, 270-280.

### 1.      The Allegations from the CWs Support the Falsity of Defendants' Misstatements and Omissions

Defendants misled investors throughout the Class Period by concealing that the Company's products were inferior relative to the competition because of Pivotal's failure to timely incorporate Kubernetes —the industry standard—into its primary product offering.  As a result, Pivotal was signing up new customers at a declining rate and its sales cycle was lengthening. For example, on September 12, 2018, Defendant Gaylor represented that Pivotal was seeing "*no real changes*" in trends and no "*changes in the [Company's] sales cycle,*" and on March 14. 2019, Defendants claimed that the Company was in the "*early stages of [a] high-growth market.*" ¶¶247, 268.

But information from the CWs tells a very different story.  CW-2 explained that pricing and competition from Kubernetes technology—including Amazon, Microsoft, and Google's versions of Kubernetes—challenged Pivotal's ability to expand down-market, and that this was becoming obvious starting soon before the IPO and increasing throughout CW-2's tenure.  ¶106. *See also* ¶108 ("problems in expanding Pivotal's customer base became apparent leading up to the IPO, beginning as early as March 2017, with more and more of Pivotal's revenue coming from existing clients, not from new clients.").  Allegations from CW-3 and CW-6 corroborate those allegations.  *See, e.g.*, ¶112 (recalling that his region experienced a "big drop in revenue, year over year" by the time he left in June 2018).  These allegations are sufficient to plead the falsity of Defendants' statements.  *See, e.g., Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1214-15 (M.D. Fla. 2014) (misstatements regarding sales trends adequately pled where multiple CWs recounted declining sales); *In re Urban Outfitters, Inc. Sec. Litig*, 103 F. Supp. 3d 635, 643, 649 (E.D. Pa. 2015); *See also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir.

2008) (once defendants "chose to tout" certain information, "they were bound to do so in a manner that wouldn't mislead investors").[11]

## 2.    Materially Misleading Omissions

Defendants claim that none of their statements were misleading because there is no "duty of completeness." MTD at 8. However, it is undeniable that there exists a duty to disclose material information if its omission would "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Dynavax Sec. Litig.,* 2018 WL 2554472, at *5-6 (N.D. Cal. June 4, 2018); *see also Matrixx*, 563 U.S. at 45 ("[C]ompanies can control what they have to disclose ... by controlling what they say to the market.").  "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 705–06 (9th Cir. 2016) (quotation marks and citation omitted); *Accord Berson,* 527 F.3d at 987.

Even if not objectively false, a statement "may be misleading if it omits material information." *Orexigen Therapeutics.,* 899 F.3d at 1008-09; *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."). Thus, Defendants' argument that Pivotal's revenues and customer base increased overall during the Class Period (MTD at 2) misses the mark. The Complaint pleads information from well-placed former Pivotal employees showing that, throughout Class Period, Pivotal struggled to attract new customers to its products as well as retain its existing customers.¶¶105-119. In addition, growth in RPO and deferred revenue was decreasing substantially as the Company was closing fewer deals and experiencing lengthening sales cycles. Eventually, this led to the disclosure that Pivotal's RPO—

---

[11] Defendants rely heavily on the Ninth Circuit's 2002 decision in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002).  But in *Vantive*, the court merely held that conclusory allegations are insufficient under the PSLRA absent "corroborating details."  For example, the court held that the allegation that "sales cycles were lengthening substantially" was insufficient. *Id*. at 1086. Here, the Complaint's allegations are supported by several witness accounts detailing precisely what was happening at the Company when Defendants were issuing the alleged false statements — Pivotal's pipeline of deals was declining due to competition. ¶¶97–129, 215–225.

Pivotal's "key" metric that tracked both billed and unbilled subscriptions and services—had plummeted 11% and was expected to get worse. ¶¶175, 297.[12]

Moreover, the stock price reaction to news of the Company's lengthening sales cycles, deceleration in core growth, proliferation of contracts with shorter durations, and decreased billings is further compelling evidence that this information was material to investors. *See Backe v. Novatel Wireless, Inc.,* 642 F. Supp. 2d 1169, 1183 (S.D. Cal. 2009) ("[t]he significance of this information is illustrated by . . . the market reaction to the alleged disclosures").

### 3.    Statements Defendants Challenge as Opinion Are Actionable

Defendants are wrong that the majority of the allegedly false and misleading statements (¶¶153, 155-161, 228, 229, 232, 240-246, 248, 255, 258, 259, 264, 265, 273-280 (MTD at 9; MTD App. A) are inactionable statements of opinion. A statement is not an opinion if it is "capable of objective verification." *Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Thus, for example, when Defendant Mee claimed on September 12, 2018 that *"[w]e're starting to see a lot of customers coming in, wanting to buy PKS, wanting an enterprise Kubernetes solution,"* (¶245), he was not stating an opinion, but a fact he claimed to be observing. As a result, the statement (and others like it) was misleading because new customer and existing customer expansion were on the decline. *Id.*[13] And even for the small number of statements that are arguably statements of opinion, those statements are materially false and misleading because the Complaint "identif[ies] particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the

---

[12] Defendants rely on the decision in *City of Sunrise Firefighters Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019) in an effort draw attention away from these well-pled allegations. However, in *Oracle,* the market was warned that the Company expected revenue numbers from certain of its contracts to decline. *Id.* at *10. Here, Defendants knew or should have known that new customers and existing customer expansions were on the decline, yet they failed to disclose this to the market. *See* ¶¶247, 264, 268, 279.

[13] *See also* ¶247 ("No, we haven't seen any changes in the sales cycles"); ¶229 (strategy of "landing and expanding is working"), ¶230 (sales cycle accelerated), ¶241 ("market getting bigger for us"), ¶245 ("a lot of uptake in our pipeline for PKS and a lot of our existing customers jumping onto PKS quite quickly"….. "pretty fast uptake"), ¶265 ("we're seeing a lot of traction with existing customers"); ¶274 (Pivotal was "still in the early stages of this high-growth market."); ¶277 ("we're really encouraged by what we're seeing with PKS and the traction we're seeing with customers, both new and existing . . .").

knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

### 4. Statements Defendants Challenge as Forward Looking Are Actionable

Defendants also challenge a majority of the false statements as "forward looking" and protected by the statutory safe harbor. *See* ¶¶153, 155-161, 228, 230, 243, 244, 245, 248, 255, 257-259, 265, 266, 268, 271-274, 277, 280. MTD at 11; App. A. This mischaracterizes those statements and the boilerplate "cautionary language" accompanying some of those statements. *See* App. B (ECF 80-2). Indeed, the Complaint alleges that the statements Defendants point to are false and misleading for failing to disclose present and historical facts. "The safe harbor applies to forward-looking statements only, and not to material omissions or misstatements of historical fact." *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013).[14] Here, the Complaint alleges with specificity the then-known facts Defendants omitted.

For example, Defendant Gaylor's statements on January 8, 2019 that, "*we're very encouraged by the traction that we're seeing in the customer base and particularly in the pipeline*" (¶265) and June 12, 2018 statement that "*we're strong across sectors, within the sectors that we are in*" (¶266) are false and misleading for what they failed to disclose—i.e., that core growth was decelerating, and deferred revenue was substantially below expectations due to the fact that the Company was experiencing longer sales cycles. ¶¶267, 238. These statements— as well as others Defendants challenge as forward looking—omitted present and historical facts and, therefore, are not protected by the safe harbor.[15] Even assuming, arguendo, that portions of the statements that Defendants challenge as forward looking are, in fact, forward looking, they were not accompanied by meaningful cautionary language, only boilerplate risk disclosures. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (forward looking

---

[14] *See also Todd v. STAAR Surgical Co.,* 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) (noting the safe harbor does not apply to alleged omissions of present facts).

[15] The non-forward-looking portions of mixed statements also are not protected by the safe harbor provisions of the PSLRA, *See, e.g. In re Quality Sys,, Inc. Sec. Litig.,,* 865 F.3d 1130, 1142, 1148-50 (9th Cir, 2017).

Lead Pls.' Opp'n to Defs.' Mot. to Dismiss
Master File No. 3:19-cv-03589-CRB

12

statements were not protected where risk warnings were "vague"); *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (boilerplate warnings insufficient to protect forward looking statements).

### 5. Statements Defendants Challenge As Puffery Are Actionable

Defendants also argue that certain alleged misstatements (¶¶49, 150, 151, 231, 232, 240, 242, 243, 245, 246, 256, 264, 266, 274, 276, 288) are inactionable because they are statements of corporate optimism (*i.e.,* puffery). *See* MTD at 10–11; App. A. But those arguments are also unavailing. "When determining whether statements amount[ ] only to puffery, the court must analyze the context in which the statements were made." *Mulligan v. Impax Labs., Inc.,* 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *see In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017) ("the line between puffery and a misleading statement is often indistinct, and requires an analysis of the context in which the statements were made."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141 (N.D. Cal. 2017) ("defendant's reassurances to investors that sales were 'unchanged, or even growing, compared to previous quarters' was a 'concrete description,' not a 'feel good' optimistic statement")(citing *Quality Sys.,* 865 F.3d at 1144-45).[16] Here, Defendants have improperly cherry-picked snippets of statements out of context in an attempt to convince the Court that it must conclude, as a matter of law at the pleading stage, that certain statements are immaterial puffery.

### D. The Complaint Adequately Alleges Scienter

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.

### 1. Statements From the CWs Support a Strong Inference of Scienter

Plaintiffs' particularized CW allegations meet the Ninth Circuit standard set forth in *Zucco Partners, LLC v. Digimarc Corp.*, and support a strong inference of scienter. 552 F.3d

[16] "[D]etermining whether a given statement is material entail[s] fact-intensive assessments that are more properly left to the jury," which is why courts "must exercise great caution" when deciding whether a statement is puffery at this stage. *Mulligan*, 36 F. Supp. 3d at 966.

981, 995 (9th Cir. 2009). Under *Zucco*, CW statements raise a strong inference of scienter when they "describe[] [the CWs] with sufficient particularity to establish their reliability and personal knowledge," and when those statements themselves are "indicative of scienter." *Id.* The Complaint's CW allegations easily meet the *Zucco* standard where Plaintiffs allege the reliability and personal knowledge of each CW based on their position at the Company. ¶¶97–104.

First-hand accounts of former Pivotal employees confirm that Defendants received regular reports about sales at the Company and, thus, would have known about changing sales trends. For example, CW-1 confirmed that there were weekly pipeline calls led by leaders in sales and operations where all bookings, the pipeline, and live opportunities were reviewed. ¶220. Pivotal's Senior Director of Revenue Accounting (Tracy Thompson), who reported directly to Defendant Gaylor (for part of the Class Period), attended the pipeline meetings and kept Gaylor apprised of issues related to sales and revenue. ¶219. CW-4 confirmed that sales reports were provided to senior executives at Pivotal on a weekly basis and that weekly meetings (which CW-4 set up) were regularly attended by Pivotal's senior executives, occasionally including Defendants Mee and Gaylor. ¶224. CW-7 advised that everything was tracked in the Company's Salesforce database and that executives including Defendants Mee and Gaylor received reports generated from Salesforce. ¶225. Viewed holistically, the reliable and highly corroborative CW allegations regarding Defendants' knowledge of sales issues and delays raise a strong inference of scienter. *See Quality Sys.*, 865 F.3d at 1145; *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1211-1212 (W.D. Wash. 2009).

### 2. The Core Operations Doctrine Supports a Finding of Scienter

Under the core operations doctrine, knowledge of facts critical to a business's core operations may be imputed to a company's key officers "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *See S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 782–86 (9th Cir. 2008) ("facts critical to a business's core operations . . . are known to a company's key officers"); *Berson*, 527 F.3d at 988–89 ("absurd to suggest" that top management did not know facts involving significant losses on the company's largest contract); *Mulligan*, 36 F. Supp. 3d at

970 (inferring knowledge of facts involving a critical element of company's business). There can be no dispute that PAS and PKS were the Company's principle products and that Defendants would have been made aware of sales cycle delays and increased competition.

### 3. Defendants' Other Arguments Do Not Undermine Scienter

Defendants make two additional arguments in an attempt to escape liability. First, they contend that scienter cannot be found because there was no insider trading. MTD at 14. But that is not the law. *See, e.g., Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 943 (S.D. Cal. 2019) ("[T]he lack of stock sales by a defendant is not dispositive as to scienter.") (citation omitted). *Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *7 (D. Nev. Nov. 7, 2013) (finding scienter and holding that "[defendant] may not have had a clear motive is of little import at this stage, as the absence of a motive allegation is not fatal."). Second, Defendants argue that because Pivotal met its quarterly guidance for Q1 FY20 ended May 3, 2019, Plaintiffs' theory of fraud is illogical. MTD at 14. But this ignores that because of the Company's subscription-based business model, investors placed greater focus on the change in deferred revenue and RPO in any given quarter—as compared to the Company's reported revenues (¶70)—which both significantly fell when Defendants revealed the truth.

### E. The Complaint Sufficiently Pleads Control Person Liability

Plaintiffs have adequately alleged violations of Section 10(b) and Rule 10b-5, thus the Section 20(a) control person claims should be sustained.[17]

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied in its entirety.[18]

---

[17] Plaintiffs also allege Section 15 claims against Mee, Gaylor and Michael Dell. With respect to Michael Dell, as Chairman and CEO of Dell, Michael Dell controlled Dell, and consequently controlled Pivotal and its officers and directors.¶211. Michael Dell – as a Pivotal Board Member– also signed the Company's Registration Statement. *Id.*

[18] In the event the Court grants Defendants' motion, or any part of it, Plaintiffs respectfully request leave to amend. *See*, *e.g.*, *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012) ("[r]equests for leave [to amend] should be granted with 'extreme liberality . . .'").

Dated: May 22, 2020

**LABATON SUCHAROW LLP**

/s/ Christine M. Fox
Carol Villegas  (admitted *pro hac vice*)
Christine M. Fox  (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
cvillegas@labaton.com
cfox@labaton.com

***Counsel for Lead Plaintiffs the Oklahoma City
Employee Retirement System and Police
Retirement System of St. Louis and Lead Counsel
for the Class***

**WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK LLP**
James M. Wagstaffe (#95535)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
wagstaffe@wvbrlaw.com

***Liaison Counsel for the Class***

Lead Pls.' Opp'n to Defs.' Mot. to Dismiss
Master File No. 3:19-cv-03589-CRB

16