1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE PIVOTAL SECURITIES
LITIGATION

Master File No.  3:19-cv-03589-CRB

**ORDER GRANTING MOTION TO
DISMISS**

This consolidated class action alleges violations of the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Pivotal Software, Inc. ("Pivotal").  Purchasers of Pivotal's securities argue that they are entitled to damages caused by Pivotal's alleged false and misleading statements about its financial and business condition.  Pending before this Court is Pivotal's motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("CAC").  Because Plaintiffs fail to plausibly allege that any statement was false or misleading, and for other reasons explained below, the Court GRANTS Pivotal's motion to dismiss.

**I.      BACKGROUND**

**A.      Parties**

Defendant Pivotal is a San Francisco-based information technology and software company founded in 2013.  CAC (dkt. 75) ¶ 4.  Pivotal provides a cloud-native application platform, Pivotal Cloud Foundry ("PCF"), and strategic services.  Id.  Pivotal's platform enables software developers to accelerate and streamline their processes for modernizing cloud-based applications.  Id.  Pivotal's consulting services assist companies in developing software and adapting to cloud computing.  Id. ¶ 31.  Pivotal generates most of its revenue

United States District Court
Northern District of California

1  from the sale of time-based PCF subscriptions.  Id. ¶ 5; MTD (dkt. 80) at 1.  Pivotal's

2  flagship product is Pivotal Application Service ("PAS"), and in February 2018, Pivotal

3  made its new product, Pivotal Container Service ("PKS") commercially available.  CAC ¶

4  5; MTD at 1.  PKS allows customers to "more easily deploy and operate Kubernetes," an

5  open-source system designed for managing containerized workloads and services.  CAC ¶

6  5.

7          At all relevant times, Defendant Robert Mee ("Mee") served as Pivotal's Chief

8  Executive Officer, and Defendant Cynthia Gaylor ("Gaylor") served as Pivotal's Chief

9  Financial Officer.  Id. ¶ 32.  Defendants Mee and Gaylor possessed the power and

10  authority to control the contents of Pivotal's Securities and Exchange Commission

11  ("SEC") filings, press releases, and other market communications.  Id. ¶ 35.

12          Defendants Paul Martiz, Egon Durban, William Green, Marcy Klevorn, Khozema

13  Shipchandler, and Michael S. Dell each signed the Registration Statement, solicited the

14  investing public to purchase securities issued pursuant thereto, hired and assisted the

15  underwriters, and planned and contributed to the initial public offering ("IPO") and

16  Registration Statement.  Id. ¶¶ 36–43.

17          Defendants Morgan Stanley & Co. LLC; Goldman Sachs & Co. LLC; Citigroup

18  Global Markets Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Capital Inc.;

19  Credit Suisse Securities (USA) LLC; RBC Capital Markets, LLC; UBS Securities LLC;

20  Wells Fargo Securities LLC; KeyBanc Capital Markets Inc.; William Blair & Company,

21  L.L.C.; Mischler Financial Group, Inc.; Samuel A. Ramirez & Co., Inc.; Siebert Cisneros

22  Shank & Co., LLC; and Williams Capital Group, L.P. ("Underwriter Defendants") are

23  financial services companies that acted as underwriters for Pivotal's IPO, helping to draft

24  the Registration Statement and solicit investors to purchase securities issued pursuant

25  thereto.[1]  Id. ¶¶ 44–59.  Representatives for the Underwriter Defendants allegedly

26

27  _____

28  1. The Underwriter Defendants have moved to join Pivotal's motion to dismiss the CAC, and Pivotal's reply to the opposition.  See generally Mot. for Joinder (dkt. 88); Notice of Joinder (dkt. 93).  The motions for joinder are GRANTED.

conducted a "due diligence" investigation into Pivotal's operations and financial prospects, met with Pivotal executives for "drafting sessions," and caused the Registration Statement to be filed with the SEC.  Id. ¶ 59.

The Plaintiff class consists of all persons and entities, other than the defendants, who purchased or otherwise acquired (1) Pivotal's common stock traceable to the registration statement and prospectus issued in connection with Pivotal's April 2018 IPO, and/or (2) Pivotal securities between April 20, 2018 and June 4, 2019 (the "Class Period"). Id. ¶ 3.  The Lead Plaintiffs in this matter are the Oklahoma City Employee Retirement System and the Police Retirement System of St. Louis ("Plaintiffs").  Id. ¶ 1.

### B.    Factual Background

On December 15, 2017, Pivotal filed a confidential draft registration statement on Form S-1.  Id. ¶ 75.  On or about April 18, 2018, Pivotal filed a final amendment to the registration statement, which registered over 37 million shares of Pivotal common stock for public sale.  Id. ¶ 79.  The SEC declared the registration statement effective on April 19, 2018.  Id.  On or about April 20, 2018, Pivotal filed the final prospectus for the IPO. Id. ¶ 80.

On April 24, 2018, Pivotal completed the IPO, which, upon the Underwriter Defendants exercising their full overallotment option to purchase additional shares, issued a total of 42,550,000 shares priced to the public at $15 per share and generated more than $638 million for Pivotal.  Id. ¶ 81.  Pivotal's 200-page registration statement included an overview of its products, business operations, financial results, and almost forty pages of risk disclosures.  MTD at 1 (citing Webb Decl. Ex. 1 at 16–50).  The registration statement promoted Pivotal's "leading" and "turnkey cloud-native platform," claiming it "combine[d] the latest innovations from open-source projects . . . ." and integrated PCF with Kubernetes.  CAC ¶ 8.  The registration statement also emphasized "the Company's sales and customer success model."  Id.  The CAC alleges that the registration statement and prospectus made false and/or misleading statements regarding Pivotal's business for

failing to disclose material information.  Id. ¶¶ 9, 148–62.

During the Class Period, Pivotal "repeatedly touted the superiority and adoption of its products."  Id. ¶ 15.  The CAC alleges that statements made during the Class Period were materially false and/or misleading because Pivotal Defendants failed to disclose "among other things, that Pivotal was facing major problems with its sales execution and a complex technology landscape resulting in lengthening sales cycles and diminished growth, as well as the industry's sentiment [having] shifted away from Pivotal's principal product, which was incompatible with Kubernetes, the industry-standard platform."  Id. ¶ 16.  These purportedly misleading statements were made in connection with a January 2019 conference and Pivotal's quarterly earnings reports and calls on four dates: June 12, 2018, September 12, 2018, December 11, 2018, and March 14, 2019.  Id. ¶¶ 227–33, 239–48, 254–59, 264–66, 268–80.

On June 4, 2019, Pivotal reported its financial results for the first quarter of fiscal year 2020.  CAC ¶ 18.  Defendant Mee advised investors that Pivotal "closed fewer deals than . . . expected in Q1 due to sales execution and a complex technology landscape that is lengthening [Pivotal's] sales cycle."  Id.  Pivotal lowered its going-forward fiscal year 2020 revenue guidance from $798–806 million to $756–767 million.  Id. ¶ 19; MTD at 3. The next day, Pivotal's stock price fell $7.65 per share, or more than 40 percent, from $18.54 per share to $10.89 per share.  Id. ¶ 20.  Following the news, analysts called the quarter a "train wreck" and characterized Pivotal's operating results as "disastrous" and a "cause for concern."  Id. ¶ 21.  On August 22, 2019, Pivotal announced a proposed merger with VMware at $15 per share; the merger closed at the end of 2019.  Id. ¶ 21; MTD at 3.

## C.    Procedural Background

In November 2019, this Court consolidated three related securities class actions against Pivotal, and appointed Oklahoma as Lead Plaintiff.  See generally Order Granting Consolidation and Appointing Lead Plaintiff and Lead Counsel (dkt. 63).

Plaintiffs subsequently filed the CAC on February 11, 2020.  See generally CAC.

4

1   On March 27, 2020, Pivotal filed a motion to dismiss the CAC, see generally MTD, a

2   declaration in support of the motion that attached twenty-one documents, some of which

3   were incorporated in the CAC by reference, see generally Webb Decl. (dkt. 81), and a

4   request for the Court to consider these documents and to take judicial notice of Pivotal's

5   SEC filings.  See generally Request for Judicial Notice (dkt. 83).  Plaintiffs oppose

6   Pivotal's motion to dismiss.  See generally Opp'n (dkt. 90).  Pivotal filed a reply to

7   Plaintiffs' opposition.  See generally Reply (dkt. 91).  The Court also held a motion

8   hearing on July 17, 2020.  See Motion Hearing (dkt. 95).

9   **II.    LEGAL STANDARD**

10          Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed

11   for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b).

12   Dismissal may be based on either "the lack of a cognizable legal theory or the absence of

13   sufficient facts alleged under a cognizable legal theory."  Godecke v. Kinetic Concepts,

14   Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  The Court is "not bound to accept as true a

15   legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286

16   (1986) (citation omitted); see Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55

17   (9th Cir. 1994).  Rather, a complaint must plead "enough facts to state a claim to relief that

18   is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atlantic

19   Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff

20   pleads factual content that allows the court to draw the reasonable inference that the

21   defendant is liable for the misconduct alleged."  Id.  When evaluating a motion to dismiss,

22   the Court "must presume all factual allegations of the complaint to be true and draw all

23   reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles,

24   828 F.2d 556, 561 (9th Cir. 1987).  "Courts must consider the complaint in its entirety, as

25   well as other sources courts ordinarily examine when ruling on Rule

26   12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by

27   reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor

28   Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

United States District Court
Northern District of California

If a court does dismiss a complaint for failure to state a claim, the Federal Rules of Civil Procedure state that the court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); see Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty., 708 F.3d 1109, 1117 (9th Cir. 2013).  A court nevertheless has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir.2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

## III.   DISCUSSION

First, the Court considers Pivotal's request for judicial notice and incorporation by reference.  Second, the Court addresses Plaintiffs' claims concerning Pivotal's registration statement and prospectus, analyzing the allegations under Sections 11, 12(a)(2), and 15 of the Securities Act.  Third, the Court examines Plaintiffs' claims regarding the various statements made during the Class Period, evaluating the allegations under Sections 10(b) and 20(a) of the Exchange Act.

### A.     Judicial Notice and Incorporation by Reference

Pivotal attaches twenty-one documents (Exhibits 1–21) to the Declaration of Robert L. Cortez Webb and cites to a subset of these in its motion to dismiss.  See generally Webb Decl.; MTD.  Pivotal has asked the Court to consider documents under the incorporation-by-reference doctrine and to take judicial notice of other documents.  Request for Judicial Notice at 1.  Plaintiffs do not oppose Pivotal's request, but they maintain that "these documents only may be considered for their existence—not for the truth of the matters asserted therein or for matters that are disputed."  Opp'n at 5 n.8.

In reviewing a motion to dismiss, a district court is usually limited to the allegations in the complaint.  Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial

1    notice—without converting the motion to dismiss into a motion for summary judgment."

2    United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

3        Courts may take judicial notice of facts that are "not subject to reasonable dispute"

4    because they (1) are "generally known within the trial court's territorial jurisdiction," or

5    (2) "can be accurately and readily determined from sources whose accuracy cannot

6    reasonably be questioned." Fed. R. Evid. 201(b). Matters of public record may be

7    judicially noticed, but disputed facts contained in those records may not. Khoja v.

8    Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018).

9        The incorporation-by-reference doctrine "treats certain documents as though they

10   are part of the complaint itself." Id. at 1002. Documents are subject to incorporation by

11   reference if the Plaintiffs refer to them "extensively" or they form the basis of the

12   complaint. Id. Unlike documents subject to judicial notice, courts may properly assume

13   the truth of documents incorporated by reference. Id. at 1003. But "it is improper to

14   assume the truth of an incorporated document if such assumptions only serve to dispute

15   facts stated in a well-pleaded complaint." Id.

16       Exhibit 1 is Pivotal's registration statement, Exhibits 2, 5, and 12 are Pivotal's SEC

17   filings, and Exhibits 15 through 19 are transcripts of earnings calls and corporate

18   presentations, all of which, according to the CAC, allegedly contain materially false or

19   misleading statements. Request for Judicial Notice at 3; see, e.g., CAC ¶¶ 8, 15, 68–69,

20   269, 287–88. Because these documents form the basis of Plaintiffs' complaint, they are

21   subject to incorporation by reference. See Khoja, 899 F.3d at 1005 (documents containing

22   alleged misrepresentations and corrective disclosures form the basis of a Section 10(b)

23   claim and are subject to incorporation by reference). Similarly, Exhibit 20 is the transcript

24   of the June 4, 2019 earnings call, which the CAC repeatedly references to illustrate "the

25   materialization of previously undisclosed risks." CAC ¶¶ 172 n.36, 291 n.44; see also

26   id. ¶¶ 176–81, 296–304, 317. It is likewise subject to incorporation by reference. See

27   Khoja, 899 F.3d at 1005.

28       Exhibit 21 is an analyst report that the CAC identifies to define "the cloud" and to

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    demonstrate the positive analyst coverage following Pivotal's IPO.  CAC ¶¶ 60, 164.  It

2    does not satisfy the incorporation-by-reference doctrine's requirements, as the report is not

3    referenced extensively in, nor does it form the basis of, the complaint.  See Khoja,

4    899 F.3d at 1003–04.  While Plaintiffs do not oppose judicial notice of the analyst report

5    for the limited purpose of recognizing its existence, the report is not relevant to the Court's

6    analysis.  Opp'n at 5 n.8.  The Court thus declines to take judicial notice of Exhibit 21.

7    See Wochos v. Tesla, Inc., No. 17-CV-05828-CRB, 2019 WL 1332395, at *2 (N.D. Cal.

8    Mar. 25, 2019).

9         Exhibits 3, 4, 6–8 (Pivotal's 10-Q forms filed with the SEC) and Exhibits 9–11, 13,

10   14 (Pivotal's 8-K forms filed with the SEC) are not cited in the CAC.  See Request for

11   Judicial Notice at 4.  These documents are not subject to incorporation by reference.  See

12   Khoja, 899 F.3d at 1006 (SEC filings that were not extensively referenced in the complaint

13   not subject to incorporation by reference).  Nonetheless, the SEC filings are publicly-filed

14   documents whose accuracy cannot reasonably be questioned and are therefore subject to

15   judicial notice.  Wochos, No. 17-cv-05828-CRB, 2019 WL 1332395, at *2.  The Court

16   therefore takes judicial notice of Pivotal's SEC filings for the sole purpose of determining

17   what representations Pivotal made to the market.  The Court does not take notice of the

18   truth of any facts asserted in these documents.

19        **B.    Securities Act Claims**

20        Plaintiffs bring claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

21   CAC ¶¶ 183, 198, 209.  The Court first considers Plaintiffs' §§ 11 and 12(a)(2) claims

22   together and then addresses the control-person claim under § 15.

23            **1.    Sections 11 and 12(a)(2) Claims**

24        For Plaintiffs to state a claim under Section 11 of the Securities Act, they must

25   plausibly allege that the registration statement "contained an untrue statement of material

26   fact" or "omitted to state a material fact . . . necessary to make the statements therein not

27   misleading."  15 U.S.C. § 77k(a).  For the former, a statement must be both (1) false and

28   (2) material to investors.  See In re Rigel Pharm., Inc. Sec. Lit., 697 F.3d 869, 880 n.8 (9th

United States District Court
Northern District of California

Cir. 2012).  For the latter, it is not enough that the registration statement omitted relevant facts, or even material facts.  See Rigel, 697 F.3d at 880 n.8 (citing Matrixx Initiatives v. Siracusano, 563 U.S. 27, 38 (2011)); Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir 2002).  Instead an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists" to be actionable.  Brody, 280 F.3d at 1006.

The same standard applies for pleading a violation of Section 12(a)(2).  See 15 U.S.C. § 77l (imposing liability where a prospectus or communication "includes an untrue statement of a material fact" or "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading").

Pivotal moves to dismiss the §§ 11 and 12(a)(2) claims on the grounds that the CAC fails to plausibly allege a false or materially misleading statement because (a) Plaintiffs did not establish contemporaneous falsity, (b) many of the statements are not actionable, and (c) SEC Regulation S-K did not impose a duty to disclose.  MTD at 5–12.

Pivotal also argues that the heightened pleading standards of Rule 9(b) apply here because Plaintiffs' Securities Act claims only make "nominal efforts to disclaim allegations of fraud" yet Plaintiffs employ "the exact same factual allegations" to support their 10(b) claims under the Exchange Act.  Id. at 4–5.  Additionally, Pivotal asserts that Plaintiffs do not have standing to pursue a § 12(a)(2) claim because Lead Plaintiff Oklahoma "purchased [its shares] in the secondary market, not the IPO," thereby precluding Section 12(a)(2) standing.  Id. at 15.  The Court need not address whether the Securities Act claims sound in fraud or whether Plaintiffs have standing to pursue a § 12(a)(2) claim because the claims fail regardless.

### a.      Plaintiffs Fail to Establish Falsity

Plaintiffs allege that Pivotal's registration statement contained several affirmative misrepresentations.  See, e.g., CAC ¶¶ 148, 167.  To support these claims, Plaintiffs

United States District Court
Northern District of California

provide statements from Confidential Witnesses ("CWs"), former Pivotal employees, describing Pivotal's internal business state before the IPO and throughout the Class Period.[2]  Id. ¶¶ 97–129.  However, throughout its 103-page complaint, Plaintiffs fail to plead sufficient factual content to allow a reasonable inference that Pivotal's statements were false or misleading when made in violation of §§ 11 and 12(a)(2).  The Court first addresses statements about Pivotal's products, then statements about Pivotal's competition, and finally statements within Pivotal's risk disclosures.

### i.        Statements Regarding Pivotal's Product Offerings

Specifically, Plaintiffs challenge portions of Pivotal's registration statement asserting that its products offer "a built-in advanced container networking and security engine," "combin[ing] the latest innovations from open-source projects such as application containers," and "integrat[ing] PCF with leading open-source projects such as Kubernetes."  Id. ¶ 150.  Plaintiffs argue that these statements were false and misleading because "in fact, Pivotal's primary software offering, PAS, was outdated and did not incorporate Kubernetes" and Pivotal's sales strategy did not include "the sale of PKS as a standalone product."  Opp'n at 3.  Pivotal accurately points out that the PCF platform contained several components, which included both PAS and PKS, and only the former did not incorporate Kubernetes at the time.  Reply at 4; CAC ¶ 63.  Even taking as true the assertion that Pivotal's strategy prevented the individual sale of PKS, this does not render Pivotal's statements false.  There is no untruth or misleading omission here.

### ii.        Statements Regarding Pivotal's Competition

Plaintiffs also take issue with Pivotal's characterization of one competitive strength as "Blue-Chip customer adoption," as well as the company's statements that it "work[s] closely with large public cloud providers, including Google and Microsoft, to bring [Pivotal's] customers' workloads to their cloud infrastructure."  CAC ¶ 150, 152.

---

2. Underwriter Defendants also noted at the motion hearing that it is "wholly implausible" that anything in June 2019 indicates the falsity of Pivotal's IPO registration statement 14 months before.

Plaintiffs allege that these statements were false and misleading because "rather than engaging in partnerships and joint selling opportunities, Pivotal was increasingly competing for enterprise clients with its cloud partners, Amazon Web Services, Microsoft Azure, and Google Cloud, as well as competing with its sister company, VMware." Id. ¶ 166(d).  However, a statement from Plaintiffs' own CW-1 rejects a portion of this claim, see id. ¶ 122 ("PKS was jointly sold by Pivotal and VMWare"), and Pivotal disclosed in its registration statement that it operated in a "highly competitive industry," specifying the company "currently or in the future may compete" with Amazon Web Services, Google Cloud Platform, and Microsoft Azure, among others.  MTD at 7; Webb Decl. Ex. 1 at 19. The CAC does not provide any further factual assertions to plausibly allege that these statements were false or misleading.

### iii.    Pivotal's Risk Disclosures

A majority of the challenged statements within the registration statement challenge the use of words like "if," "may," "could" and "possible" in its "Risk Factors" section. CAC ¶¶ 153, 155–61.  Plaintiffs allege that these conditionals were misleading because "these 'risks' had already materialized at the time of the IPO." Id. ¶ 166; see also id. ¶ 154.

The Ninth Circuit has noted that "risk factors" are not actionable without further factual allegations indicating that the risks had already "come to fruition." Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1181 (9th Cir. 2009) (citation omitted), aff'd, 563 U.S. 27.  Although this Court has held that risk factors may be actionable when combined with other statements that create plausible deceit, see, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. MDL 2672 CRB (JSC), 2017 WL 3058563, at *7 (N.D. Cal. July 19, 2017), that is not the case here.

Plaintiffs allege that Pivotal's risk factor disclosures amounted to framing risks as hypotheticals rather than current and past realities, in violation of securities regulations. See CAC ¶¶ 154, 166.  For example, Plaintiffs allege that Pivotal failed to disclose that its sales cycles were "elongating" and lengthening" before the IPO.  See CAC ¶ 166.

11

However, only one CW statement mentions Pivotal's sales cycles, and these allegations do not indicate that there was anything inconsistent with the challenged disclosure regarding Pivotal's "long sales cycles."  Id. ¶ 110 ("larger companies took more time to pursue and complete and led to an elongated sales cycle"); MTD App'x B at 1.  Defendants likewise pointed out at the hearing that Plaintiffs fail to plead the falsity of the risk language regarding Pivotal's competition.  The remaining challenged risk disclosures fail for the same reason: the CAC does not provide anything beyond conclusory assertions that the risks "had already materialized."  See CAC ¶¶ 154, 166; see also id. ¶¶ 25–147.

### b.     Expressions of Corporate Optimism Are Not Actionable

Plaintiffs challenge many statements, both in the registration statement and during the Class Period, that Pivotal Defendants argue constituted corporate optimism.  See MTD at 10–11 (citing to App'x A, CAC ¶¶ 149, 150, 152).  Multiple courts have held that such statements are not actionable.  See, e.g., In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (defendants' statement that "we believe our employee relations are good" was not actionable, even though many employees were leaving the company, because "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers").  General optimistic statements when taken in context may nevertheless form a basis for a securities fraud claim when those statements "address specific aspects of a company's operation that the speaker knows to be performing poorly," but the facts here do not lead to this conclusion.  See In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1143 (9th Cir. 2017); see also Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) (telling investors FDA approval was "going fine" when the company knew approval would never come was materially misleading); Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (saying the company "anticipates a continuation of its accelerated expansion schedule" when the expansion already failed was misleading).

Statements classifying Pivotal's PAS offering as providing a "cutting-edge,"

"leading," and "turnkey cloud-native platform" and naming "viral adoption together with C-level focus" as a competitive strength are not actionable because they are vague assessments that "represent the 'feel good' speak that characterizes 'non-actionable puffing.'" Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1060 (9th Cir. 2014) (citing Cutera, 610 F.3d at 1111); CAC ¶ 150.  The same applies to Pivotal's statements that the company has the "ability to innovate and rapidly respond to customer needs and changing open-source software standards" and that its software addresses the "rapidly growing market" for public cloud workloads.  CAC ¶ 149–51.  That Pivotal made these statements in a registration statement is insignificant: they were still puffery.  See Greenberg v. Sunrun, 233 F. Supp. 3d 764, 775 (N.D. Cal. 2017).

### c.    Regulation S-K Does Not Impose a Duty to Disclose

Plaintiffs also contend that Pivotal violated §§ 11 and 12(a)(2) because the registration statement—allegedly in violation of SEC Regulation S-K Items 303 and 503 (which is actually Item 105, as discussed below)—failed to disclose that Pivotal was experiencing "deferred sales, lengthening sales cycles and diminished growth in new customers," disadvantages due to competition, and a "disjointed product mix," which included primary offerings that were "increasing[ly] obsole[te]."  See CAC ¶¶ 9–11; 148–67.

"Allegations which state a claim under Item 303(a) of Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)."  Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1296 (9th Cir. 1998).  Under Item 303, issuers must "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

Taking all of Plaintiffs' allegations as true, the CAC fails to state a claim under Item 303 for which relief can be granted.  Pivotal argues that Plaintiffs fail to meet the first prong of this test because the CAC does not show that any trend or uncertainty was

"known" to management.  MTD at 9.  Plaintiffs respond that it is sufficient to plead that Pivotal Defendants acted negligently.  Opp'n at 7 (citing In re Daou Sys., Inc., 411 F.3d 1006, 1027 (9th Cir. 2005)).  However, an Item 303 claim must indeed show that the trend, demand, commitment, event, or uncertainty "is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  Steckman 143 F.3d at 1296 (emphasis in original).  Plaintiffs fail to meet this requirement.  See also infra Section III.C.1.b for further discussion on Plaintiffs' allegations regarding Pivotal Defendants' mental states and knowledge of these alleged trends.

Plaintiffs also contend that Pivotal violated Regulation S-K Item 503 for failing to adequately disclose risk factors.  CAC ¶ 167(b).  While Item 503 outlines the mandatory elements of the prospectus summary, regulation statements filed on form S-1 require fulfillment of Regulation S-K Item 502, which in turn necessitates compliance with Item 105, which requires "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. §§ 229.105, 229.502(a), 229.503; see SEC, Form S-1 at 4.  For the purposes of this motion, and given the language the CAC uses to form this allegation, the Court evaluates Plaintiffs' Item 503 claim as an Item 105 claim.  CAC ¶ 167(b).

Another court in this district recently held that a defendant violated Item 105, implying that an omission of the "unusual nature" of a company's service level agreements' terms in its Offering Materials gave rise to an actionable claim under § 11.  See Pirani v. Slack Techs., Inc., No. 19-CV-05857-SI, 2020 WL 1929241, at *13 (N.D. Cal. Apr. 21, 2020).  However, the facts here are distinguishable from Pirani.  Plaintiffs contend that Pivotal's risk disclosures failed to "mention, much less adequately describe, the risk posed by the increasingly apparent obsolescence of its primary offerings, competitive disadvantages hampering its sales force, and consequently lengthening sales cycles, diminished growth and other financial metrics . . . ."  CAC ¶ 167(b).  However, Pivotal's risk disclosures discuss exactly these possibilities.  See, e.g., Webb Decl. Ex. 1 at

14

17 ("[I]f demand for PCF does not grow as quickly as we anticipate, whether as a result of competition, pricing sensitivities, product obsolescence, technological change . . . our business, results of operations and prospects will be harmed."); Webb Decl. Ex. 1 at 20 ("Our sales cycles can be long, unpredictable and vary seasonally . . . . Large individual sales have, in some cases, occurred in quarters subsequent to those we anticipated, or have not occurred at all."); Webb Decl. Ex. 1 at 23 ("The introduction of third-party solutions embodying new technologies and the emergence of new industry standards . . . could make our existing and future software offerings obsolete and unmarketable.").  Given these risk disclosures, Plaintiffs have not plausibly alleged that Pivotal violated Item 105 for failing to discuss "the most significant factors that make the Offering risky or speculative and that each risk factor adequately describe the risk."  See CAC ¶ 167(b).

   For the foregoing reasons, the Court DISMISSES Plaintiffs' §§ 11 and 12(a)(2) claims without prejudice, as Plaintiffs indicated at the motion hearing that they could plead additional facts demonstrating falsity.  Importantly, amendment as to some of the challenged statements (e.g., corporate puffery) would be futile for the reasons explained above.

### 2.    Section 15 Claim

   To state a claim against a control person under Section 15 of the Securities Act, Plaintiffs must plausibly allege (1) an underlying violation of Section 11 or 12, and (2) control.  See 15 U.S.C. § 77o; In re Rigel Pharm., Inc. Sec. Lit., 697 F.3d 869, 886 (9th Cir. 2012).  Because Plaintiffs have not plausibly alleged an underlying violation of Section 11 or 12, Plaintiffs' Section 15 claim is DISMISSED with leave to amend.

### C.    Exchange Act Claims

   Plaintiffs also bring claims under Sections 10(b) and 20(a) of the Exchange Act. CAC ¶¶ 323, 332–37.  Plaintiffs allege that Pivotal Defendants made false and materially misleading statements and omissions throughout the class period, which artificially inflated or maintained Pivotal's securities price and "operated as a fraud or deceit on all

United States District Court
Northern District of California

15

1    persons and entities who purchased or otherwise acquired those securities during the Class

2    Period." CAC ¶ 226.

3        In addition to satisfying Rule 8's plausibility requirement, claims for fraud must

4    meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party

5    "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud

6    or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires . . . an account of the time, place,

7    and specific content of the false representations as well as the identities of the parties to the

8    misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal

9    quotation marks omitted). This standard "applies to all elements of a securities fraud

10   action, including loss causation." Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,

11   774 F.3d 598, 605 (9th Cir. 2014).

12       Securities fraud claims must also meet the heightened pleading requirements of the

13   Private Securities Litigation Reform Act ("PSLRA"), which states that the complaint

14   "shall specify each statement alleged to have been misleading, the reason or reasons why

15   the statement is misleading, and, if an allegation regarding the statement or omission is

16   made on information and belief, the complaint shall state with particularity all facts on

17   which that belief is formed." 15 U.S.C. § 78u-4(b)(1); Tellabs, 551 U.S. at 321. The

18   Court must dismiss any complaint that does not meet these requirements. See

19   15 U.S.C. § 78u-4(b)(3)(A).

20       The PSLRA also requires Plaintiffs to state with particularity facts giving rise to a

21   strong inference of the defendants' scienter. See 15 U.S.C. § 78u-4(b)(2). "[A]n inference

22   of scienter must be more than merely plausible or reasonable—it must be cogent and at

23   least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S.

24   at 314. Therefore, a court "must consider plausible, nonculpable explanations for the

25   defendant's conduct." Id. at 324. "Where pleadings are not sufficiently particularized or

26   where, taken as a whole, they do not raise a 'strong inference' that misleading statements

27   were knowingly or deliberate recklessness [sic] made to investors, a private securities

28   fraud complaint is properly dismissed under Rule 12(b)(6)." Ronconi v. Larkin,

United States District Court
Northern District of California

253 F.3d 423, 429 (9th Cir. 2001).

### 1.     Section 10(b) and Rule 10b-5

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act, a plaintiff must plead: (1) a misrepresentation or the use or employment of any manipulative or deceptive device or contrivance; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).  "SEC Rule 10b-5 implements [Section] 10(b) by declaring it unlawful: '(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'"  Tellabs, 551 U.S. at 318 (quoting 17 CFR § 240.10b-5).

Pivotal moves to dismiss the Section 10(b) claim on the grounds that the CAC (a) fails to plead facts sufficient to establish that any defendant made a false or materially misleading statement, and (b) fails to plead facts giving rise to a "strong inference" of scienter.  MTD at 5, 12.

### a.     False or Materially Misleading Statement

To prevail on a Section 10(b) claim, Plaintiffs must show that the defendant made a statement that was "misleading as to a material fact."  Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988) (emphasis omitted).  A complaint satisfies the materiality requirement when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Id. at 231–32.  The PSLRA "has exacting requirements for pleading 'falsity,'" which include pleading "specific facts" that indicate "the misleading nature of the statements when made."  Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir. 2008); Ronconi, 253 F.3d at 432, 434.

Moreover, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." <u>Matrixx Initiatives, Inc. v. Siracusano,</u> 563 U.S. 27, 44 (2011).  Disclosure is required only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." <u>Id.</u> (citing 17 C.F.R. § 240.10b-5(b); <u>Basic</u>, 485 U.S. at 239 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.")).  "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." <u>Matrixx</u>, 563 U.S. at 45.  These rules "prohibit only misleading and untrue statements, not statements that are incomplete."  <u>Rigel</u>, 697 F.3d at 880 n.8.

The CAC recites pages of excerpts from four financial earnings calls and one conference to support its 10(b) and Rule 10b-5 claims, bolding and italicizing the more than forty allegedly misleading statements within these transcripts. CAC ¶¶ 226–33; 240–48; 254–59; 264–66; 268–80.  It nowhere lists each challenged statement and provides an explanation as to why it is misleading—if Plaintiffs amend, they should do so.

After a careful review of every alleged false statement or omission in the CAC, the Court finds that Plaintiffs failed to plead specific facts indicating why each of Pivotal's statements were false when made.  The CAC instead provides a conclusory litany of reasons for the statements' falsity that are insufficiently supported by vague accounts from seven CWs.  Additionally, many statements are not actionable because they are either statements of corporate optimism or forward-looking statements protected by the PSLRA's Safe Harbor.

### i.      Plaintiffs Fail to Show That Any Statement Was False or Misleading When Made

Although Plaintiffs did not arrange them as such, for the sake of organization, the statements can be roughly categorized as statements concerning (i) Pivotal's competition, customer growth, and financial metrics, (ii) product offerings, and (iii) opinions.  Plaintiffs

United States District Court
Northern District of California

allege that over the Class Period, Pivotal made false and misleading statements that "created an impression of a state of affairs . . . that differed in a material way from the one that actually existed" because Pivotal failed to disclose increasing competition, problems with its sales execution (resulting in lengthening sales cycles, diminished customer growth, and decreasing deferred sales growth), the quality and obsolescence of its products, and employee attrition issues. See CAC ¶¶ 14, 16, 226, 238. To support their allegations, Plaintiffs again rely on statements from CWs that describe Pivotal's internal business state before the IPO and throughout the Class Period.

### (i) Statements Regarding Pivotal's Sales Cycles, Competition

Plaintiffs challenge Pivotal's statements regarding its sales cycles and "high-growth market," CAC ¶¶ 230, 247, 266 268, 272, 274, as well as statements concerning Pivotal's customer growth and competition, id. ¶¶ 228–29, 232, 240–42, 244, 246, 248, 255–56, 264. Plaintiffs also emphasize that the several remarks made by Defendants Mee and Gaylor on Pivotal's March 2019 earnings call—including that there were "no specific anomalies [in Pivotal's deferred revenue or elongation of contract terms] to point out"— were "most shocking" because this was "in the months prior to the 'train wreck' of an earnings announcement." Id. ¶ 278; Opp'n at 3; see also id. ¶¶ 268, 270–72, 274–75, 277, 279–80 (statements on Pivotal's sales cycle, customer growth, and financial metrics made during the March 2019 earnings call). All of these statements were allegedly misleading because Pivotal was "already experiencing lengthening sales cycles and diminished growth" as a result of increased competition and decreased demand. E.g., id. ¶ 238. Plaintiffs support this claim by pointing to CW accounts that describe Pivotal's competitive market and internal sales strategy. See e.g., id. ¶¶ 106, 108, 110, 112.

However, even with the inclusion of the CW accounts, the allegations are much like those rejected by In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1086 (9th Cir. 2002). There, the plaintiffs alleged that software company Vantive misled investors by stating that its sales cycle "was holding steady at 3–6 months" when they were actually "lengthening

19

1    substantially."  Id.  The Ninth Circuit noted that the complaint gave "no indication of what

2    it means for a sales cycle to lengthen 'substantially,' or what the actual length of the cycle

3    was at the time of the statement."  Id.  Here, although Plaintiffs provide CW reports that

4    supposedly back their claim, the CAC never provides "the actual length of the cycle," nor

5    does it plead anything beyond vague assertions from former employees that Pivotal faced

6    sales and customer growth issues due to "pricing and competition," that new business did

7    not accumulate "as expected," that leadership "only pursued business with large

8    customers," and that Pivotal's sales strategy consisted of getting "customers to commit to a

9    suite of Pivotal's products" although there were mixed messages "internally regarding

10   what product to sell."  Vantive, 283 F.3d at 1086; CAC ¶¶ 105–06, 108, 110, 116, 118.

11        Plaintiffs also do not allege any specific facts regarding Pivotal's "increased

12   competition" or anything inconsistent with the risk disclosures that Pivotal included in its

13   quarterly reports, which cautioned that "Pivotal operated in a 'highly competitive

14   industry.'"  CAC ¶ 238; MTD at 7.

15        None of these claims contain the sufficient particularity required by the PSLRA to

16   indicate that Pivotal's statements "affirmatively create[d] an impression of a state of affairs

17   that differ[ed] in a material way from the one that actually exist[ed]."  See Intuitive

18   Surgical, 759 F.3d at 1061 (citation omitted).  Moreover, the caselaw cited by Plaintiffs

19   that meets this requirement involves omissions beyond failing to disclose internal sales

20   tactics and competitive trends.  Opp'n at 10; see Schueneman v. Arena Pharms., Inc.,

21   840 F.3d 698, 705–06 (9th Cir. 2016) (holding statement about company's confidence in

22   FDA approval based on "all" animal studies when a rat study indicated the drug could be

23   carcinogenic was misleading); Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987

24   (9th Cir. 2008) (noting that touting company's order backlog without disclosing it

25   consisted of a stop-work order, which "signals a heightened risk that the company never

26   will earn the money" from that contract was misleading); see also Khoja v. Orexigen

27   Therapeutics, Inc., 899 F.3d 988 (9th Cir. 2018) (finding misrepresentation where

28   company reported clinical trials as "ongoing" but specific factual allegations showed trials

United States District Court
Northern District of California

had been halted).

Here, Plaintiffs' allegations and the underlying CW accounts merely suggest that Pivotal did not provide a more fulsome report on its competitive landscape, sales strategy, and financial outlook. As the Supreme Court held in Matrixx, there is no affirmative duty to disclose "any and all material information." 563 U.S. at 44–45. See also Intuitive Surgical, 759 F.3d at 1061 ("We have expressly declined to require a rule of completeness for securities disclosures because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'") (quoting Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir 2002)).

"[I]n order to survive a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), the [CAC] must specify the reason or reasons why the statements made . . . were misleading or untrue, not simply why the statements were incomplete." Brody, 280 F.3d at 1006; 15 U.S.C. § 78u–4(b)(1); see also Ronconi, 253 F.3d at 429. As Pivotal Defendants note, nothing in the challenged statements affirmatively created an impression that Pivotal did not have "long, varying sales cycles, competition, attrition, or face challenges." MTD at 8 (citing App'x B). Thus, Plaintiffs' claims challenging the statements regarding Pivotal's sales, customer growth, and competition fail.

**(ii) Statements Regarding Pivotal's Product Offerings**

A majority of the allegedly false or misleading statements in the CAC concern Pivotal's products. CAC ¶ 228 ("[We] have a differentiated multi-cloud platform"); id. ¶ 231 ("PKS [is] expanding both the addressable workloads for our existing platforms"); id. ¶ 232 ("[We] now offer PKS, which is comparable to OpenShift and it's offered within the PCF platform. And the platform allows customers to run those workloads anywhere, in on-prem or off-prem"); id. ¶ 245 ("PKS expands our ecosystem quite a bit"); id. ¶ 246 ("I think with PCF [offering] a single platform with a consistent application runtime for all of

these different things, the cloud-native applications and legacy workloads and one platform essentially that can provide for the major workload abstraction, apps, containers and functions. . .”); id. ¶ 264 (“PKS is very differentiated from that product in terms of a security, the embedded networking, the constantly updated Kubernetes, constant compatibility there . . . Kubernetes is continuously updating and having new releases and we're keeping up with that”).  The CAC also challenges many statements made about PKS as it related to customer growth, specifically concerning the product's adoption among existing customers and customer pipeline.  See, e.g., id. ¶ 243 (“PKS ‘had been a driver not only of new logos coming to Pivotal but also existing customers kind of buying new products.’”); see also id. ¶¶ 230–31, 242–43, 245, 257, 264–66, 274.

Plaintiffs contend that these statements failed to disclose, among other things, Pivotal's “disjointed product mix,” which could not satisfy its enterprise customer's needs, and that its PKS offering both “had a number of undisclosed drawbacks” (including a lack of “key automation features”) and rendered its primary PAS offering “increasingly obsolete.”  Id. ¶ 238.  Again, Plaintiffs assert that these statements are misleading because of the facts asserted in the CW accounts.  Id.

However, none of the CW reports sufficiently allege that any of Pivotal's statements were false or materially misleading at the time they were made.  With regards to the challenged statements about Pivotal's products, the CWs report that “PAS was the Company's main product that larger customers liked” and “Pivotal developed PKS specifically because the Company knew that Kubernetes was causing decreased interest in Pivotal's Cloud Foundry (PAS platform)” do not contradict or render misleading any of the earnings call remarks.  Id. ¶¶ 106, 111.  CW-3's conclusory assertions that Pivotal's product was “inflexible,” “monolithic” and “difficult to implement” are likewise insufficient.  Id. ¶ 119; see Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009), as amended (Feb. 10, 2009) (rejecting as insufficient CW accounts that “allege conclusory assertions”); Daou, 411 F.3d at 1015 (articulating the pleading standard for reliance on confidential witnesses).

United States District Court
Northern District of California

The CW reports regarding PKS merely indicate that Pivotal was "late to the Kubernetes game" and although the market for PKS was "larger," it "did not develop as hoped." E.g., CAC ¶¶ 118, 121. In fact, portions of the CW statements arguably corroborate some challenged statements. Compare id. ¶ 121 ("customers were asking 'more and more for Kubernetes'") with id. ¶ 245 ("We're starting to see a lot of customers coming in, wanting to buy PKS, wanting an enterprise Kubernetes solution").

The statements from CW-5, identified as a former Senior Federal Account Sales Manager, indicate that the government team "did not sell a lick" of PKS and that overall there was "not a lot of PKS sold." Id. ¶ 123; see id. ¶ 102. CW-5 does not provide any dates for this assertion (although CW-5 was only tenured from February 2018–November 2018). See id. ¶ 102. This limited nine-month window only overlaps with two of the earnings calls containing allegedly false and misleading statements. Further, the CAC, which narrowly defines CW-5's responsibilities as "'hunting [and] prospecting' potential Federal clients," fails to describe this witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess" information regarding the "overall" sales and customers of PKS. See Daou, 411 F.3d at 1015; CAC ¶ 102; see also Zucco, 552 F.3d at 995.

The CAC also adds that CW-4, an Executive Assistant and Office Manager, "confirmed hearing the customers did not want Pivotal's new product, PKS." CAC ¶ 124. When confidential witnesses report only unreliable hearsay or allege conclusory assertions, these allegations are insufficient. See Zucco, 552 F.3d at 996; see also Daou, 411 F.3d at 1015. For these reasons, Plaintiffs' claims challenging the statements regarding Pivotal's products and PKS customers also fail.

### (iii)      Opinion Statements

Plaintiffs allege that many of Pivotal's opinion statements contained materially misleading facts or were false and misleading because they failed to disclose material facts. See, e.g., CAC ¶¶ 226, 238. The Court has already analyzed any opinion statements that contain objectifiable statements of fact in the above sections. See supra Sections

United States District Court
Northern District of California

United States District Court
Northern District of California

III.C.1.a.i.(i), III.C.1.a.i.(ii).  The remaining opinion statements throughout the Class

Period include expressions such as "we remain excited about Pivotal's opportunity," "we

feel like we are unmatched in the market," "feeling very good about the number of new

customers and logos," "feeling pretty optimistic about the pipeline," and "we're

comfortable with current [revenue] expectations."  CAC ¶¶ 240, 242–43, 246, 258–59,

275; accord id. ¶¶ 244, 265, 273–74, 277, 279–80; see also id. ¶ 229 ("[W]e think we're at

the leading edge of really the technology to expand with customers"); id. ¶ 232 ("[W]e

think it's good to have multiple players in the market. And we think there's plenty of room

for competition, and that's good for innovation."); id. ¶ 240 ("[W]e feel like we're

unmatched in the market by any of the competitive solutions"); id. ¶ 255 ("Overall, we

think the challenging landscape is a long-term positive for Pivotal . . . I think we have a

good position in the marketplace here."); id. ¶ 264 ("We think there is a lot of

differentiation there, but there's also a lot of emerging technologies in the market, and so

we think customers . . . are really sorting through the emerging technologies . . . ."); id.

¶ 276 ("[W]e think that PKS has the best enterprise Kubernetes offering . . . . It's probably

the strongest in the market.").

Several other statements are opinions related to Pivotal's financial projections.  Id.

¶ 243 ("Overall, we are pleased with our . . . outlook for the remainder of the year."); id.

¶ 244 ("I think we're feeling good about our second half of the year and our pipeline . . .

and that's reflected in our guidance that we gave today."); id. ¶ 258 ("[W]e're comfortable

with current expectations on deferred revenue for Q4."); id. ¶ 259 ("Looking ahead to Q4,

we are comfortable with the current expectations for short-term and total deferred revenue

and expect both of these metrics to increase compared to Q3."); id. ¶ 273 ("[W]e think [our

guidance] . . . is reasonable for the year.").

When Plaintiffs assert an omissions theory, as here, see Opp'n at 10–12, they must

"identify particular (and material) facts going to the basis for the issuer's opinion—facts

about the inquiry the issuer did or did not conduct or the knowledge it did or did not

have—whose omission makes the opinion statement at issue misleading to a reasonable

24

person reading the statement fairly and in context." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 194 (2015); accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 616–18 (9th Cir. 2017) (same rule for § 10(b) claims).

The CAC contains no allegations of subjective falsity—Plaintiffs have not alleged any facts to demonstrate that Pivotal Defendants did not hold their stated beliefs. Nor does the CAC plead sufficient facts to allow an inference of subjective falsity. The handful of CW reports do not demonstrate with any particularity that the alleged trends were generalizable across the company, nor do they suggest that Pivotal Defendants "must have known" that their statements were misleading. See Dearborn Heights, 856 F.3d at 618. For a further explanation of Plaintiffs' allegations regarding Pivotal Defendants' mental states and knowledge, see the discussion infra Section III.C.1.b.

Moreover, an opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because opinions "rest on a weighing of competing facts." Omnicare, 575 U.S. at 189. Plaintiffs also fail to adequately allege that Pivotal's statements were made misleading because the CAC fails to mention how Pivotal Defendants formed their opinions. See discussion supra Sections III.C.1.a.i.(i), III.C.1.a.i.(ii). This is especially true given the context in which the statements were made: namely, that Pivotal's increasing revenue and growing customer bases supported Pivotal's optimistic statements. See MTD at 2. Further, Pivotal disclosed risk factors that curbed these statements. See Webb Decl. Ex. 2 at 18, 24–29, 35–36; Webb Decl. Ex. 3 at 27–33, 40–41; Webb Decl. Ex. 4 at 27–34, 42; Webb Decl. Ex. 5 at 11–17, 25.

### ii.     Expressions of Corporate Optimism Are Not Actionable

Defendants argue that many of the challenged statements constituted puffery, which multiple courts have held is not actionable. MTD at 10–11. See cases cited supra Section

III.B.1.b; see also Apollo, 774 F.3d at 606–07 (finding subjective statements preceded by qualifiers to be "business puffery").

Statements classifying Pivotal's products and business as "uniquely position[ed]," "strong across sectors," "best-in-class," and "industry-leading" are not actionable because they "represent the 'feel good' speak that characterizes 'non-actionable puffing.'" Id. ¶¶ 242, 266, 274, 288; see Intuitive Surgical, 759 F.3d at 1060 (citing Cutera, 610 F.3d at 1111). The Court therefore concludes that they are unactionable statements of corporate puffery, and should not be included in any amended complaint.

### iii.    Forward-Looking Statements Are Not Actionable

Many of the statements Plaintiffs challenge are not actionable because they are forward-looking statements.  The PSLRA carves out a safe harbor from liability for statements that are identified as "forward-looking" and are "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)(i).  A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues."  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003).  "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  Cutera, 610 F.3d at 1112.  A projection may contain an implied factual misstatement where (1) the speaker does not actually believe the statement, (2) there is no reasonable basis to believe the statement is true, or (3) the speaker is aware of undisclosed facts that seriously undermine the statement's accuracy.  Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996).

Plaintiffs claim that Pivotal's statements were not forward looking but "false and misleading statements for failing to disclose present and historical facts."  Opp'n at 12.

26

While some courts have held that omissions of known prior fraudulent acts do not fall within the safe harbor provisions, see, e.g., In re Celera Corp. Sec. Litig., No. 5:10-CV-02604 EJD, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013), others have rejected this reasoning, see, e.g., Kipling v. Flex Ltd., No. 18-CV-02706-LHK, 2020 WL 2793463, at *12 (N.D. Cal. May 29, 2020); see also Cutera, 610 F.3d at 1112.  Regardless, Plaintiffs have not established that Pivotal omitted or misstated material facts.  See discussion supra Sections III.C.1.a.i.(i), III.C.1.a.i.(ii).

Accordingly, Pivotal's statements are only actionable if they are not forward-looking or are unaccompanied by meaningful cautionary statements.  See 15 U.S.C. § 78u-5(c)(1)(B); Provenz, 102 F.3d at 1493.  The Court concludes that many of the challenged statements are forward-looking and are accompanied by the requisite cautionary language, so they are not actionable.

Some of Pivotal's representations "fall solidly within the category of forward-looking statements regarding plans and objectives for future operations."  See Wochos v. Tesla, Inc., No. 17-CV-05828-CRB, 2018 WL 4076437, at *5 (N.D. Cal. Aug. 27, 2018) (holding as forward-looking a company's statement that it was "on track" to achieve its production goal) (citing Joint Council Pension Trust Fund, 320 F.3d at 936); see, e.g., CAC ¶ 228 ("[We] will continue to focus on adding new customers and expanding existing customers across sectors."); id. ¶ 256 ("We remain focused on executing for the long-term, driving innovation and customer satisfaction as we broaden our portfolio of differentiated offerings"); id. ¶ 272 ("[W]e will continue to drive top line growth and operating leverage across the company.  We are still in the early stages of executing against our long-term vision in this high growth market . . . .").

Many others are forward-looking statements regarding Pivotal's future economic performance, or assumptions underlying its future economic performance.  CAC ¶ 229 ("[W]e're expecting [our net expansion rate] to come down"); accord id.  ¶ 271; see id. ¶ 230 ("[W]e think we'll see our marketplace expand with PKS as well, and we're going to continue to press on that."); id. ¶ 245 ("So I think it terms of new logos, we're going to see

27

continued improvement."); <u>id.</u> ¶ 245 ("I think [Pivotal's ecosystem expansion is] going to be very helpful going forward"); <u>id.</u> ¶ 265 ("[W]e're looking for that momentum to continue to build and translate to top line growth"); <u>id.</u> ¶ 274 ("[W]e expect to see continued growth in these very large accounts as they seek to modernize the applications that run their businesses."); <u>id.</u> ¶ 274 ("We are enthusiastic about the market opportunity and positioning and are confident [we] will continue to drive strong growth through fiscal '20."); <u>id.</u> ¶ 277 ("[W]e expect our existing customers to continue to expand their footprint with PKS."); <u>see</u> <u>Intuitive Surgical</u>, 759 F.3d at 1059 ("these responses during the analyst calls relate to future economic performance or assumptions underlying those projections").

Plaintiffs argue in the alternative that these forward-looking statements were not accompanied by meaningful cautionary language, but rather insufficient "boilerplate risk disclosures." Opp'n at 12. Cautionary language is adequate under the PSLR if it identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement." <u>See</u> 15 U.S.C. § 78u-5(c)(1)(A)(i). The cautions Pivotal provided addressed the very subjects Plaintiffs challenge. <u>See</u> MTD at 9 (citing App'x B at 1, 2). Accordingly, the Court finds these forward-looking statements not actionable, and they should not be included in any amended complaint.

### b.    Scienter

Plaintiffs' Exchange Act claims fail for an additional reason: the CAC does not adequately allege scienter. A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter. <u>See</u> 15 U.S.C. § 78u–4(b)(2)(A); <u>Tellabs</u>, 551 U.S. at 321. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs</u>, 551 U.S. at 308. To demonstrate scienter, a complaint must allege that the defendants made "false or misleading statements either intentionally or with deliberate recklessness." <u>See</u> <u>Zucco</u>, 552 F.3d at 991; <u>Ronconi v. Larkin</u>, 253 F.3d 423, 432 (9th Cir. 2001). "[M]ere recklessness or a motive to commit fraud" is not enough. <u>Reese v. Malone</u>, 747 F.3d 557, 569 (9th Cir. 2014), <u>overruled on other grounds</u>

by <u>Dearborn Heights</u>, 856 F.3d at 616.  Rather, the complaint must allege "a highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  <u>See</u> <u>Zucco</u>, 552 F.3d at 991.  The court must "assess all the allegations holistically," not "scrutinize each allegation in isolation."  <u>Tellabs</u>, 551 U.S. at 326.  Courts in the Ninth Circuit sometimes conduct a dual inquiry, which first considers "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter."  <u>VeriFone Holdings</u>, 704 F.3d at 702.  If not, the court asks whether the individually inadequate allegations suffice when considered as a whole.  <u>Id.</u>

The CAC points to a number of bases for a strong inference of scienter, including (1) CW statements that "confirm" that Pivotal tracked their competition and that describe internal business strategy and difficulties, (2) the close proximity between the alleged false and misleading statements and materialization of the risk on June 4, 2019, (3) Pivotal stating in calls and filings that their subscription business model provided for "quite a bit of revenue visibility," and (4) the core operations doctrine.  CAC ¶ 313.  The Court addresses why each scienter allegation individually fails, and it then considers whether the claims, taken together as a whole, create a strong inference of scienter.

### i.      The Confidential Witnesses Statements Do Not Give Rise to a Strong Inference of Scienter

The CAC relies on statements from CWs to plead the requisite mental state.  A complaint relying on such statements to establish scienter must satisfy a two-part test to meet the PSLRA pleading requirements: (1) CWs must be described with sufficient particularity to establish reliability and personal knowledge, and (2) CW statements must themselves be indicative of scienter.  <u>Zucco</u>, 552 F.3d at 995; <u>see also</u> <u>Daou</u>, 411 F.3d at 1015.  Neither the CW accounts that "confirm" that Pivotal tracked its competition nor the CW statements describing Pivotal's internal business state satisfy this test because none of

the statements themselves are indicative of scienter.

The CAC relies on statements from CWs (all of whom were at least two reporting levels removed from the Pivotal Defendants, see CAC ¶¶ 98–104; MTD at 13) that indicate the existence of meetings and reports to establish scienter.  For example, CW-1 indicated that Senior Director of Revenue Accounting Tracy Thompson, who reported directly to Gaylor and kept her apprised of revenue, tracked competition and "would have been aware of and possibly tracking Pivotal's RPO."  CAC ¶ 219.  CW-1 noted that Thompson took a "heavy part" in weekly pipeline calls and "only sometimes attended" bi-weekly sales forecasting meetings.  Id. ¶¶ 221–22.  CW-4 stated that "reports on sales were given to senior executives at Pivotal on a weekly basis and that weekly meetings . . . occasionally includ[ed] CEO Robert Mee and CFO Cynthia Gaylor."  Id. ¶224.  CW-7 likewise asserted that "everything" was tracked in the Salesforce database and executives "received reports generated from Salesforce."  Id. ¶ 225.  General allegations of Pivotal Defendants' "interaction with other officers and employees, their attendance at meetings, and their receipt of weekly or monthly reports are insufficient" to create an inference of scienter "more cogent or compelling than an alternative innocent inference."  Daou, 411 F.3d at 1022; Zucco, 552 F.3d at 999; see also Intuitive Surgical, 759, F.3d at 1062 (rejecting scienter claims relying on "the impressions of witnesses who lacked direct access to the executives but claim that the executives were . . . familiar with the contents of the software-generated reports because the substance of the reports was discussed in meetings.").

The CW accounts of Pivotal's sales execution allegedly illustrate that there were issues with customer expansion due to increased competition and a poor sales strategy, which targeted larger clients and prioritized selling PAS (Pivotal's main but increasingly outdated product) rather than PKS (the newer product that incorporated the industry standard, Kubernetes).  See CAC ¶¶ 105–19; see also id. ¶ 238.  Plaintiffs allege that when Pivotal shifted its focus to PKS, the market for the product did not robustly develop.  See id. ¶¶ 120–25.  Two CWS also briefly explain aspects of internal reporting methods.  See

1     id. ¶ 216 (for revenue recognition purposes contract start dates had "three months 'leeway'

2     or wiggle room"); id. ¶ 218 (sales projections were "routinely modified by his higher ups"

3     to show the new focus on selling PKS).  However, this narrative does not satisfy the

4     second prong.  An unsuccessful sales strategy and disagreement within the company over

5     its approach to selling PKS does not support an allegation that Pivotal was deliberately

6     reckless.  See Zucco, 552 F.3d at 998.

7                              ii.        Proximity to Lowered Guidance and RPO Metrics

8                                         Do Not Give Rise to a Strong Inference of Scienter

9           The proximity of Pivotal's March earnings statements to its later revised going-

10    forward guidance does not indicate that the March statements were false when made. Here,

11    Plaintiffs are simply alleging fraud by hindsight.  It is well-settled in the Ninth Circuit that

12    "fraud by hindsight is not actionable" and "honest optimism followed by disappointment is

13    not the same as lying or misleading . . . ."  Ronconi, 253 F.3d at 430 n.12, 432.

14          Plaintiffs also challenge Pivotal's statements that its RPO provided "quite a bit of

15    revenue visibility."  CAC ¶ 313 (citing id. ¶¶ 66, 239, 248, 279).  As discussed above,

16    Plaintiffs fail to show why this statement was false, and it is not clear why this would

17    plausibly allege scienter.

18                            iii.        The Core Operations Doctrine Does Not Apply

19          Under the core operations doctrine, a court can infer scienter if the fraud is based on

20    facts "critical to a business's core operations," such that the company's key officers would

21    know of those facts.  S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783–84 (9th Cir. 2008)

22    (internal quotation marks omitted).  Courts applying the core operations doctrine have

23    required Plaintiffs to plead "details about the defendants' access to information within the

24    company" related to the fraud.  Id. at 785.  For example, in Daou, the plaintiffs

25    successfully relied on the core operations doctrine where the complaint included specific

26    allegations that the defendants manually adjusted the data that was the subject of the

27    allegedly false statements and personally directed the accounting violations.  411 F.3d at

28

1022–23.  Similarly, in <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp.</u>, 380 F.3d

1226 (9th Cir. 2004), the plaintiffs relied on the core operations doctrine to demonstrate a

CEO's scienter as to false statements regarding the company's sales, where the CEO stated

that: "All of our information is on one database.  We know exactly how much we have

sold in the last hour around the world."  <u>Id.</u> at 1231.

The situation here is different.  Unlike <u>Daou</u> and <u>Nursing Home</u>, the CAC alleges

that Pivotal Defendants had generalized access to sales reports and "occasionally" sat in on

regular meetings.  <u>See</u> sources cited <u>supra</u> Section III.C.1.b.i; <u>see also</u> <u>Webb v. Solarcity</u>

<u>Corp.</u>, 884 F.3d 844, 857 (9th Cir. 2018); <u>Intuitive Surgical</u>, 759 F.3d at 1062 (holding that

proof under the core operations doctrine "is not easy," and requires "either specific

admissions by one or more corporate executives of detailed involvement in the minutia of

a company's operations, such as data monitoring, or witness accounts demonstrating that

executives had actual involvement in creating false reports"); <u>Zucco</u>, 552 F.3d at 1000

(finding "allegations that senior management . . . closely reviewed the accounting numbers

generated . . . each quarter . . . and that top executives had several meetings in which they

discussed quarterly inventory numbers" insufficient to establish scienter).

For the foregoing reasons, it would not be "'absurd' to suggest that management

was without knowledge" of these sales cycle delays and increased competition.  Opp'n at

14–15; <u>S. Ferry</u>, 542 F.3d at 786.  The Court concludes that Plaintiffs have not alleged any

facts supporting the inference that Pivotal had knowledge of core facts and made its

statements with fraudulent intent or deliberate recklessness.  <u>See</u> <u>Webb</u>, 884 F.3d at 857.

### iv.     Considering the Complaint in Its Entirety Does Not Give Rise to a Strong Inference of Scienter

Although none of the CAC's allegations is individually compelling to survive the

PSLRA scienter pleading requirements, the Court must also "consider the complaint in its

entirety" to determine if "all of the facts alleged, taken collectively, give rise to a strong

inference of scienter" that is "at least as compelling as an alternative innocent

1    explanation." Tellabs, 551 U.S. at 322–23; Zucco, 552 F.3d at 1006.

2           Pivotal points out that Plaintiffs do not "offer any coherent theory of fraud," and the

3    absence of any individual Defendant's personal profit further undermines the scienter

4    allegations.  MTD at 14.  While Plaintiffs accurately point out that a "lack of stock sales"

5    is not dispositive as to scienter, Opp'n at 15 (citation omitted), the Ninth Circuit has held

6    that an absence of malicious gains does indeed "detract from a scienter finding." Webb,

7    884 F.3d at 856; In re Rigel Pharm., Inc. Sec. Lit., 697 F.3d 869, 884–85 (9th Cir. 2012).

8           Taking all of the CAC's allegations into consideration, together they still do not

9    produce an inference that is as cogent or compelling as an alternative: explicitly, even

10   though Pivotal faced competitive challenges and strategical disagreements, there was no

11   specific intent to deceive investors.  A fall in Pivotal's stock price does not alone constitute

12   fraud.  See In re Lexar Media Sec. Litig., 2005 WL 1566534, at *3.  The Court therefore

13   concludes that on the whole, Plaintiffs' narrative of fraud "is simply not as plausible as a

14   nonfraudulent alternative." See Webb, 884 F.3d at 858 (citing ESG Capital Partners,

15   LP v. Stratos, 828 F.3d 1023, 1035 (9th Cir. 2016)).

16          For the reasons explained above in Sections III.C.1.a and III.C.1.b, the Court

17   DISMISSES Plaintiffs' § 10(b) claim with leave to amend, as Plaintiffs indicated at the

18   hearing that they could plead additional facts demonstrating scienter.  Statements that are

19   not actionable should not be included in any amended complaint.

20          **2.      Section 20(a)**

21          Section 20(a) of the Exchange Act provides a right of action against any person

22   "who violates any provision of this chapter or the rules or regulations thereunder by

23   purchasing or selling a security while in possession of material, nonpublic information."

24   15 U.S.C. § 78t-1(a).  To plead a Section 20(a) claim, Plaintiffs must allege "a predicate

25   insider trading violation of the Exchange Act." In re Volkswagen "Clean Diesel" Mktg.,

26   Sales Practices, & Prods. Liab. Litig., 328 F. Supp. 3d 963, 987 (N.D. Cal 2018).  To

27   establish this claim under Securities Exchange Act Section 20(a), Plaintiffs must show

28

United States District Court
Northern District of California

1   (1) "a primary violation of federal securities law," and (2) that the defendant exercised

2   actual power or control over the primary violator."  See Zucco, 552 F.3d at 990 (internal

3   quotations omitted).  Because Plaintiffs fail to state a claim under Section 10(b), their

4   "control person" claim against Pivotal is therefore DISMISSED with leave to amend.

5   **IV.    CONCLUSION**

6        For the foregoing reasons, the Court GRANTS Pivotal's motion to dismiss with

7   leave to amend.  Any statements that are not actionable and cannot be amended around

8   (e.g., puffery and forward-looking statements) should not be part of any amended

9   complaint.

10       **IT IS SO ORDERED.**

11       Dated: July 21, 2020

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

34